No. 26-6667

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Global Nurse Force, et al.,

Plaintiffs-Appellees,

v.

Donald J. Trump, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California
No. 25-cv-08454 (Gilliam, J.)

EXCERPTS OF RECORD

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

THOMAS VASELIOU
Senior Counsel to the Assistant Attorney General

DAVID J. BYERLEY
Senior Litigation Counsel

ANDREA GARCIA
Law Clerk

JAIME A. SCOTT
Trial Attorney
United States Department of Justice,
Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 305-3620
Email: jaime.a.scott@usdoj.gov

*Attorneys for Defendants-Appellants*

## TABLE OF CONTENTS

Order granting in part, denying in part motion for preliminary injunction (Dkt. No. 130) .................... ER-001–ER-035

Transcript of February 26, 2026 hearing (Dkt. No. 115) ............................................ ER-036–ER-101

Amended complaint (Dkt. No. 74) .................................... ER-102–ER-171

USCIS September 20, 2025 Memorandum (Dkt. No. 46-5) ...........ER-172

CBP September 20, 2025 Memorandum (Dkt. No. 46-6) ...............ER-173

USCIS September 21, 2025 FAQ (Dkt. No. 46-7) ........... ER-174–ER-175

Department of State September 21, 2025 FAQ (Dkt. No. 46-8) ............................................. ER-176–ER-178

USCIS October 20, 2025 Updates (Dkt. No. 46-9) .......... ER-179–ER-181

Notice of appeal (Dkt. No. 132) ........................................ ER-182–ER-188

Docket report ........................................................................ ER-189–ER-237

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GLOBAL NURSE FORCE, et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 25-cv-08454-HSG

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION, AND DENYING MOTION FOR CLASS CERTIFICATION AND MOTION TO DISMISS**

Re: Dkt. Nos. 75, 76, 104

Plaintiffs filed this action in October 2025, challenging Presidential Proclamation 10973, which requires that employers provide a $100,000 payment with each petition H-1B petition they file.[1] Dkt. No. 1. Pending before the Court are several motions: a motion for preliminary injunction brought by a subset of Plaintiffs ("PI Plaintiffs"),[2] Dkt. No. 75; a motion for

[1] Defendants include Donald J. Trump, in his official capacity as the President of the United States; the U.S. Department of Homeland Security ("DHS"); Markwayne Mullin, in his official capacity as the Secretary of Homeland Security; U.S. Citizenship and Immigration Services ("USCIS"); Joseph B. Edlow, in his official capacity as USCIS Director; U.S. Customs and Border Protection ("CBP"); Rodney Scott, in his official capacity as CBP Commissioner; the U.S. Department of State; and Marco Rubio, in his official capacity as Secretary of State. *See* Dkt. No. 74 ("FAC"); *see also* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

[2] These PI Plaintiffs include BAE Industries, a small automotive parts manufacturing company based in Detroit, Michigan; Nephrology Associates of the Carolinas PA, a small medical practice providing kidney care in rural North Carolina; Lower Brule Day School, a K–12 school on a Sioux reservation in rural South Dakota; Global Village Academy Collective ("GVAC"), a nonprofit operating three tuition-free, public charter schools providing second language immersion instruction; and Global Nurse Force, a staffing agency that connects nurses with healthcare facilities worldwide. *See* FAC at ¶¶ 21–23, 33–34; *see also* Dkt. No. 75. The Court notes that Plaintiff Phoenix Doe voluntarily dismissed her case after her H-1B petition and discretionary change of status request was approved. *See* Dkt. No. 100.



United States District Court
Northern District of California

preliminary class certification filed by a subset of employer Plaintiffs, Dkt. No. 76; and a motion to dismiss filed by Defendants, Dkt. No. 104. The Court held a hearing on the motions. *See* Dkt. No. 113. Having carefully considered the parties' arguments and supplemental briefing, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for preliminary injunction; **DENIES** the motion for class certification; and **DENIES** the motion to dismiss.

## I. BACKGROUND

It is important at the outset for the Court to make clear that this case is not about whether the challenged Proclamation is good or bad, or the appropriate policy response to the concerns it describes. These policy questions are the subject of extensive, and often intense, differences of opinion, and this Court cannot—and does not—express any view as to them. The Court considers only the legal questions presented here regarding whether the Proclamation and resulting agency policies exceed the Executive Branch's constitutional and statutory authority.

The Court also acknowledges that it does not decide this motion—or consider this case—in a vacuum. Two other lawsuits have challenged the Proclamation and reached different conclusions. In *Chamber of Commerce v. United States Department of Homeland Security*, the district court for the District of Columbia upheld the Proclamation and its $100,000 fee for H-1B petitions, finding that the President acted within his statutory authority under the Immigration and Nationality Act ("INA") and that the agency's policies implementing the fee did not violate the Administrative Procedure Act ("APA"). 815 F. Supp. 3d 73, 79 (D.D.C. 2025). The case is currently on appeal in the U.S. Court of Appeals for the D.C. Circuit.

In *California v. Mullin*, the district court for the District of Massachusetts recently declared unlawful and vacated the Department of Homeland Security's and the Department of State's policies implementing the $100,000 fee. 833 F. Supp. 3d 50, 60–84 (D. Mass. 2026). The First Circuit later denied the government's request for a stay pending appeal. *See California v. Mullin*, 183 F.4th 42, 46–52 (1st Cir. 2026) ("*Mullin II*"). The agency policies discussed further below are thus currently vacated. This Court is not, however, precluded from considering Plaintiffs' motion and requested relief as the parties in both *Chamber of Commerce* and *Mullin* are pursuing further judicial review. *Cf. Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("As long as the parties have a

concrete interest, however small, in the outcome of the litigation, the case is not moot." (quotation omitted)); *United States v. Mendoza*, 464 U.S. 154, 160 (1984) (discussing the "benefit [the Supreme Court] receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari"); *Am. Encore v. Fontes*, 152 F.4th 1097, 1121 (9th Cir. 2025) ("[N]o authority [] holds that issuing a duplicative injunction is a bar to preliminary injunctive relief."). As *Chamber of Commerce* and *Mullin* illustrate, these are complex legal issues on which reasonable minds have differed. The Court further notes that DHS has proposed a new rule requiring the payment of a $103,265 fee for H-1B petitions. *See* Fee for Certain H-1B Petitions, 91 Fed. Reg. 54,817 (Aug. 25, 2026). And on September 18, 2026, the President issued another proclamation extending Proclamation 10973 for an additional 12 months.[3] *See* Proclamation No. 11069, 91 Fed. Reg. 60,497 (Sept. 18, 2026). This Court accordingly considers the parties' arguments below, with the understanding that the United States Supreme Court is likely to eventually provide further clarity.

### A. The H-1B Visa Program

The Immigration and Nationality Act ("INA") governs the admission of noncitizens into the United States. *See* 8 U.S.C. §§ 1101 *et seq.* To enter the United States, noncitizens must generally present a valid visa or other travel document, such as a passport, and be found admissible upon inspection by an immigration officer at a port of entry. *See* 8 U.S.C. §§ 1181, 1182(a)(7)(A)(i) and (B)(i), 1185(d), 1201(h), 1225(a); *cf. Trump v. Hawaii*, 585 U.S. 667, 694 (2018) (recognizing "the basic distinction between admissibility determinations and visa issuance").

In 1990 Congress established the H-1B visa program, which provides a pathway for American employers to hire skilled, nonimmigrant foreign workers in certain "specialty occupations."[4] *See* 8 U.S.C. § 1101(a)(15)(H)(i)(B); 8 U.S.C. § 1184(i). H-1B visas fall into two

[3] The recent Proclamation states that "without an extension of the 2025 Proclamation, it is highly likely that progress will halt and program abuse will resume, undermining American workers and posing a threat to the labor market that would be detrimental to the interests of the United States." However, it does not appear to substantively change the prior Proclamation or the $100,000 fee.

[4] A "specialty occupation" is one that requires "theoretical and practical application of a body of



United States District Court
Northern District of California

categories: cap-subject petitions and cap-exempt petitions. For "cap-subject" petitions, Congress has set strict numerical limits on the number of H-1B visas available each year (65,000, plus an additional 20,000 for holders of an advanced degree from a United States university). *See* 8 U.S.C. §§ 1184(g)(1)(A)(vii), (g)(5)(C). Because demand for these visas significantly outpaces their availability, USCIS has implemented a lottery. *See* 8 C.F.R. § 214.2(h)(8)(iii)(A). For "cap-exempt" petitions, however, Congress has exempted certain employers, such as universities and nonprofit organizations, from these numerical limits. *See* 8 U.S.C. § 1184(g)(5)(A)–(B).

Before submitting a petition, both cap-subject and cap-exempt employers must file an application with the Department of Labor ("DOL") affirming that they will comply with wage and working condition requirements. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730(d). For example, employers must affirm that they will pay any H-1B employee either the actual wage paid to others with similar experience and qualifications or the prevailing wage for the same occupational classification, whichever is greater. *See* 8 U.S.C. § 1182(n)(1)(i). Employers also are prohibited from bringing in H-1B visa workers during a strike or lockout. *See* 8 U.S.C. § 1182(t)(1)(B). Once DOL certifies the application, the employer may submit an H-1B petition to USCIS. *See* 8 C.F.R. § 214.2(h)(4)(i). Assuming USCIS grants the petition, the employee—if located outside the United States—must apply for an H-1B visa at a U.S. embassy or consulate abroad.[5] *See* 8 U.S.C. §§ 1201(a)(1)(B), 1202(c); 22 C.F.R. §§ 41.53, 41.101. If the employee is already in the United States, the employer may request permission for the employee to change to H-1B status without first leaving the county. *See* 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)–(b).

Congress also created a detailed fee structure for the H-1B visa program. Congress has imposed certain explicit statutory fees. For example, Congress imposed a $1,500 fee on employers for initial petitions. *See* 8 U.S.C. § 1184(c)(9)–(11). The statute halves this fee for employers with 25 or fewer employees and does not apply to cap-exempt employers. *Id.*

---

highly specialized knowledge," and "a bachelor's or higher degree in the specific specialty (or its equivalent." 8 U.S.C. § 1184(i)(1)(A)–(B).

[5] Under the INA, this process is referred to as an "application for admission." *See* 8 U.S.C. §§ 1101(a)(4), (a)(13)(A).

Congress also imposed a "fraud prevention and detection fee" on employers. *See* 8 U.S.C. § 1184(c)(12). The fraud prevention and detection fee is $500. *See* 8 U.S.C. § 1184(c)(12)(C). However, certain high-volume H-1B employers must pay a higher fee (currently $4,000). *See* Consolidated Appropriations Act, 2016 Pub. L. No. 114-113, 129 Stat. 2242 (2015). Congress also permitted DHS to collect "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of providing all such services . . . ." 8 U.S.C. § 1356(m). "Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* Current regulatory H-1B fees include a fee to register for the lottery, file a petition, and subsidize asylum application processing. *See* 8 C.F.R. §§ 106.2(a)(3), (c)(11), (c)(13). At the high end, the regulatory and statutory fees together total $7,595. Employers must pay all statutory and regulatory fees when they file a petition. *See* 8 C.F.R. § 103.2(a)(1); *see also* 20 C.F.R. §§ 655.731(c)(9)(iii)(C), (c)(10)(ii).

### B. Presidential Proclamation 10973

On September 19, 2025, the President signed Proclamation 10973, which requires a supplemental payment of $100,000 for all H-1B petitions.[6] *See* 90 Fed. Reg. 46,027 (Sept. 19, 2025). It became effective two days later, on September 21, 2025, and based on the recent extension it will not expire until September 21, 2027. *See id.* at 46,028; *see also* 91 Fed. Reg. 60,497 (Sept. 18, 2026). The Proclamation states that this payment is necessary to curb "systemic abuse" of the H-1B visa program, which "has undermined both our economic and national security." 90 Fed. Reg. at 46,027.

The Proclamation states that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation [under the H-1B visa program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000 . . . ." *Id.* (Section 1(a)). The Proclamation accordingly directs the Secretary of Homeland Security to "restrict decisions on petitions not accompanied by a $100,000 payment for H-1B specialty

---

[6] The Proclamation is comprised of five sections. Section 1 is entitled "Restriction on Entry"; Section 2 is entitled "Compliance"; and Section 3(a) is entitled "Scope and Implementation on Restriction on Entry." The Court references the relevant—and challenged—provisions below.

occupation workers [] who are currently outside the United States, for 12 months following the effective date of this proclamation." *Id.* at 46,028–29 (Section 1(b)); *see also id.* at 46,029 (Section 3(a) (noting that "[t]he restriction on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter or attempt to enter the United States after the effective date of this proclamation").

The Proclamation directs the Secretary of State to verify payment, and to "approve only those visa petitions for which the filing employer has made the payment . . . ." *Id.* (Section 2(b)). The Secretary of Homeland Security may, however, waive the new payment requirement "if the Secretary of Homeland Security determines, in the Secretary's discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* at 46,029 (Section 1(c)). The Proclamation also directs DHS and the Department State to "coordinate to take all necessary and appropriate action to implement this proclamation and to deny entry to the United States to any H-1B nonimmigrant for whom the prospective employer has not made the payment described in section 1 of this proclamation." *Id.* (Section 2(c)).

The Proclamation explicitly invokes two provisions of the INA as authorization, 8 U.S.C. §§ 1182(f) and 1185(a). *See id.* at 4,6027 (Section 1). Section 1182(f) states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f). The Supreme Court has stated that "[b]y its terms, § 1182(f) exudes deference to the President in every clause." *Hawaii*, 585 U.S. at 684. Section 1185(a), in relevant part, states:

> Unless otherwise ordered by the President, it shall be unlawful—
>
> (1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules,

United States District Court
Northern District of California

> regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.

8 U.S.C. § 1185(a)(1). The President's authority under this section "substantially overlaps" with the President's power under § 1182(f). *Hawaii*, 585 U.S. at 693, n.1.

### C. Implementing the Proclamation

On September 20, 2025, the day after the President signed the Proclamation, USCIS issued a memorandum clarifying that the Proclamation "only applies prospectively to petitions that have not yet been filed." *See* Dkt. No. 46-5, Ex. 4 ("USCIS Memo") (emphasis omitted). The memorandum states that the Proclamation thus "does not apply to aliens who: are the beneficiaries of petitions that were filed prior to the effective date of the proclamation, are the beneficiaries of currently approved petitions, or are in possession of validly issued H-1B non-immigrant visas." *Id.* That same day, CBP in turn issued a memorandum similarly explaining that the Proclamation is prospective, and explaining that USCIS and the Department of State were "instructed to begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only." *See* Dkt. No. 46-6, Ex. 5 ("CBP Memo"). The CBP Memo stated that the Proclamation "does not impact the ability of any current visa holder to travel to or from the United States." *Id.*

On September 21, 2025, the day the Proclamation took effect, both USCIS and the Department of State released "FAQs" regarding the Proclamation. *See* Dkt. No. 46-7, Ex. 6 ("USCIS FAQ"); Dkt. No. 46-8, Ex. 7 ("State Dept. FAQ"). Like the earlier memorandums, the FAQs reiterated that the Proclamation required a $100,000 payment for "new" visa petitions as of September 21, 2026, but did not "[a]pply to any previously issued H-1B visas." *Id.* The FAQs further stated that the payment did not apply to "any H-1B renewals." *See id.* This guidance, however, did not explain how to make the payment or how to seek a national interest exception.

A month later, on October 20, 2025, USCIS updated its guidance. *See* Dkt. No. 46-9, Ex. 8 ("USCIS H-1B Update"). USCIS stated that the Proclamation "applies to new H-1B petitions" filed after the effective date "on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa," and as to beneficiaries inside the United States if "USCIS determines



United States District Court
Northern District of California

that the alien is ineligible for a change of status or an amendment or extension of stay . . . ."[7] *Id.* USCIS directed petitioners to submit the $100,000 through Pay.gov prior to filing a petition with USCIS. *See* USCIS H-1B Update. USCIS also explained that the Secretary of Homeland Security would grant exceptions "in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." *Id.* Such exceptions may be requested by email. *Id.* Collectively, these materials constitute the "Agency Policies" that Plaintiffs challenge here: in short, a one-time payment of $100,000 that is required "on submission" of any "new" H-1B petition filed on or after September 21, 2025. *See* FAC at ¶¶ 11–13, 15, 105–13, 227–52.

## II. PROCEDURAL HISTORY

Plaintiffs initially filed this case on October 3, 2025, Dkt. No. 1, and filed an amended complaint on December 18, 2025, FAC. As discussed further below, Plaintiffs contend that the Proclamation and related Agency Policies have significantly increased the cost of H-1B visa petitions and that they have suffered—or will suffer—harm as a result. Plaintiffs challenge the Proclamation and Agency Policies on several bases, though fundamentally they contend that the President and the agencies lacked the authority to unilaterally impose the new $100,000 fee. *See* FAC at ¶¶ 14–15, 86, 97, 105–113, 227–52. Plaintiffs contend that the President acted *ultra vires*, in excess of his statutory authority; and that the agencies similarly violated the APA by acting in excess of their authority, issuing policies that were arbitrary and capricious, and failing to conduct notice and comment rulemaking before promulgating the policies. *See id.* at ¶¶ 211–52.

As noted above, a subset of Plaintiffs have moved for a preliminary injunction. Dkt. No. 75. PI Plaintiffs seek to preliminarily enjoin and/or stay Defendants from enforcing or implementing Sections 1, 2, and 3(a) of the Proclamation and the resulting Agency Policies,

---

[7] Such change of status or extension of stay approvals are discretionary. *See* 8 U.S.C. § 1258(a); 8 C.F.R. § 214.1(c)(7).

including the requirement to pay a $100,000 fee as a condition of an H-1B petition. *Id.* A smaller subset of these PI Plaintiffs—BAE, Nephrology Associates, and Lower Brule Day School—seek injunctive and declaratory relief on behalf of a class of employers, defined as:

> [A]ll U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee under [the Proclamation] or the Proclamation's implementing guidance, or would file such a petition but for the fee, with [USCIS] received on or between September 21, 2025 and September 21, 2026, to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i).

FAC at ¶¶ 196–210. They have moved to provisionally certify this employer class under Federal Rule of Civil Procedure 23(b)(2) in conjunction with the motion for preliminary injunction.[8] *See* Dkt. No. 76. These Putative Class Plaintiffs urge that class treatment is particularly appropriate "because the legality of Defendants' Proclamation and implementing policies present a single, dispositive question common to every class member: *Is the $100,000 H-1B fee lawful or not?*" *Id.* at 3 (emphasis in original). These Putative Class Plaintiffs contend that "[c]ertification ensures that any declaratory and injunctive relief will apply consistently and fairly to all those affected—not just the three Named Plaintiffs." Dkt. No. 102 at 1–2.

Defendants, for their part, filed a motion to dismiss. Dkt. No. 104. In doing so, Defendants explicitly invoke the arguments they raised in their opposition to the motion for preliminary injunction. *See id.* The arguments across the three motions thus largely collapse into the same analysis: can Plaintiffs challenge—and the Court review—the Proclamation and resulting Agency Policies? The Court begins its analysis with the motion for preliminary injunction, but incorporates its analysis as relevant to the other pending motions.

//

//

//

[8] Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied," and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

United States District Court
Northern District of California

## III. LEGAL STANDARD

### A. Motion for Preliminary Injunction

Plaintiffs seeking preliminary relief must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Preliminary relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Where, as here, the government is a party, the public interest and the balance of equities factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

A court must find that "a certain threshold showing" is made on each of the four required elements. *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Under the Ninth Circuit's sliding scale approach, a preliminary injunction may issue if there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards the [movant]," and "so long as the [movant] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Under either standard, Plaintiffs bear the burden of making a clear showing that they are entitled to this extraordinary remedy. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). "Likelihood of success on the merits is the most important *Winter* factor." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quotation omitted).

### B. Motion to Dismiss

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible

United States District Court
Northern District of California

on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031. Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## IV. DISCUSSION

### A. Standing

As an initial matter, Defendants contend that Plaintiffs lack Article III standing to challenge the Proclamation and Agency Policies. Dkt. No. 98 at 11–15; *see also* Dkt. No. 104 at 3–8. Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (quotation omitted). Specifically, to meet its burden of establishing standing, a plaintiff must show it has (i) "suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "At the preliminary injunction stage, [] the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22).

Here, Defendants urge that Plaintiffs' "injuries rest on a 'speculative chain of possibilities' that are not clearly traceable to the Proclamation." *See* Dkt. No. 98 at 13 (quoting *Murthy*, 603 U.S. at 70). The Court is not persuaded.[9]

[9] The Court does not address Defendants' argument that Plaintiff Phoenix Doe lacks standing, Dkt. No. 98 at 11–13, because she has voluntarily dismissed her case, Dkt. No. 100.

Case: 26-6667, 11/06/2026, DktEntry: 30.1, Page 14 of 240

Defendants argue that the PI Plaintiffs do not allege that they sought, but failed to obtain, an exception to the $100,000 payment for any prospective workers, or adequately allege that they could not hire American workers to fill any vacancies. *See* Dkt. No. 98 at 13–14.

Defendants do not explain why seeking a discretionary exception is a prerequisite to standing. The Proclamation itself states that the decision about whether to waive the new payment is "in the Secretary [of Homeland Security]'s discretion." *See* 90 Fed. Reg. at 46,029 (Section 1(c)). The USCIS guidance that followed likewise explained that such exceptions will be "extraordinarily rare," and turn on the overall interests of the United States rather than those of any specific employer or employee. *See* USCIS H-1B Update. For an employer even to be eligible for such an exception, the Secretary must have "determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." *Id.* Neither the Proclamation nor the USCIS guidance, however, explains when a worker's presence in the United States would be in the national interest or under what circumstances requiring the payment of the new fee "would significantly undermine the interests of the United States." *Id.* There is simply no basis in the record for the Court to conclude that any Plaintiff would qualify for and obtain a national interest exception such that some Plaintiffs' failure to seek the exception somehow undermines their standing.

Defendants' reliance on *Murthy v. Missouri* is also misplaced. *See* 603 U.S. at 70. In *Murthy*, the plaintiffs sought to enjoin government agencies from pressuring social media platforms into restricting user speech. *See id.* at 53–54. In holding that the plaintiffs lacked standing, the Supreme Court explained that the plaintiffs' actual injury was "one[] step removed" from the government—the entity they sought to enjoin. *Id.* at 57. The actual suppression of the plaintiffs' speech turned on "the independent action of some third party [*i.e.*, the social media platform] not before the court." *Id.* (quotation omitted). The plaintiffs were also seeking prospective relief, and the Court thus explained that "the plaintiffs must show a substantial risk



United States District Court
Northern District of California

that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 58. However, the Court noted that the platforms independently had "moderated similar content long before any of the Government defendants engaged in the challenged conduct," consulted with outside experts, and at times pushed back when government officials flagged specific content that did not violate the platforms' policies. *Id.* The existence of a causal chain was thus not the problem, but rather the lack of evidence supporting this causal chain for any individual plaintiff. *See id.* at 62–72.

Not so here. BAE, for example, is a privately held automotive manufacturing company headquartered in Auburn Hills, Michigan. *See* FAC at ¶ 153. BAE alleges that "[r]ecruiting has been a challenge for BAE due to the highly competitive nature of the market in Detroit," and that as a result, it has "hired several employees through the H-1B visa program." *Id.* at ¶ 154. Specifically, and as relevant here, BAE explained that one of its critical employees in the Quality Department had been on H-1B status since 2019. *See id.* at ¶¶ 155–56; *see also* Dkt. No. 75-3 ("Zylka Decl.") at ¶¶ 8–11. Given his integral contributions to the company, BAE began the process of sponsoring him for employer-based permanent residence, and USCIS approved the petition (Form I-140). *See* FAC at ¶ 157. However, the employee is still waiting for an immigrant visa to become available so he can apply for permanent residence status. *Id.* Given the I-140, BAE prepared an H-1B extension petition, but was unable to complete the process before the employee's H-1B status expired, in part because of the government shutdown. *Id.* at ¶¶ 158–59; Zylka Decl. at ¶¶ 10–11. The employee returned to India to avoid being out of status. *See* FAC at ¶ 159.

Any new H-1B visa application for the employee thus appears subject to the $100,000 fee. *See id.* at ¶¶ 160–61. However, BAE recently lost a significant portion of its business and simply cannot afford the fee. *Id.* at ¶ 161. BAE requested a "national interest" exception on November 14, 2025, but has yet to receive a response. See Dkt. No. 101-1 ("Supp. Zylka Decl.") at ¶¶ 3–4. In the meantime, it is suffering harm "due to the importance of [the employee's] role, his tenure with the company, and the respect he has developed within the company." *See* FAC at ¶¶ 160–61; *see also* Zylka Decl. at ¶¶ 14–15. As the company's Chief Financial Officer explained, building

relationships within the company is especially important because "[p]eople in internal quality control positions often encounter resistance from other employees who are reluctant to admit errors." *See* Zylka Decl. at ¶ 15.

Nephrology Associates, a rural medical practice that serves patients with kidney issues, similarly expressed difficulty in recruiting physicians with the necessary specialized knowledge given its geographic location. *See* FAC at ¶¶ 115–18. The company explained that "[n]early all of [its] physicians have been or are currently on an H-1B visa." *See* Dkt. No. 75-2 ("Waters Decl.") at ¶ 11. Recently, after retaining a recruiting company and a nine-month search, Nephrology Associates only received ten applications for an open physician position, and only one applicant—an Indian physician completing her fellowship in the United States on a J-1 visa—was qualified for the position and willing to accept its terms. *See id.* at ¶ 119. The physician returned to India following completion of her J-1 program and the company filed the H-1B petition, which remains pending. *See id.* at ¶¶ 120–22; Waters Decl. at ¶¶ 16–17. Following the USCIS's additional guidance, Nephrology Associates requested a "national interest" exception. *See* FAC at ¶ 122; Waters Decl. at ¶¶ 18–19. Nephrology Associates has not received a response to its request for an exception, and USCIS indicated that it would not resume processing the case until the company provided evidence either that it paid the $100,000 or received an exception. *See* Waters Decl. at ¶ 19. Nephrology Associates, which operates a small practice in a rural and underserved community, cannot afford to pay the fee. *See id.* at ¶¶ 19–20. Because it has been unable to hire another physician in the interim, the company has had to move patient appointments and delay essential care, and now has a waitlist of approximately 100 new patients.[10] *See id.* at ¶¶ 20, 21.

[10] Defendants do not make any standing arguments specific to Global Nurse Force. *See generally* Dkt. No. 98. But relatedly, Global Nurse Force is a company that helps with the recruitment and hiring of international nurses for healthcare facilities, including in the United States under the H-1B visa program. *See* FAC at ¶¶ 33, 124. Global Nurse Force has stated that the Proclamation and the accompanying $100,000 fee "eliminates [its] ability to operate its H-1B placement business in the United States." *See* Dkt. No. 75-7 ("Pattanaik Decl.") at ¶ 15. The company explained that despite the growing and unmet demand for nursing services, their clients have largely paused hiring due to the $100,000 fee. *Id.* at ¶¶ 10–12. For example, the company pointed to one healthcare system in the Washington, D.C. area that, prior to the Proclamation, had successfully hired three H-1B nurses into their operations and identified a need for 60 to 70 additional specialized nurses. *See id.* at ¶ 11. However, after the Proclamation, the healthcare system paused hiring. *Id.*



United States District Court
Northern District of California

Contrary to Defendants' assertion, Nephrology Associates' basis for standing does not "depend on the contingency that the pending exception will be denied," or on some "speculative" chain of inferences that its future recruiting efforts will fail. *See* Dkt. No. 98 at 14–15. Rather, the company provided a concrete example of its rigorous recruiting efforts and inability to hire American physicians to fill the position. Nephrology Associates also has been waiting almost a year for a decision on its request for a national interest exception but has not heard anything. *See* Waters Decl. at ¶¶ 19–20. Defendants' indefinite delay does not make Plaintiffs' harm speculative. If that were the case, Defendants could preclude anyone from challenging the Proclamation or Agency Policies by refusing to ever act on a discretionary exception request. The Court declines to adopt an interpretation of standing that could be manipulated this way.

The Court is similarly unpersuaded by Defendants' arguments that Plaintiffs only speculate that they will be unable to fill their existing roles with domestic workers. *See* Dkt. No. 98 at 14–15. Defendants emphasize that Lower Brule Day School, a K–12 school located on a Sioux reservation in rural South Dakota, has only identified "limited vacancies" for the 2026–2027 school year. *Id.* Defendants appear to suggest that a single teaching position could be readily filled even in the absence of the H-1B visa program. But Defendants ignore Lower Brule Day School's detailed discussion of the challenges it has experienced in hiring qualified teachers, especially in special education. *See* FAC at ¶¶ 142–43. For the two positions for the 2026–2027 school year, the school received just ten applications, and all ten candidates are foreign nationals who would require H-1B visa sponsorship. *See* Dkt. No. 101-2 ("Supp. Witte Decl.") at ¶¶ 4–5. The school's superintendent indicated that this is consistent with their prior recruitment efforts: "In the last 5 years, at least 90% of [the school's] applicants for teacher positions have been foreign nationals, and the majority of them have been from abroad." *Id.* at ¶ 5. Ten of the school's 45 teachers are on H-1B visas. *See* Dkt. No. 75-4 ("Witte Decl.") at ¶ 11. Moreover, the school has stated that it is unable to make even one $100,000 payment, as that amount is "approximately twice a starting teacher's salary," which is already "above the median" for the area. *See* Witte Dec. at ¶ 12; Supp. Witte Decl. at ¶ 5.

Similarly, Defendants urge that GVAC has not explained its "belief that [it] could not fill

[its] limited vacancies by focusing [its] efforts to recruit domestically." *See* Dkt. No. 98 at 14. GVAC operates three K–8 tuition-free, public charter schools in Colorado that offer language immersion instruction in various languages. *See* FAC at ¶¶ 34, 145–49. Their learning model is specifically dependent on the use of instructors with native-language skills "who also bring their unique cultural perspectives and competencies from their home countries into the classroom." *See id.* at ¶ 149. Given this model, GVAC estimates that it recruits approximately two to five language teachers each year from around the world, regularly using the H-1B visa process to do so. *See id.* at ¶ 150. For the 2025 to 2026 school year, for example, GVAC hired ten teachers who required H-1B visa sponsorship. *Id.* However, because GVAC is tuition-free, it relies on funding from the State of Colorado, and could not afford to pay even a single $100,000 fee. *Id.* at ¶¶ 151–52. Contrary to Defendants' urging, the fact that GVAC may hire some American workers does not undercut their standing, because they cannot hire enough language teachers with the language and cultural competencies from within the United States to fill their needs.[11] *See id.*; *see also* Dkt. No. 75-6 ("Henderson Decl.").

The Court finds that PI Plaintiffs have standing to challenge the Proclamation and Agency Policies.[12]

### B. Consular Nonreviewability

Defendants next argue that the Proclamation and resulting Agency Policies are non-justiciable under the doctrine of consular nonreviewability. *See* Dkt. No. 98 at 15–17. Under the doctrine, because the INA "does not authorize judicial review of a consular officer's denial of a visa . . . the federal courts cannot review those decisions." *Dep't of State v. Muñoz*, 602 U.S. 899,

---

[11] The District of Columbia's footnote in *Chamber of Commerce* about associational standing for cap-subject members is not to the contrary. *See* 815 F. Supp. 3d at 89, n.1. There, the court noted as an aside that only one of the Chamber's cap-subject members identified itself by name, and that member ultimately hired a "domestic," non-H-1B worker for a single open position. *Id.* In contrast, there is nothing in the record to suggest that GVAC has already filled its teacher positions with non-H-1B visa employees.

[12] In their motion to dismiss, Defendants urge that remaining Plaintiffs also lack standing because their injuries are only speculative. *See* Dkt. No. 104 at 3–8. But again, Defendants cite *Murthy* and suggest that Plaintiffs' injuries are dependent on a speculative causal chain. *Id.* The Court simply disagrees with this assessment, particularly at the motion to dismiss stage.

908 (2024).

Citing the Supreme Court, Defendants assert that "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* at 907 (quoting *Hawaii*, 585 U.S. at 702). Defendants assert that Congress has delegated its "sweeping" authority to the Executive Branch under the INA. *See* Dkt. No. 98 at 15–16 (citing 8 U.S.C. §§ 1182(f) and 1185(a)); *see also Fiallo v. Bell*, 430 U.S. 787, 796 (1977) (noting that "[t]he conditions of entry for every alien . . . have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control"). As the Supreme Court has noted, when "Congress [] delegate[s] to executive officials the discretionary authority to admit noncitizens . . . the action of an executive officer to admit or to exclude an alien is final and conclusive." *Muñoz*, 602 U.S. at 907–08. In short, Defendants characterize the Proclamation and Agency Policies as "admission decisions" that are nonreviewable. Dkt. No. 98 at 17.

However, Defendants' argument misses the mark. Plaintiffs are not challenging the manner in which Defendants exercised their discretionary authority to admit or deny noncitizens. Rather, Plaintiffs argue that Defendants *exceeded* any such delegated authority. None of Defendants' cited cases suggest that the consular nonreviewability doctrine applies to shield purported *ultra vires* conduct from judicial review. *Muñoz*, for example, involved a challenge to an individual visa denial. 602 U.S. at 902–18. The respondent—a U.S. citizen—brought a Due Process challenge to the consular officer's denial of her noncitizen husband's visa application. *Id.* at 902. The Court noted that consular nonreviewability barred it from considering any challenge by the noncitizen husband to the consular officer's decision. *See id.* at 908–09. Nevertheless, the Court considered the respondent's constitutional challenge under "a narrow exception" to the doctrine. *Id.* at 909–19 (holding that U.S. citizens do not have a fundamental liberty interest in the admission of a noncitizen spouse). Similarly, in *Knauff v. Shaughnessy*, the petitioner was challenging the Attorney General's order to exclude her without a hearing for security reasons. 338 U.S. 537, 539–41 (1950); *id.* at 543 ("[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government

to exclude a *given* alien."[13] (emphasis added)).

The Ninth Circuit, on the other hand, has rejected the argument that executive policies and practices, even in the immigration context, are completely unreviewable. *See Washington v. Trump*, 847 F.3d 1151, 1161–62 (9th Cir. 2017). In *Washington*, the plaintiffs challenged an executive order which "ban[ned] for 90 days the entry into the United States of individuals from seven countries." *Id.* at 1156. The government argued that the executive order was unreviewable, relying at least in part on the doctrine of consular nonreviewability. *Id.* at 1161–63 (citing *Kleindienst v. Mandel*, 408 U.S. 753 (1972)). In rejecting this argument, the court emphasized the critical distinction between "the President's *promulgation* of a sweeping immigration policy" and "an executive branch official's decision to issue or deny an individual visa." *Id.* (emphasis in original); *cf. Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) (considering merits of petitioner's case where they were "challenging the consul's authority to suspend their visa applications, not challenging a decision within the discretion of the consul"). "[E]xercises of policymaking authority at the highest levels of the political branches are plainly not subject to [the doctrine of consular nonreviewability]." *Washington*, 847 F.3d at 1162. To the contrary, "it is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." *Id.* at 1164; *see also id.* at 1163 ("This is no less true when the challenged immigration action implicates national security concerns.").

The Court therefore turns to the substance of Plaintiffs' claims and the motion for preliminary injunction.

### C. Preliminary Injunction Factors

#### i. Likelihood of Success on the Merits

The critical *Winter* factor, and the primary dispute among the parties, is Plaintiffs' likelihood of success on the merits of their claims. *See VidAngel*, 869 F.3d at 856. Plaintiffs

[13] In *Trump v. Hawaii*, the plaintiffs challenged Presidential Proclamation No. 9645, which placed entry restrictions on the nationals of several predominantly Muslim countries. 585 U.S. at 677. Although the government there had urged, as it does here, that the doctrine of consular nonreviewability prevented the Court from considering the case, the Court noted that the INA did not "expressly strip[] the Court of jurisdiction," and "assume[d] without deciding that plaintiffs' statutory claims [were] reviewable." *Id.* at 683–84.



United States District Court
Northern District of California

challenge both the President's Proclamation and the Agency Policies as *ultra vires*, and further argue that the Agency Policies violate the APA.

As a threshold issue, and before turning to the substance of these claims, Defendants suggest that the Court lacks the authority to consider any *ultra vires* claim against the President. *See* Dkt. No. 98 at 17–20. Defendants broadly state that the Court lacks any power to enjoin the President. *Id.* at 17–18. And much like their argument about the application of the consular nonreviewability doctrine, Defendants urge that the INA gives the President broad authority, and that this authority is at its apex where, as here, he exercises his discretion in the immigration and national security context. *See id.* at 18–19. They further suggest that the INA "implicitly preclude[s] such review." *Id.* at 19–20.

Courts largely have bypassed such justiciability arguments in similar contexts. The Supreme Court's decision in *Trump v. Hawaii* highlights this approach. 585 U.S. at 683. There, the plaintiffs were also challenging a presidential proclamation that invoked the authority in §§ 1182(f) and 1185(a). *Id.* at 675–80. The Court "assume[d] without deciding that plaintiffs' statutory claims [were] reviewable." *Id.* at 683–84. Noting that "[t]he justiciability of plaintiffs' challenge under the INA presents a difficult question," the Court simply "assume[d] without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue."[14] *Id.* at 683. The District of Columbia in *Chamber of Commerce* also "side-stepp[ed]" such questions and "assume[d] that plaintiffs' claims challenging the Proclamation are justiciable." 815 F. Supp. 3d at 91. Here too, rather than wade into these complex questions in the first instance, the Court addresses Plaintiffs' claims against the Agency Policies first. As Defendants' own authorities indicate, although the Court may not have jurisdiction "to enjoin the President in the performance of his official duties,"

[14] The Court notes that although the Supreme Court reversed and remanded the Ninth Circuit's underlying opinion, the circuit court did directly address these justiciability questions. *See Hawaii v. Trump*, 878 F.3d 662, 678–80 (9th Cir. 2017), *rev'd and remanded*, 585 U.S. 667 (2018). There, the court noted that "[a]lthough the Executive has broad discretion over the admission and exclusion of aliens, that discretion is not boundless," and instead "extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations." *Id.* at 679 (quotation omitted) (cleaned up). "It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie." *Id.* (quotation omitted).

*Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992), "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive," *id.* at 828 (Scalia, J., concurring).

**a. Claims against Agency Defendants**

Plaintiffs bring several claims against Agency Defendants under the APA. The APA requires courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants attempt to shield Agency Defendants from scrutiny, urging that the Agency Policies are not distinct from the Proclamation itself, and thus are unreviewable. *See* Dkt. No. 98 at 20–22, 39–40. Relatedly, they argue that there is no final agency action for purposes of APA review because the Agency Defendants were bound to follow the Proclamation. *Id.* at 22–25. The Court disagrees.

Despite Defendants' efforts to distinguish the case, the Court finds the Ninth Circuit's opinion in *Nebraska v. Su* directly on point. 121 F.4th 1 (9th Cir. 2024). In *Su*, the plaintiffs challenged President Biden's Executive Order 14026, which required federal contractors to pay employees a $15 minimum wage. *Id.* at 5–6. In response, and after notice and comment, the DOL issued a final rule implementing the executive order. *See id.* The plaintiffs sought to challenge both the executive order and the DOL's implementing rule. *Id.* at 6. The court reviewed both the executive order and the DOL's implementing rule, finding that they exceeded the statutory authority Congress provided under the Federal Property and Administrative Services Act ("FPASA"), and that the DOL, in issuing its implementing rule, had violated the APA.[15]

The DOL argued that the APA did not apply to the DOL's rule that implemented the executive order. *See id.* at 14. In rejecting this argument, the Ninth Circuit pointed out that "[n]o language in the APA prevents or excepts review of an agency action that implements a

[15] The Court notes that *Su* also suggests that at least in the Ninth Circuit, *ultra vires* challenges that a President exceeded his statutory authority are viable and such presidential action is reviewable, as the court explicitly found that President Biden had exceeded his statutory authority under the FPASA. *See* 121 F.4th at 7–13. In short, the executive order was not shielded from scrutiny simply because the President had issued it.



United States District Court
Northern District of California

United States District Court
Northern District of California

presidential action."[16] *Id.* at 15; *cf. City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (holding two executive orders were subject to judicial review under the APA). The *Su* court expressed incredulity at the agency's interpretation, concluding that it "would shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Su*, 121 F.4th at 15; *see also id.* at 16 ("To hold as the Government urges would allow presidential administrations to issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first."). The court was also unpersuaded that if such agency action was not exempted from APA review, "agencies would be put in the untenable position of having to follow mandatory executive orders and engage in APA-required deliberation about whether to choose a policy alternative unavailable under the executive order." *Id.* at 16 (quotation omitted). The court dismissed this concern on the ground that "[o]f course, policy justifications cannot supersede statutory text." *Id.* The court thus moved on to determine whether DOL acted arbitrarily and capriciously when it failed to consider alternatives to the $15 minimum wage mandate.[17] *Id.* at 17.

Defendants attempt to distinguish *Su* by arguing that unlike the executive order there, the Proclamation does not give the Agency Defendants any discretion to depart from it. *See* Dkt. No. 98 at 40. The executive order at issue in *Su* stated, *inter alia*, that "[t]he Secretary [of Labor] shall, consistent with applicable law, issue regulations . . . to implement the requirements of this order." *See* 86 Fed. Reg. 22,835, 22,836 (Section 4); *see also Su*, 121 F.4th at 17. But the Agency Defendants here have similarly broad discretion under the Proclamation. Section 2 of the Proclamation states that "[t]he Department of Homeland Security and the Department of State

---

[16] The Court recognizes that district courts in the District of Columbia have reached different conclusions, but this Court is bound by Ninth Circuit precedent. *Cf. Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 93, 98–105 (D.D.C. 2016); *Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28 (D.D.C. 2001).

[17] Throughout their briefing and at the hearing, Defendants suggest that because the Proclamation pertains to matters of immigration and invokes national security concerns that it is sui generis. However, nothing in the Ninth Circuit's textual analysis in *Su* suggests that the subject matter of the presidential action matters when determining whether subsequent and implementing agency actions are subject to review under the APA. The APA provides no such limitation, and the Court finds no basis to impose one.

United States District Court
Northern District of California

shall coordinate to take *all necessary and appropriate action* to implement this proclamation." *See* 90 Fed. Reg. at 46,029 (Section 2(c)) (emphasis added). The Proclamation also explicitly provides that the $100,000 payment "shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, *in the Secretary's discretion*, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States." *Id.* (Section 1(c)) (emphasis added). Defendants do not offer any reasoned distinction between the discretion provided to the DOL in implementing a $15 minimum wage in *Su* and the discretion provided here to the Agency Defendants, including the Secretary of Homeland Security, in implementing a supplemental payment of $100,000 for H-1B petitions.

At the hearing on the pending motions, Defendants also attempted to distinguish *Su* by arguing that it concerned an executive order rather than a proclamation. *See* Dkt. No. 115 at 45–64. Defendants urged that an executive order, as in *Su*, "is a directive to agencies, but doesn't, by itself, have the force of law." *See id.* at 47:19–25. Executive orders, counsel stated, "rely on agencies to [] implement them." *Id.* at 45:13–16. Defendants argued that the Proclamation here, in contrast, was issued consistent with the authority that Congress delegated to the President under § 1182(f), and had "the force of law" such that the agencies could not "diverge from what the President la[id] out in the proclamation." *Id.* at 45:21–46:2.

Defendants did not offer—and the Court has not found—any support for this distinction. *Su* itself stated that "[n]o language in the APA prevents or excepts review of an agency action that implements a presidential *action*." 121 F.4th at 15 (emphasis added). The Ninth Circuit's reasoning did not turn on the nature of the presidential action: the APA by its terms does not exclude actions implementing presidential proclamations from review any more than it does actions implementing executive orders.[18] Like the Proclamation, which invokes the President's

---

[18] Although the parties did not brief this specific issue, it is not clear that there is any meaningful distinction between executive orders and presidential proclamations for purposes of APA review. Secondary sources, for example, indicate that "the distinction [between executive orders and presidential proclamations] is not always maintained." *See* 3 Admin. L. & Prac. (3d ed.), *Executive Orders* § 7:31. "Executive orders are presidential directives issued to federal government agencies or officials" that "bind the agencies." *Id.* And "[m]ost executive orders are

statutory authority under § 1182(f), the first line of the executive order in *Su* stated that it invoked "the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act, 40 U.S.C. 101 *et seq.*" 86 Fed. Reg. 22,835. It is not clear why the INA broadly, or § 1182(f) more specifically, has more "force of law" than the Constitution or the FPASA. The Ninth Circuit has explained elsewhere that a presidential proclamation, also issued pursuant to §§ 1182(f) and 1185(a), did "not have the force of law," and had "little effect" without the agencies' implementing rule. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 659 (9th Cir. 2021), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026).

In *East Bay Sanctuary*, DOJ and DHS adopted an interim final rule, which "ma[de] migrants who enter the United States in violation of 'a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico' categorically ineligible for asylum." *Id.* at 658 (quoting 83 Fed. Reg. 55,934, 55,952). That same day, President Trump issued a presidential proclamation, invoking §§ 1182(f) and 1185(a), that said "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico is hereby suspended and limited" for a period of 90 days. *See* Presidential Proclamation No. 9822, 83 Fed. Reg. 57,661, 57,663. However, the proclamation stated that this limitation would "not apply to any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States." *Id.* Together, the rule and the proclamation "stripp[ed] asylum eligibility from every migrant who crosses into the United States between designated ports of entry." *East Bay Sanctuary*, 186 F.4th at 658. In discussing the import of the rule and the proclamation, the Ninth

issued pursuant to specific statutory delegation of authority . . . ." *Id.* Proclamations, on the other hand, "are generally hortatory or declaratory," and "Presidents tend to use proclamations in foreign affairs." *Id.* Under these definitions, the Proclamation at issue here operates like an executive order. The Court also notes that the President has used proclamations for domestic issues as well, such as lifting some prohibitions on commercial fishing operations and providing regulatory relief for coal-fired power plants. *See* Unleashing American Commercial Fishing in the Pacific, 90 Fed. Reg. 16,987 (April 17, 2025); Regulatory Relief for Certain Stationary Sources To Further Promote American Energy, 90 Fed. Reg. 34,583 (July 17, 2025). So the Court sees no reason to treat executive orders as differently than proclamations.



United States District Court
Northern District of California

Circuit explained:

> Individually, the Rule and Proclamation have little effect. The Proclamation *does not have the force of law*, and the Rule only effectuates proclamations. But together, the Rule and Proclamation make asylum entirely unavailable to migrants who enter the country between ports of entry.

*Id.* at 659 (emphasis added). The proclamation in *East Bay Sanctuary*, although similarly issued pursuant to §§ 1182(f) and 1185(a), still relied on the agencies to implement it. *See id.* at 669 ("[T]he Proclamation and Rule together create an 'operative rule of decision' for asylum eligibility that is reviewable by this court."). Here too, there is simply no basis for the Court to conclude that the Agency Policies are unreviewable under the APA on the ground that they implement the Proclamation.

Next, Defendants argue that Plaintiffs cannot challenge the Agency Policies because they do not constitute "final agency action." *See* Dkt. No. 98 at 20–25, 37–38; *see also* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). "[T]wo conditions must be satisfied for agency action to be 'final.'" *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

> First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Id.* (cleaned up).

Although Defendants reference this two-step inquiry, they do not meaningfully grapple with it here. Instead, they repeatedly state that Plaintiffs are, in reality, challenging the Proclamation rather than any agency action or implementation. They urge that none of the Agency Policies impose the $100,000 fee at issue here. *See, e.g.*, Dkt. No. 98 at 22–25. Rather, Defendants assert that the Agency Policies "are merely explanatory, and are therefore not actions," and "at most, the memoranda merely direct the agency personnel to comply with the President's Proclamation . . . ." *See id.* at 23. As discussed above, however, binding Ninth Circuit precedent

United States District Court
Northern District of California

Case: 26-6667, 11/06/2026, DktEntry: 30.1, Page 27 of 240

United States District Court
Northern District of California

precludes the conclusion that the agency's implementation of the Proclamation is shielded from APA review. In *Su*, the DOL's final rule explicitly sought to "establish[] standards and procedures for implementing and enforcing the minimum wage protections of the Executive order." *See* 86 Fed. Reg. at 67,126. It thus "imposed" the $15 hourly minimum wage on federal contractors in the same way that the Agency Policies here impose the $100,000 fee for H-1B visa petitions. To put a finer point on this, the DOL rule considered in *Su* explicitly stated "[t]here is no indication in the Executive order that the Department has authority to modify the amount or timing of the minimum wage requirement . . . ." *Id.* at 67,129. Even still, the court found that the rule was subject to review under the APA. *See Su*, 121 F.4th at 14–17; *accord Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020, 1038–39 (9th Cir. 2025) (construing memorandum from Office of Management and Budget and Office of Personnel Management to be "final agency action" where it provided "instructions regarding the implementation of [Executive Order 14210]" regarding workforce reductions).

The Ninth Circuit's recent decision in *Pacito v. Trump* does not change this analysis. 169 F.4th 895 (2026). In *Pacito*, the Ninth Circuit reviewed preliminary injunctions prohibiting the enforcement of the President's executive order suspending the entry of certain refugees, as well as the agencies' actions defunding the program. *Id.* As relevant here, the Ninth Circuit considered whether the court could review the agencies' actions under the APA. *See id.* at 930–32. In beginning its discussion, the court emphasized that "[t]he Supreme Court has 'long applied a strong presumption favoring judicial review of administrative action.'" *Id.* at 930 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). Consistent with this Court's discussion above, the Ninth Circuit held that APA review did not apply to "the President's decision to suspend entry [of refugees]." *Id.* at 931. However, the court held that the APA challenge to the agencies' defunding decision "stands on different footing," and the effects of terminating funding "flowed from the termination letters issued by [the agencies]." *Id.* Nothing in *Pacito*, however, appears to implicitly or explicitly overturn or limit *Su*.

In light of this backdrop, the Court finds that the Agency Policies here readily satisfy the two-step inquiry in *Bennett v. Spear*. As the court in *Mullin* explained:

> First, Defendants' memoranda, FAQs, and other materials implementing the Proclamation have resulted in a policy imposing a $100,000 payment requirement on H-1B petitions. There is no indication that these actions are "of a merely tentative or interlocutory nature." Second, legal consequences flow out of Defendants' actions. Because of the Policy, employers seeking to hire workers through the H-1B program face a new payment obligation that did not exist before. These agency actions have altered the legal status quo for applicants to the H-1B program. Therefore, Defendants' issuance of the Policy constitutes final agency action.

*Mullin*, 833 F. Supp. 3d at 77 (quoting *Bennett*, 520 U.S. at 178). The Court thus turns to the merits of Plaintiffs' APA claims.

**1. Arbitrary and Capricious Claim**

Plaintiffs allege that the Agency Policies are arbitrary and capricious in violation of the APA. *See* FAC at ¶¶ 235–46; Dkt. No. 75 at 29–33. "To survive review under the arbitrary and capricious standard, an agency's action must have been the result of reasoned decisionmaking." *Pacito*, 169 F.4th at 937 (quotation omitted). Such decisionmaking requires an agency "to consider alternatives" and "give a reasoned explanation for its rejection of such alternatives." *Su*, 121 F.4th at 17 (quotation omitted).

Defendants' primary argument is that the Agency Policies are not subject to arbitrary and capricious review at all because the agencies were merely implementing a presidential directive (*i.e.*, the Proclamation). Dkt. No. 98 at 40–41. Defendants urge that considering alternatives would have required the agencies to "def[y] the H-1B Proclamation or [] consider[] choices they lacked authority to adopt . . . ." Dkt. No. 98 at 40. But as already explained above, the Ninth Circuit rejected this exact argument in *Su*. The court there directly found that "the executive order does not exempt [the agency] from basic APA requirements of reasoned decisionmaking." *Su*, 121 F.4th at 17. And despite the executive order unambiguously requiring a $15 an hour minimum wage, the Ninth Circuit in *Su* nevertheless held that the "DOL acted arbitrarily and capriciously when it overlooked alternatives to the $15 per hour minimum wage mandate," including "modifying the amount of the minimum wage rate, changing the effective date for the wage rate, or phasing in the wage rate over a number of years." *Id.* (cleaned up). Defendants

United States District Court
Northern District of California

offer a halfhearted secondary response that "agencies 'are not compelled to explore every alternative device and thought conceivable by the mind of man.'" Dkt. No. 98 at 40 (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020)). But although the Supreme Court in *Regents* explained that the agency was not required to consider *all* policy alternatives, the agency "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (emphasis in original). There is no question here that Agency Defendants failed to consider *any* alternatives or the reliance interests of the regulated parties.[19] As such, Plaintiffs are likely to succeed on their claim that the Agency Policies are arbitrary and capricious.[20]

**2. Failure to Conduct Notice-and-Comment Rulemaking**

Plaintiffs also allege that the Agency Defendants violated (1) the APA by failing to engage in notice-and-comment rulemaking before implementing the Agency Policies; and relatedly, (2) the Regulatory Flexibility Act ("RFA") by failing to prepare an "initial regulatory flexibility analysis" describing the impact of the proposed rule on small businesses. *See* FAC at ¶¶ 248–50

---

[19] The Court finds it worth noting here that prior to the Proclamation and Agency Policies, Defendants had never increased H-1B fees without advance notice, and had never increased them by anywhere close to this magnitude. For example, USCIS increased the fees for H-1B filers by $1,125 in 2024, and by $10 in 2019. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6,194, 6,363 (Jan. 31, 2024); Registration Fee Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap Subject Aliens, 84 Fed. Reg. 60,307, 60,307 (Nov. 8, 2019).

[20] Defendants briefly cite the Supreme Court's emergency stay order in *Trump v. Orr*, suggesting it undercuts Plaintiffs' arbitrary and capricious argument. 146 S. Ct. 44, 46 (2025). There, the Court stayed a preliminary injunction enjoining the government from enforcing a policy requiring all new passports to display an individual's biological sex at birth. *Id.* In a single sentence, the Supreme Court stated that the plaintiffs were not "likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow." *Id.* The Court is mindful that although this was an emergency order, it remains binding precedent. *See Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring) ("[W]hen this Court issues a decision, it constitutes a precedent that commands respect in lower courts."). But the order offers little insight into the Court's reasoning. Without explanation, the Court cites 22 U.S.C. § 211a, which states that "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." *Id.* This statutory provision appears to suggest that the agencies have no discretion to deviate from the President's rule. Defendants do not point to a similar provision here, and as already discussed the Proclamation did grant the agencies considerable discretion. Without more, the Court does not read *Orr* as overruling *Su*, or as shielding from APA review all agency actions that follow presidential directives.

United States District Court
Northern District of California

(citing 5 U.S.C. §§ 553(b)–(d), and 706(2)(D) and 5 U.S.C. §§ 601 *et seq.*). The Court finds that Plaintiffs have established that they are likely to succeed as to these claims as well.

Under the APA, when promulgating a "legislative rule," an agency must publish a proposed rule and give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(b)–(c). Only after considering relevant materials can the agency finalize the rule. *See* 5 U.S.C. § 553(c). By its terms, § 553 does not apply to "interpretative rules." *See* 5 U.S.C. § 553(b)(A). "[I]nterpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). "Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Id.* In other words, a legislative rule has the "force of law." *Id.* (quotation omitted). A rule may have the "force of law" "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule." *Id.*

Here, Defendants concede that Agency Defendants did not conduct any notice and comment rulemaking or prepare any analysis of the impact of the policies on small businesses. *See* Dkt. No. 98 at 37 (describing notice-and-comment rulemaking as "meaningless" in the face of the Proclamation). Instead, Defendants urge that the Agency Policies are not "legislative rules" because the Proclamation alone has the "force of law," and the policies merely interpreted it. *See* Dkt. No. 98 at 37–38. Without the Agency Policies, however, the $100,000 fee would not be enforceable. The policies provide the necessary contours and limitations for the imposition of the $100,000 fee.

For example, the Proclamation broadly states that "the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under [the H-1B visa program] is restricted, except for those aliens whose petitions are accompanied or supplemented by a payment of $100,000." *See* 90 Fed. Reg. at 46,028 (Section 1). The Proclamation indicates that it applies prospectively. *See id.* (Section 3). Still, the broad language of Section 1 suggests

United States District Court
Northern District of California

that the fee is required not only for new petitions, but also that already-filed or even already-approved petitions must be "supplemented" by a $100,000 payment. The Agency Policies, however, determine who is actually subject to the fee requirement. The USCIS and State Department FAQs, for example, state that the payment would only be required for "new" petitions and would not be required for "H-1B visa renewals." *See* USCIS FAQ and State Dept. FAQ. The Agency Policies also specify how the fee shall be paid (through Pay.gov) and explain how, and under what circumstances, an exception may be sought. *See* USCIS H-1B Update. The Agency Defendants did not simply interpret the Proclamation, but set their own criteria for administering the fee and determining whether to grant exceptions from it. *See id.* (requiring "that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States").

The Agency Policies accordingly are most accurately characterized as legislative rules subject to notice-and-comment rulemaking. *Accord Mullin*, 833 F. Supp. 3d at 77 (concluding "it was the agency materials that created rights, assigned duties, and imposed obligations by effectuating the $100,000 payment requirement" (cleaned up)).

Even if the Court finds that the Agency Policies were legislative rules, Defendants argue that exceptions to notice-and-comment rulemaking apply. *See* Dkt. No. 98 at 38–39. Section 553 includes a "good cause" exception. *See* 5 U.S.C. § 553(b)(B). However, to invoke this exception, the agency must "incorporate[] the [good cause] finding and a brief statement of reasons therefor in the rules issued." *Id.* No such finding was made and no statement of reasons was issued. In any event, the good cause exception "is a high bar because it is essentially an emergency procedure." *East Bay Sanctuary*, 993 F.3d at 675 (quotation omitted). Accordingly, to invoke it, "[t]he government must make a sufficient showing that delay would do real harm to life, property, or public safety . . . or that some exigency interferes with its ability to carry out its mission." *Id.* (cleaned up).

Defendants have not met this high bar. They generically assert that it would be

"'impracticable' to announce rulemaking for a temporary one-year Proclamation and allow potential petitioners to quickly apply and avoid the Proclamation altogether." *See* Dkt. No. 98 at 38–39. However, the Proclamation now has been extended another year, undercutting Defendants' temporal argument. To the extent Defendants suggest that harm would result from the delay caused by rulemaking, they simply offer no support for this assertion. The Ninth Circuit rejected an argument in *East Bay Sanctuary* that good cause existed because "[t]he lag period before any regulation, statute, or proposed piece of legislation [would] allow[] parties to change their behavior in response." 993 F.3d at 676. The court reasoned that "[i]f we were to agree with the government's assertion that notice-and-comment procedures increase the potential harm the Rule is intended to regulate, these procedures would often cede to the good-cause exception." *Id.*

Similarly, for the "foreign affairs" exception to apply, *see* 5 U.S.C. § 553(b)(4)(B), "the public rulemaking provisions should provoke definitely undesirable international consequences." *East Bay Sanctuary*, 993 F.3d at 676 (quotation omitted). "Otherwise, the exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs." *Id.* (quotation omitted). The exception thus applies only "where the international consequences of the rule-making requirements are obvious or thoroughly explained." *Id.* Defendants have not made any showing of the international consequences flowing from the rulemaking requirements here. They assert that §§ 1182(f) and 1185(a) "inherently deal with foreign affairs functions . . . ." Dkt. No. 98 at 39. But this is clearly insufficient. The international consequences of requiring rulemaking here are no more obvious that they were in *East Bay Sanctuary*, which also involved the invocation of §§ 1182(f) and 1185(a).

Finally, the Court acknowledges that the D.C. district court's decision in *Chamber of Commerce* relied on the D.C. Circuit's harmless error doctrine to reject the plaintiffs' notice-and-comment claim because plaintiffs there had not met their burden to show that, had they been given notice and an opportunity to comment, they could have "mounted a credible challenge" to the agencies' memoranda. *See Chamber of Commerce*, 815 F. Supp. 3d at 111 (cleaned up). In the D.C. Circuit, "the harmless error rule requires the party asserting error to demonstrate prejudice from the error." *Id.* (quotation omitted).



United States District Court
Northern District of California

United States District Court
Northern District of California

But the Ninth Circuit, in contrast, has held that "[t]he public interest is served by compliance with the APA," and "it does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper process itself." *East Bay Sanctuary*, 993 F.3d at 678 (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). Accordingly, the Ninth Circuit has stated that "[t]he court must exercise great caution in applying the harmless error rule in the administrative rulemaking context." *Azar*, 911 F.3d at 580 (quotation omitted). "The failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached." *Id.* (cleaned up). The record before the Court does not support such a conclusion.

**ii. Likelihood of Irreparable Injury**

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

Defendants argue that the harm to Plaintiffs is purely economic and thus not irreparable because "the Court (in theory) could order the one-time payments returned." *See* Dkt. No. 98 at 41–42. But Defendants ignore Plaintiffs' compelling evidence that they cannot afford to pay the fee in the first place. BAE Industries, for example, could not afford the $100,000 payment for its valued Senior Quality Engineer. *See* Zylka Decl. at ¶ 11. Without this engineer, BAE Industries explained that it would "lose the years of knowledge, experience, and trust that this employee has developed." *Id.* at ¶¶ 12, 14–15. Nephrology Associates, likewise, has suffered a "reduced ability to provide medical services to the local population," as well as "disruption of business operations, and increased workload for existing physicians" because of its inability to pay the $100,000 fee. *See* Waters Decl. at ¶¶ 6–11, 20; *see also* Witte Decl. at ¶¶ 4–5 (describing need for additional teachers but all applicants will require H-1B visa sponsorship); Pattanaik Decl. at ¶¶ 14–15 (describing loss of clients and existential threat to business because of fee). The Court finds that Plaintiffs have shown a likelihood of irreparable harm absent the requested injunction.

**iii. Balance of the Equities and Public Interest**

As for the remaining factors, when the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge. *See*

*Drakes Bay*, 747 F.3d at 1092. According to Defendants, these factors tilt in their favor because the Proclamation is directed at resolving "[t]he large-scale replacement of American workers" which "has undermined both our economic and national security." Dkt. No. 98 at 53. They argue that granting the Plaintiffs relief would "deeply intrude[] into the core concerns of the executive branch." *Id.* at 44. At bottom, Defendants succinctly state their argument: "Every day an injunction is in place, the President loses valuable time to implement his policies." *Id.* Defendants' argument thus collapses into its prior assertion that the Court lacks authority to review the Agency Policies because the Proclamation has the "force of law" and the President is not subject to the APA. But the Court has already addressed these arguments above, and Defendants offer no concrete explanation of the equities or public interest here. On the other hand, and as noted previously, "[t]he public interest is served by compliance with the APA." *Azar*, 911 F.3d at 581. As the Ninth Circuit has explained, "[i]t does not matter that notice and comment could have changed the substantive result; the public interest is served from the proper process itself." *Id.* Particularly given the complex interests at play here, such process is especially critical under the circumstances.[21]

* * *

Accordingly, the Court concludes that the *Winter* factors favor a preliminary injunction. Where a court determines that an agency action is arbitrary and capricious or made "without observance of procedure required by law," the APA authorizes the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2)(A), (D). In passing, Defendants suggest that the Court must limit any relief to the PI Plaintiffs. *See* Dkt. No. 98 at 44. But the Ninth Circuit has continued to

---

[21] To the extent Defendants suggest that in the immigration context agencies are freed from the procedural constraints of the APA, this exception does not appear in the APA itself and seems inconsistent with Ninth Circuit law. In *East Bay Sanctuary*, for example, the DOJ and DHS interim final rule and Presidential Proclamation No. 9822 involved asylum eligibility and entry across the United States-Mexico border. *See* 993 F.3d at 658–59; *see also id.* at 669 ("[T]he Proclamation and Rule together create an operative rule of decision for asylum eligibility that is reviewable by this court." (quotation omitted)). The court ultimately concluded that the "operative rule" was not in accordance with the law, was arbitrary and capricious, and failed to comply with notice-and-comment rulemaking requirements. *See id.* at 669–77. In so finding, however, the court never suggested that a possible cure for any APA violations was for the agencies to simply avoid rulemaking entirely.



United States District Court
Northern District of California

United States District Court
Northern District of California

find that vacatur of agency actions found to violate the APA is appropriate and does not implicate the Supreme Court's concerns about "universal injunctions." *See Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170, n.7 (9th Cir. 2025); *cf. Trump v. CASA, Inc.*, 606 U.S. 831 (2025) (staying preliminary injunctions "but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue"). The Court thus **GRANTS IN PART** Plaintiffs' motion for a preliminary injunction, to the extent they seek vacatur of the Agency Policies. The Court otherwise **DENIES** the motion at this time.

## V. REQUEST FOR BOND AND STAY PENDING APPEAL

Defendants request that "to the extent the Court is inclined to issue a universal preliminary injunction, it should require bond." Dkt. No. 98 at 44–45. Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, district courts have considerable discretion in determining whether the posting of a bond is necessary:

> Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any. In particular, the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.

*Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotation omitted). Defendants make little effort to explain the likelihood of harm that would occur in light of an injunction. *See* Dkt. No. 98 at 44–45. They suggest that domestic workers will be "replace[d] by foreign labor" and that posting a bond will not impose a financial hardship given Plaintiffs' extensive assets. *Id.* But the Court is simply not persuaded that a bond is necessary where, as here, the Court found that Plaintiffs have shown a likelihood of success on the merits as to the claim that the Agency Defendants failed to comply with the APA's requirements. The Court exercises its discretion and waives any bond requirement under the circumstances.

Defendants also request that this Court should stay any injunction or vacatur pending appeal. Dkt. No. 98 at 45 (citing *Nken*, 556 U.S. at 435). This request is also denied. A stay is

not appropriate where, as here, Plaintiffs have shown that they are likely to succeed on the merits of their APA claims. *Accord Mullin II*, 183 F.4th at 50–51.

## VI. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for preliminary injunction as discussed above. Dkt. No. 75. The Agency Policies are **VACATED** and **REMANDED** to Agency Defendants. Agency Defendants, and all persons acting under their direction, are enjoined from enforcing or implementing the Agency Policies made pursuant to or in implementation of Proclamation No. 10973 and its extension in Proclamation No. 11069, until notice-and-comment rulemaking under the APA and regulatory flexibility analyses under the RFA have been conducted.

The Court **DENIES** the motion to dismiss. Dkt. No. 104. Defendants raise overlapping arguments in their opposition to the motion for preliminary injunction, but as the complexity of the issues discussed above suggests, this is not a case well-suited to a decision at the motion to dismiss stage. The Court further notes that the legal landscape has shifted considerably since Defendants first filed the motion to dismiss, and further briefing may be needed to squarely address any remaining issues.

The Court **DENIES** the related provisional motion to certify the class without prejudice. Dkt. No. 76. Even assuming the requirements of Rule 23(a) and Rule 23(b)(2) are met, it is not clear to the Court why class certification is necessary under the current circumstances. Certification is not required for the Court to enter the requested preliminary injunction, which it has done. Putative Class Members suggested that certification would "ensure[] that any declaratory and injunctive relief [would] apply consistently and fairly to all those affected . . . ." Dkt. No. 102 at 1. But Plaintiffs and any putative class members are now doubly protected: the *Mullin* court already vacated the Agency Policies such that the $100,000 fee is no longer in effect, and the First Circuit declined to stay the vacatur pending appeal. To the extent the Putative Class Plaintiffs believe class treatment is nonetheless still necessary, they may renew their motion for class certification and update their motion in light of current circumstances.

The Court further **SETS** a case management conference on October 27, 2026, at 2:00 p.m.

United States District Court
Northern District of California

Case: 26-6667, 11/06/2026, DktEntry: 30.1, (37 of 240)

The conference will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The parties shall meet and confer and file a joint case management statement by October 20, 2026. The parties should be prepared to discuss a plan for expeditiously resolving this matter in light of the Court's order and the status of *Chamber of Commerce* and *Mullin*.

**IT IS SO ORDERED.**

Dated: 9/30/2026

Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

**Pages 1 - 65**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

GLOBAL NURSE FORCE, et al., )
)
Plaintiffs, )
)
VS. ) **NO. 25-CV-08454-HSG**
)
DONALD J. TRUMP, in his official capacity as President of the United States, et al., )
)
Defendants. )

Oakland, California
Thursday, February 26, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
BY: **ESTHER HSIAO-IN SUNG, ATTORNEY AT LAW**
**VANESSA RIVAS-BERNARDY, ATTORNEY AT LAW**
**KAREN C. TUMLIN, ATTORNEY AT LAW**

COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
BY: **ALEXANDRA GRAY, ATTORNEY AT LAW**

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W., Suite 800
Washington, DC 20005
BY: **HARINI SRINIVASAN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY: Kendra A. Steppler, RPR, CRR
Official United States Reporter

APPEARANCES: (Continued)

DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
**BY: CYNTHIA LIAO, ATTORNEY AT LAW**

SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
**BY: KALPANA V. PEDDIBHOTLA, ATTORNEY AT LAW**

For Defendants:

DEPARTMENT OF JUSTICE
Civil Division
950 Pennsylvania Avenue, Suite 400
Washington, DC 20530-0001
**BY: TIBERIUS T. DAVIS, ATTORNEY AT LAW**

Thursday - February 26, 2026 1:59 p.m.

P R O C E E D I N G S

---o0o---

**THE COURTROOM DEPUTY:** Your Honor, we're calling Case Number 25-CV-8454, Global Nurse Force, et al. v. Trump, et al.

Counsel, please step forward to the podiums and state your appearances for the record, starting with counsel for plaintiff.

**THE COURT REPORTER:** I'm sorry. Can we start the --

**MS. SUNG:** Good afternoon.

**THE COURT REPORTER:** Can we start the -- okay. We're good. Thank you.

**THE COURTROOM DEPUTY:** Go ahead. State your appearance.

**THE COURT:** Who was that?

**THE COURTROOM DEPUTY:** That's Kendra --

**THE COURT:** Ah.

**THE COURTROOM DEPUTY:** -- the court reporter.

**MS. SUNG:** Good afternoon, Your Honor. Esther Sung for the plaintiffs.

**THE COURT:** Good afternoon. Why don't you just introduce your whole team rather than have everybody come up separately.

**MS. SUNG:** Sure, happy to. We have, at the table for plaintiffs, Karen Tumlin, Kalpana Peddibhotla, Vanessa

Rivas-Bernardy, Alexandra Gray, Harini Srinivasin, and Cynthia Liao.

**THE COURT:** All right. Good afternoon.

**MS. SUNG:** Thank you.

**MR. DAVIS:** Good afternoon, Your Honor. Tiberius Davis on behalf of the defendants.

**THE COURT:** All right. Good afternoon.

All right. So we're here for a hearing on nominally three motions. One, is the plaintiffs' motion for a preliminary injunction. There then is a motion for class certification. And then there was a motion to stay that the Government filed some time ago. So let's start -- and whoever is going to be arguing should just come and stay at the podium. We'll probably be having a discussion on a rolling basis. I don't know who that is for the plaintiffs.

**MS. SUNG:** Yes, Your Honor. We have three oral advocates for the plaintiffs today. We can all stand up here, pop up and down, however you would like it.

**THE COURT:** How is it divided up?

**MS. SUNG:** I'm going to be handling the 212(f) claim and the *ultra vires* claim for the motion for preliminary injunction. Ms. Srinivasin is handing the motion for class certification. And my colleague, Ms. Liao, is handling everything else.

**THE COURT:** All right. Well, at least these first

Case: 26-6867, 11/06/2026, DktEntry: 30.1, Page 42 of 240

issues are probably for whoever is lead counsel, because they're really some pragmatic questions that I have.

**THE COURTROOM DEPUTY:** And I'll just ask, because there are three of you, please make sure you're stating your name each time so that the court reporter knows who's speaking.

**THE COURT:** All right.

**THE COURTROOM DEPUTY:** Sorry, Judge. We're having some technical difficulties. That one is echoing, so we turned it off. And so we're just going to have defense stand in the center.

**THE COURT:** Okay. That sounds good.

All right. Really, the first questions are just being sure I understand the lay of the land. Obviously, there's some time sensitivity here. But I want to understand the details of that as much as I can.

I mean, obviously there is a lot that's happening that's relevant. We just got the tariffs decision from the Supreme Court earlier this week. I know that the plaintiffs filed a notice of recent authority. I had seen the case before that.

In an ideal world, I'd want supplemental briefing on the import of the case. I mean, I think it's likely to be relevant at some level. I'm not saying what outcome it drives. But I certainly would like the chance for the parties to address it in writing. I mean, obviously we can do that at some level here today, but it would be more helpful to have that written.

Second, I know that the D.C. Circuit is hearing the argument in the *Chamber of Commerce* case, as I understand it, on March 9th. And in an ideal world, I would actually listen to that argument and see what the D.C. Circuit does. Obviously, the issues teed up there are, if not identical, substantially overlapping with the ones here. But I don't think that a stay is likely warranted in the manner that the Government's requesting. And that whatever the D.C. Circuit does, it would be potentially persuasive. And it's obviously not binding. And I don't know that making the plaintiffs here wait for anything that happens there is warranted.

But -- so the question -- the immediate question I had on these issues is, as I understand it, the parties that are actually moving for the preliminary injunction have all confirmed that they're not participants in the lottery that starts on March 4th and ends on the 19th; is that right?

**MS. LIAO:** Correct.

**THE COURT:** All right. And so given that, how does that affect what I'm saying? And most particularly, I'd like to give the parties some short period of time to submit briefs on the tariff case so that I can review those. How -- how does the state of affairs play into whether that is doable or not?

**THE COURT REPORTER:** If you could state your name first. I'm not sure which attorney you are.

**MS. LIAO:** Your Honor -- sure. Cynthia Liao for the

plaintiffs.

Your Honor, we understand the desire for supplemental briefing on this new case. And we're happy to do that in short order. We can maybe provide something by next week, if that works.

In terms of how the lottery plays into this, the plaintiffs who are moving for preliminary injunction indeed are not participating in the lottery. They don't have to. But they do have ongoing harms that are occurring each day that they're not able to file their petitions or not progress in their petitions because of the fee.

So I think Your Honor is correct in the instinct that a stay, as defendants have asked for, isn't warranted here, in terms of waiting for the D.C. Circuit, because we don't know when they will decide the case. But, of course, you know, if -- Your Honor obviously needs the time you need to decide the issues, including this new tax issue.

**THE COURT:** Right. The main thing I just wanted to understand -- and I think I do now -- is it's not as though, with respect to the parties who have sought the injunctive relief, you know, some right is gone forever as of March 19th. If they were participating in the lottery, then I think they would be missing their chance for 2026. And that would create its own sort of urgency.

I understand that there's inherent urgency, given the

nature of the issues. But am I right that it's not tied directly to that March 4th to March 19th window?

**MS. LIAO:** So I will say that there is at least one plaintiff who hasn't been part of the preliminary injunction motion that is planning to participate in the lottery. And that is the Church on the Hill plaintiff.

We also are seeking to represent a class here. And the employers who are participating in the lottery I think would find it very helpful to know if the fee is going to be something they will have to pay as they're making their decisions about hiring and about participating in the lottery and so forth.

**THE COURT:** Well, understood. But the -- it sounds like the one named plaintiff who has actually sought the injunctive relief -- no -- the one named plaintiff actually in the case that's not seeking injunctive relief is the one that would be participating in the lottery; is that right?

You know, you say one plaintiff who hasn't been part of the preliminary injunction that's planning to participate in the lottery. So that's a plaintiff that's present but didn't move for preliminary injunctive relief.

**MS. LIAO:** Correct. So I think, in the end, Your Honor, as I said before, we understand the need for some time for Your Honor to decide the case. But we still submit there's some urgency for our plaintiffs who are moving, even if they're

not participating in the lottery, because of the harm they're facing in terms of not being able to proceed with their petitions.

**THE COURT:** All right. Fair enough.

What's the Government's perspective?

**MR. DAVIS:** I think, to start, Your Honor, that is quite reflective of irreparable harm that these named class plaintiffs have supposedly been ongoing this injury since the time the proclamation came down in September, but they waited until December to move. And I think it's also reflective of the lack of typicality and commonality that the named plaintiffs don't face any harm from the lottery, but they seek to represent an unknown amount of employees and employers who do -- who are subject to the lottery.

And I think it's also telling that the one plaintiff they have who's subject to the lottery didn't move for preliminary injunction or summary judgment, seemingly because of a lack of irreparable harm.

As far as timing goes, Your Honor, we're happy to do supplemental briefing on the impact of *Learning Resources*. If you want us to do that at the same time or sequentially, either way works, but also ready to talk about the case today.

**THE COURT:** That makes sense. Well, let's do this: I think having briefs of no more than ten pages -- and I think this should just be simultaneous. I understand the issues.

I've read the case. I just am interested in getting each side's representation about how it does or doesn't affect this case. And I think the plaintiffs appropriately didn't argue that in their notice, because it's not allowed by the local rules. But I would find it helpful.

So let's say simultaneous briefs of no more than ten pages by -- how about a week from today? And then I don't need any responses or oppositions. I just -- you know -- take your best shot at explaining what you think the import of the case is for the issues here, if any, and then I'll take that into consideration as part of the record.

**MS. LIAO:** Will do, Your Honor.

**MR. DAVIS:** Understood.

**THE COURT:** All right.

Okay. Then with respect to the substance, I have a number of questions. Some are about the -- essentially the Constitutional *ultra vires*-type claims. Some are about the APA claims. And, obviously, they just said Judge Howell spent a number of pages analyzing the issue that's now on appeal. But I think she laid out the basis for her position and her conclusions in that case at some length.

And so, really, for the plaintiffs, the question is whether you think that the *Chamber of Commerce* decision was just incorrect or it is inapplicable in a way, because there's relevant law in the Ninth Circuit that's different than the law

in the D.C. Circuit or some combination of those.

**MS. SUNG:** Esther Sung for the plaintiffs, Your Honor.

I think it's a combination of those things. I think the first order response that we would have as to why the cases are different and why Judge Howell's decision shouldn't dictate the outcome here is that you do have different plaintiffs before you. There's a different evidentiary record and different arguments. And, of course, there's also a different legal landscape, Your Honor.

We made reference to this earlier. But when Judge Howell issued her opinion, she did not have the benefit of the *Learning Resources* case.

And so I do think that with regards to our arguments as to why the proclamation is *ultra vires*, Judge Howell does touch on the three main arguments that we have in her opinion. But I would submit that her reasoning, in a lot of respects, doesn't support the conclusions that she reaches. And I can go into that some more, if you'd like.

**THE COURT:** I think I understand the -- your arguments. But when you say that there's a different evidentiary record and different types of plaintiffs, how is that relevant?

**MS. SUNG:** So our evidentiary record here on behalf of a variety of different employers, but particularly certain small and nonprofit employers who are not represented in the

*Chamber of Commerce* case, have made clear that the proclamation's $100,000 payment effectively eliminates the H-1B visa for them. They simply cannot access the H-1B visa the way that Congress intended for them to be able to. And there are declarations from each of them saying that it is simply unaffordable for them.

For example, the $100,000 payment is twice the starting salary of a teacher who would teach at any of the schools represented in the case. And so --

**THE COURT:** And I take your point, but my read of the decision of that case is that it was legal. It wasn't based on, for example, an idea that -- you know -- as to what the harm wouldn't be. It was really these paralegal arguments. That section 1182(f) and 1185 authorize the restriction and characterize it as a restriction. I know that's a big point of dispute. And probably we're not going to know the answer to that until the Supreme Court takes it up. But that's the -- that was the basis.

And so, in that regard, it sounds as though -- at least as to the *ultra vires* claims -- we'll talk about the APA claim, because there I really do think the Ninth Circuit law is meaningfully different than the D.C. Circuit law. But those -- it sounds like the legal arguments are more or less the same. And it's just a question of whether they will prevail or not.

**MS. SUNG:** Well, we certainly have multiple arguments

why we think that the proclamation is unlawful. And some of them do rest, in part, on the evidentiary record. Because I would submit that the evidentiary record here that establishes that the H-1B visa is effectively eliminated for small and nonprofit employers, as well as other employers, brings this case closer to, for example, *National* -- sorry -- *National Association of Manufacturers* than it does to, say, for example, *Hawaii*.

In the *National Association of Manufacturers* case, that court -- which is also a court here in the Northern District of California -- they were dealing with a proclamation that did actually eliminate the H-1B visa category, along with a bunch of other visa categories, in response to the coronavirus pandemic.

And the court there in *National Association of Manufacturers* found that that proclamation rewrites the carefully delineated balance that Congress had struck between protecting American workers and allowing American employers to hire, on a temporary basis, specialty occupation workers, and found that this contravened Congress' intent.

And so the same is happening here for many of the plaintiffs, as their declarations attest. The pathway -- the H-1B pathway is simply nonexistent for them now.

**THE COURT:** Right. Although it seems to me, again, that goes to the question of whether, I think, there's anything

in the proclamation that is inconsistent with other provisions of the INA.

**MS. SUNG:** Certainly. And I can go into those arguments, too, if you'd like.

**THE COURT:** Well, let me ask this: I mean, what is -- you know, really, the -- on this point, one of the core issues is, what's the best basis for your argument that the $100,000 payment here is not a restriction on the entry of aliens, which was basically the conclusion that the court reached in D.C., and how much of that is bound up in whether it's viewed as a tax as opposed to something else?

**MS. SUNG:** Let me break that into two -- into the separate pieces. So with regards to the proclamation being a restriction on entry, we do disagree with Judge Howell. The INA -- the structure of the INA makes very clear that the different stages in the H-1B application process are separate and distinct. They cannot be conflated with entry.

The Department of Labor certification, which is the first stage that an employer has to undertake in order to sponsor an employee, is governed by 20 different -- at least 20 different separate statutory provisions -- the USCIS petition that the employer must file, also governed by at least 20 separate statutory provisions that are distinct and not overlapping -- and also there must be an application for a visa made to a consular officer with the State Department. And that is all

before you even get to the worker attempting to enter the United States.

And so --

**THE COURT:** But is it your argument that somehow -- obviously, yes, there are many, many steps in this complicated administrative process. But the language of the statute is straightforward, which is: "Impose on the entry of aliens any restriction he," the President, "may deem to be appropriate."

And so is it your argument that to avoid the *ultra vires* problem, you're presenting this statute would have to have read what? Impose on the entry of aliens any visa restrictions? Or why is that -- why is the category of restrictions on entry not broad enough to cover all of the ancillary pieces that go into determining whether someone is ultimately eligible to enter?

**MS. SUNG:** It's a good question. I think it's -- it's a question of interpretation, I think. The term is "entry." And that has a distinct meaning that is treated differently by the INA with regards to other, again, predicate steps that are necessary for someone to be able to enter the United States.

And so I think that there are two cases that I'd point the Court to, to help illustrate this point. The first one is *Pacito v. Trump*. And the citation I have for you is 768 F. Supp. 3d 1199. And, in that case, the court was dealing with an executive order that concerned refugee admissions. And that order, similar to the order here, also directed the DHS

Secretary to suspend decisions on applications for refugee status. And the *Pacito* court held that the plain language of Section 1182(f) does not reference refugee applications, much less delegate authority to suspend agency operations directed by Congress. And so that -- that -- the court found that that section of the proclamation exceeds the statutory language of section 1182(f).

**THE COURT:** Although, I thought -- in that case, wasn't the issue that the agency had, itself, decided just to stop processing these applications because presumably the thought was, what's the point, because the proclamation is operating?

**MS. SUNG:** No. I think that's the *Gomez* line of cases. *Pacito* dealt with refugees and did not deal with visas. I actually -- the other case that I was going to bring the Court's attention to is the *Gomez* case. And I think it -- the court there did parse the language and structure of the INA and illuminated an important point to show that entry and visa issuance are not the same. And that's that Congress has made clear, through the application processes, that it has set out in the INA that visa issuance must be an independent process. And the cite I have for you here is 485 F. Supp. 3d at 194. And so, if you'll bear with me, the *Gomez* court walks through different statutory provisions.

First, 8 USC 1104(a) outlines the very considerable powers

that Congress gives to the Secretary of State in administering and enforcing the provisions of the INA. But that same section actually explicitly carves out and does not give the Secretary of State power over -- or influence over the powers, duties, and functions of consular officers as to the granting or refusal of visas. Congress gives the power over whether to issue or not issue a visa to consular officers in 8 USC Section 1202(d). And --

**THE COURT:** I read this in your papers.

**MS. SUNG:** Yeah.

**THE COURT:** I -- and, obviously, those are persuasive cases, just like *Chamber of Commerce*. But what, in your view -- what sort of entry -- when the statute grants the power to impose entry restrictions, in addition to those enumerated in the INA, which is the way that the Hawaii Supreme Court put it, in your view, what does that mean? That can't have anything at all to do with the visa process?

**MS. SUNG:** Yes. I think that the INA makes very clear that entry suspension is only an entry suspension. And that's because, if you look at 1182 itself --

**THE COURT:** But the statute uses "suspend" and "restrict." So if "restrict" is only "suspend," "restrict" would be superfluous.

**MS. SUNG:** I suppose, I will confess, I haven't thought through how a restriction would look different from a

suspension. But -- but very -- but I still think it's the case that 11 -- if you look at 1182, if you -- if you took the President at his -- well, at the -- if you took the President's power that he's claiming at face value, then a restriction or a suspension on entry would translate into a restriction or a suspension on visa issuance. And the INA -- the language of the INA doesn't support or permit that.

1182(a) makes clear when an individual is not eligible to enter the United States and also not eligible to receive a visa.

And 1182(f) specifies that the President only has the power to specify when an individual is not eligible to enter. It doesn't say anything about rendering that person ineligible to receive a visa.

And so, for that reason, the President attempting to suspend visa issuance, as well as any of the other predicate steps in the process, we think it's just not permitted by the language of the statute.

**THE COURT:** All right. Let me ask this. I think it goes to the second piece of my initial question that you were going to circle back to. Is your *ultra vires* argument necessarily dependent on the finding that there's an excess delegated power under the taxing clause? Or are there -- is there an independent way that that argument could be made?

**MS. SUNG:** I think I'm going to try and answer Your

Honor's question. But if I don't, please correct me.

I think that the -- the proclamation is *ultra vires* for independent reasons. One of them is that it is an unconstitutional tax and in violation of the powers that Congress has delegated to the President.

But then, in addition to that, it's our position that the proclamation is independently unlawful, because it exceeds the statutory grant that Congress has made to restrict or suspend entry and only entry. And then, again, separate from that, under the *Hawaii v.* -- sorry -- *Trump v. Hawaii* reasoning that the Supreme Court set out, it's our position that the proclamation does, in fact, conflict with and override the INA in an impermissible way with respect to the H-1B visa.

**THE COURT:** All right. I see. And so with respect to the statutory delegation argument, in your view -- and I'm not previewing any actual finding. I'm just trying to walk through the analytical --

**MS. SUNG:** Sure.

**THE COURT:** -- flow. If I were to find that the proclamation was within the scope of delegated authority under section 1182(f) for the -- you know -- on the grounds that we've just been talking about, I don't find that it impermissibly shades into this visa issuance piece. I don't find that there's a conflict. But, in your view, would I then still ask whether the delegation was broad enough to allow the

imposition of what you're characterizing as a tax, if I were to find it was a tax?

**MS. SUNG:** Yes. I think that's an independent reason to find the proclamation unconstitutional or unlawful. That the -- that Congress did not delegate specifically to the President in 1182(f) the power to impose a monetary assessment of this kind.

**THE COURT:** All right. I see.

So why don't I hear from the Government with respect to -- first, set aside the APA claim for now. But just talking about the *ultra vires* claims we've been talking about.

**MR. DAVIS:** So a couple of responses, Your Honor. I do think that they have three arguments. The first one essentially being that this is outside the scope of 1182(f), which they say both that it's essentially regulating domestic entities impermissibly and that it applies to visa issuance.

To the domestic entities point, *Chambers* rejected this and was partially reliant on *Doe* from the Ninth Circuit. That merits decision admittedly was vacated as moot later, but noted that almost all of the restrictions under 1182 are motivated by domestic concerns. *Hawaii* was motivated about safety and national security concerns within the county.

So the simple fact that there might be some domestic policy interest has no bearing on whether the proclamation is valid or not. That would be true of a lot of visas that

require sponsors, such as J and F visas, and there have been proclamations restricting those, as well.

On the visa issuance issue, again, we think the court got it right in *Chambers*, which said: It's a myopic view to see this as just about the moment they gain entry. For example, in *Hawaii*, the Supreme Court noted that the delegation for restrictions is extremely broad. It's any restrictions he may deem appropriate. And they cited to *Sale* and said, look, *Sale* allowed for a blockade in international waters. It's not just about entry ports.

And visa issuance is -- you know -- the point of a visa is to gain entry. And the Supreme Court in *Hawaii*, while there is a distinction between the two, says that Sections 1182(f) and 1152(a)(1), which there was about discrimination in allocation of visa issuance, operate in different spheres. Section 1182 defines the universe of aliens who are admissible into the United States and therefore eligible to receive a visa.

So, there, they were responding to this argument about 1152, and saying, well, that doesn't really apply here. But the Court acknowledges that 1182 as a section -- which 1182(f), the Supreme Court says, has ample authority to add in addition to the restrictions there -- both has admissibility requirements at the visa side and the entry side.

And I think if Your Honor took their argument seriously in parsing the two out so finely, and saying 1182(f) could never

apply to visa issuance, you'd end up with some really weird circumstances, especially here, where some aliens who might be trying to enter subject to the cap, would get a petition and get a visa issued and count against the cap, but then not be able to enter, and essentially just take that position away from anybody else who otherwise might be able to enter.

And that's why I think the court in *Chambers* really found that that distinction isn't in 1182(f) and doesn't make a lot of sense. Again, it's any restriction he may deem appropriate. And I think --

**THE COURT:** What -- what do you make -- or what am I supposed to make of that discussion that you were just talking about in *Hawaii*, which is at, it looks like, page 694 --

**MR. DAVIS:** Yes.

**THE COURT:** -- where it's talking about 1182 defining the universe of aliens who are admissible, and then once those boundaries are set, 1152(a) speaks to visas?

I have struggled a little bit with those D.C. court -- District Court cases that plaintiffs' counsel was talking about, in terms of what -- what does it actually mean, though, for these purposes, and how do those graph to the issue that's presented here? I'm having some trouble figuring that out.

**MR. DAVIS:** Yeah. I mean, it's a fairly complicated system, and one that's not super clearly delineated. I think what the Supreme Court in *Hawaii* was dealing with -- everybody

agrees, that was just -- on entry, there was a restriction. And the plaintiffs were arguing 1152, which is an antidiscrimination provision applies. But that's just about the allocation of visas. And the Supreme Court was just saying, okay, 1182 deals with both. There can be admissibility bars at both. But since this is just entry, and that's about the allocation of visas, that doesn't apply --

**THE COURT REPORTER:** I'm sorry. Will you please slow down?

**MR. DAVIS:** Yes, will do.

-- that that doesn't apply to the proclamation there.

But if you read through the section, the Supreme Court is saying that Section 1182 as a whole determines admissibility at two stages. The first stage being, when they try to apply for a visa, they can be ineligible there, and that can be under 1182, and the second stage, at entry.

And so 1182(f), as Supreme Court said, gives ample power to add restrictions in addition to those elsewhere in the INA. And I think it would be weird to read that as to not include other restrictions in 1182, which includes the visa issuance process.

And, quickly, on *Pacito*, Your Honor, I argued *Pacito* in the Ninth Circuit. And part of the issue was that the State Department stopped processing refugee applications, which was beyond the proclamation, and they thought it made sense to do

so. And the Court was concerned with that.

But the District Court, Your Honor, that they keep relying on, has been stayed about four times by the Ninth Circuit, including by the merits panel, which said that the proclamation there was likely to be lawful on the merits under *Hawaii*.

And the case there -- the plaintiffs argued many of the same arguments here -- that it was overriding Congress' reticulated scheme for refugees, saying, well, if you just suspend the entry of all refugees, that gets rid of this entire scheme. And the Ninth Circuit continually has said, in stays, that the proclamation is likely lawful.

And so I think that also rejects their argument about this replacing H-1B; same reasons that the court in *Chambers* relied on. This is their restriction in addition. It's not replacing any of the qualifications. All the same people can apply. So it's not replacing the H-1B program. It's just a temporary restriction of $100,000 in order to enter the country.

And I think it's also important to know, Your Honor, that in both *Chambers* and here, they talk about the fees. If you look at the fees, none of them are exclusive. None of them are prohibitory of other payments. None of them occupy the field of what the proclamation is doing here.

And, even so, if you look at some of the fees, like the premium visa fee and the fraud fee, they acknowledge that there can be other fees that can apply. None of them restrict

additional payments.

If you take plaintiffs' argument seriously to its logical extent, it's basically any time Congress lays out a fee or lays out a visa eligibility requirement, that implies there can be no other restrictions. But that runs completely contrary to what the Supreme Court said about 1182(f) as being ample power to impose restrictions in addition to the INA. All those fees, all the qualifications for H-1B remain in place.

And to the factual point, Your Honor, about some of the individual plaintiffs maybe not being able to make the payments here, there are always people who can't make the fee payments. Obviously these fee payments are higher. These payment requirements are higher than they have been. But, in *Chambers*, they had members who argued the exact same thing. So I don't think that that's really a basis for making a distinction here.

And if we want to talk about the taxing power, I can talk about that piece, as well.

**THE COURT:** You can. Is the *Pacito* case still on appeal?

**MR. DAVIS:** So we had the merits argument. After the merits argument, that panel issued another stay to replace the previous ones from a different panel and reiterated that at least the proclamation was likely to succeed and the injunctions against that would stay. There's a separate piece about funding that they didn't stay, but that's not

particularly relevant here. They have not issued the final decision yet. So it's still awaiting the final decision.

**THE COURT:** I see. When was the argument?

**MR. DAVIS:** It was in September.

**THE COURT:** I see. All right. Well, why don't you address the taxing clause piece. And then I'll allow plaintiffs' counsel to talk to that too.

**MR. DAVIS:** So I think our first point, Your Honor, is the Supreme Court has recognized that not every payment requirement is a tax. The Eighth Amendment, for example, speaks of excessive fines. And so in *NFIB v. Sebelius*, dealing with the individual mandate under ObamaCare, the Supreme Court went through an analysis to figure out whether that was a penalty or was a tax. One of the things it looked at was who collects the payment. And it said, well, the IRS does. So that favors it being a tax.

Here, it's USCIS, like any other sort of payments for visas. The court also looked at, well, is this prohibitory or not. And the Supreme Court said, well, the individual mandate can't be prohibitory, because it can't possibly be more than the insurance you're getting.

Here, on the other hand, while we don't think it's prohibitory, the other side says it is. Their whole argument is that there's an irreparable harm, because some of these companies are prohibited from being able to buy or pay the fee.

So we think that that cuts against it being a tax. And in *Learning Resources*, the Supreme Court noted that the whole purpose and the central focus of a tax is to raise revenue.

Now, admittedly, this was not in the record, Your Honor, because we sort of figured out the numbers as it has gone on. But I can tell you, it is not raising revenue from where H-1B fees typically are. And the only evidence that plaintiffs have to the contrary is a quote of a video and an article. And if you watch the full video, the President is actually talking about the Gold Card. And they try to make that ambiguous, but if that's their only evidence that it's raising revenue, which isn't the case, that cuts against it being a tax.

But even if Your Honor thinks, okay, this is a tax, then we get to the next question of, did Congress delegate that authority? And we think clearly the answer is yes.

Under both *Skinner* and *FCC v. Learning Resource*s, which was very recent, Congress can delegate taxing authority to the executive. And it doesn't have to be any more clear than any other authority. And *Learning Resources* didn't change that. And we think that the delegation here is quite broad.

Ruth Bader Ginsburg, when she was on the D.C. Circuit, said that the power is sweeping in *Hawaii*. That goes throughout the entire opinion, saying exudes deference. This is broad discretion, a broad delegation. And the language is "any restriction he may deem appropriate." We think that that

quite easily encompasses a limited payment here. It's for a temporary time on the entry of particular aliens. And we don't think *Learning Resources* changes that outcome.

First, Your Honor, the only majority opinion there was for the textual analysis. But the text and context here are quite different. There, the text was regulation of importations with about 16 words separating the two, as the Supreme Court pointed out. Again, here, we have a very broad, in the Supreme Court's own words, delegation -- as Ruth Bader Ginsburg said, a sweeping delegation -- of any restriction he may deem appropriate.

And, in fact, the Supreme Court, in *Learning Resources*, distinguished a case where the President did -- was allowed to impose tariffs under a different statute that said -- I believe that the precise words was "adjust imports." But it says "adjust imports as he deems necessary." And they said, well, that delegation there is much broader than the one here. But if you listen to that language, "as he deems necessary," is quite similar to "as he may deem appropriate," under 1182(f).

But even if we get into the major questions doctrine, which a majority didn't join in *Learning Resources*, that still starts with the texts in the context, as we just went over, but also it's about the match between how broad the delegation is and how broad the authority asserted is. And we disagree with the Supreme Court on this, but the Supreme Court characterized

the tariff power being asserted there as the President being able to raise tariffs as high as he wanted, as long as he wanted, on whatever countries he wanted. And they said that's quite broad. And that's a traditional tariff power for Congress.

But, here, 1182 is restricted to the entry of aliens. And it's temporary. So the power being asserted is much narrower than the power there, but the delegation is much broader. And the Court also noted there, the Government admitted there was a $15 trillion impact on the economy. There's no evidence like that here. They also talked about the history, which plaintiffs also say there hasn't been another 1182 proclamation that imposed a payment requirement.

But the plaintiffs, in *Hawaii*, made very similar arguments. That there wasn't a history of similar proclamations there. And the Supreme Court said that doesn't have any impact on how broad we read this language and the deference that's due. So, frankly, Your Honor, we think *Learning Resources* has no bearing on it. We don't think this is a tax. But even if Your Honor disagrees and looks even at major questions doctrine, we think 1182(f) is a broad enough delegation to accomplish the narrow proclamation at issue in this case.

**THE COURT:** And just one factual point I want to be sure I understood.

**MR. DAVIS:** Yeah.

**THE COURT:** You suggested that the H-1B provision isn't raising revenue. Do you mean as a matter of fact it's not raising much revenue? What do you mean?

**MR. DAVIS:** So this has not been in the record, because these are numbers that are still sort of coming in, admittedly. But, yes, as a matter of fact, the proclamation with the provision, when you offset that against the other fees that would be coming in for petitions, it is not raising revenue at all.

**THE COURT:** Well, although, that might be because people are deciding they can't afford to pay.

**MR. DAVIS:** That -- sure, Your Honor, there are fewer petitions. And so -- but -- but I think that goes to showing that it's not a tax. Because its purpose and effect is not to raise revenue. And so that's my only point with that.

And I think, you know, again, we don't think it's prohibitory, in the sense that it's overriding H-1B or nobody can do it. About 70 people have so far already paid for it -- 70 employers. But plaintiffs' whole position is that it's prohibitory. They were just saying that. And, again, under *Sebelius* --

**THE COURT REPORTER:** Please slow down. Sorry. Please slow down.

**MR. DAVIS:** And, again, under *Sebelius*, if that's the

case, that cuts against it being a tax in the first instance. And so that's -- that's my point with the revenue.

**THE COURT:** All right. Although, it did seem -- you know -- the *Consumers' Research* decision at least seems to suggest it doesn't matter whether we call it a tax or something else. I mean, did the *Sebelius* principles apply regardless, when I'm trying to decide if the congressional taxing power is being exercised?

**MR. DAVIS:** Yes, Your Honor. I see *Skinner* and the *Center for Research* case just saying that Congress can delegate the texting authority in the way it can delegate any other authority. It doesn't have to be more clear. But the question in *Sebelius* is still what operates here. Because in *Sebelius*, the challengers were arguing that it wasn't a tax; it was a penalty. And the Court did this analysis to say, okay, what bucket does it fall into? Because not every payment requirement's a tax.

Again, the Eighth Circuit -- or the Eighth Amendment talks about excessive fines. There are penalties. There are regulatory fees. And so I think whether you figure out whether it's a tax or not is still the *Sebelius* analysis.

**THE COURT:** All right. Why don't I give the plaintiffs the last word on this piece, and then we'll move on to the APA.

**MS. SUNG:** Yeah. Sure, Your Honor.

So I think the first response I have here is that, with regards to the question whether it's a tax or a fee or what have you, the Supreme Court has abandoned distinctions between regulatory and revenue raising taxes.

For example, *Bob Jones University v. Simon*, 416 U.S. 725, 741, note 12. And I think, as Your Honor was alluding to, the *Skinner* case that we cite in our briefs is just one of many cases in which the Supreme Court has reiterated that when Congress is going to delegate the discretionary authority to the executive to impose monetary assessments of any kind, regardless of whether they are characterized as fees or taxes, it has to do so clearly. That delegation has to be expressed.

And the Supreme Court's decision in *Learning Resources* only reinforces that point. That the delegation must be clear and with limits. And that's because it's an exercise of the taxing power. And, in fact, in *Learning Resources*, the Supreme Court was very clear that that power is granted to Congress and the Constitution. That Congress gives -- excuse me -- that the Constitution gives only to Congress the power to access the pockets of the people. And that all bills raising revenue must originate in the House of Representatives.

And so to speak to the language in the delegation, yes, 1182(f) the Supreme Court did hold -- although it was Chief Justice Roberts who wrote the majority opinion in *Hawaii* and not Ruth Bader Ginsburg -- that 1182(f) does exude deference to

the President in every clause, but the President's still bound by the terms of the clause. All of the language in 1182(f) concerns entry.

And there's nothing in 1182(f) that concerns fees, taxes, monetary assessments of any kind. And so the lesson from *Learning Resources* is that when you do have the President claiming a power that encroaches upon Congress' birthright power to tax, then there must be a clear delegation -- one with limits -- and that's just not what has happened here.

And the Supreme Court did emphasize, again, the power of -- the power to tax. The power to reach into someone's pocketbook is so powerful and has such an impact that the delegation must be clear. And simply to say -- for Congress to say that it's giving the executive the power to regulate anything is not the same thing as granting the power to tax.

The Supreme Court said it does not follow that the power to regulate something includes the power to tax it as a means of regulation. And they -- the Court expressed skepticism that within the language of the IEEPA, Congress hid a delegation of its birthright power to tax.

**THE COURT:** Though our delegation statute doesn't use "regulate." It uses "restrict" or "suspend" or --

**MS. SUNG:** That's correct. But also 1185 does talk about reasonable rules and regulations and orders relating, again, specifically to entry. And I think the greater point

here is that none of those words touch on taxing or imposing monetary assessments of any kind.

And I'd point out that the Supreme Court, in *Learning Resources*, did look at other provisions within the IEEPA and other provisions in which Congress had delegated tariff imposing power to the President. And I think that exercise is useful here, because the INA does show that Congress knows how to delegate its taxing power and how to exercise its taxing power.

It delegated, to the agency, the authority to set fees in Section 1356(m). And the agency has done that over the years with notice-and-comment rulemaking. And Congress has also set fees through at least five other statutory provisions relating to the H-1B visa.

And so I think the reason why *Learning Resources* has such import here is because if you do consider 1182(f) to delegate to the President the power to impose, unilaterally, a payment requirement of any amount on anyone at any time, as long as that payment is nominally connected to the entry of a foreign national into the United States, then there is no boundary within Section 1182(f) for that authority.

And so my colleague here keeps on talking about our position and taking that to its logical extreme, but -- or logical end. But I think the problem that we have here is that there -- the position that the Government advancing is -- is

unbounded. There is no constraint on the President's power if this is a permissible exercise of the restriction or suspension on -- the power to restrict or suspend entry granted in Section 1182(f).

And if I could address some of the other things that my colleague here said with regards to some of the other statutory interpretation issues. With regards to *Pacito* -- so, yes, the District Court's decision there has been stayed. But none of the Ninth Circuit opinions that have stayed the District Court's opinion specifically touched on this issue and this holding. And that's why we've been citing to it.

With respect to the idea that Congress must expressly say: And the President can't add any more when it comes to fees, and that that must be the case all the time -- that is certainly not our position. Our position here, with respect to this case, is that Congress has stepped into the space and filled it, and has solved the specific problem that the proclamation is trying to address with a specific solution.

And that's actually key to the Supreme Court's analysis in *Hawaii v. Trump*. It found, in that case, that -- well, it considered, in that case, whether Congress had stepped into the space and solved the exact same problem addressed by -- in that case, the Muslim ban -- the travel ban -- and it decided that the hadn't -- that Congress hadn't done that. But we have very different facts here -- a very different statutory scheme

here -- and our argument is based on that.

The H-1B visa -- we go through this in our papers -- it is legislatively dense. It is the most legislated visa in the INA. And there are multiple -- there are dozens of statutory provisions expressing Congress' intent as to the contours of the program. And also the legislative history of the H-1B visa reflects that Congress has calibrated the program multiple times over the years, adjusting the cap on visas that are allowed, altering which employers are subject to the cap, adjusting the fees.

And the $100,000 payment requirement sweeps away all of that congressional calibration. It obviates all of those provisions. And, again, in a space where Congress has filled the space. And to read Section 1182(f) the way that the Government is proposing, it does allow the President to render superfluous or effectively meaningless all of Congress' -- all of the many dozens of enactments that Congress has made to calibrate the H-1B program.

**THE COURT:** Although, it -- I assume your argument is not that there's something express in the statute that says only X dollars may be charged. There's no conflict in that regard; right?

**MS. SUNG:** No. But -- so what -- certainly, though, Congress did not say that. And I actually think that that's part of what Judge Howell based her opinion on. She said that

there's no -- that there's nothing in, for example, 1356(m) that says and the -- that the President can't do more.

But the language in *Hawaii* indicates that that kind of direct instruction from Congress is not required. *Hawaii* said we may assume that Section 1182(f) does not allow the President to expressly override particular provisions of the INA.

But then the court went on to say, but plaintiffs have not identified any conflict between the statute and the proclamation that would implicitly bar the President from addressing deficiencies the nation's vetting system. And then it did go on to consider, again, whether Congress has stepped into the space.

And with regards to the national -- the visa waiver program, it found that Congress had not. But our point here simply is that we're dealing with a very, very different statutory scheme here, where Congress has, in fact, stepped into the space.

And also, just very quickly, the Government's argument with regards to 1182 and admissibility and entry -- the Government's court addresses this in its opinion. So I won't belabor the point. But when the Supreme Court talked about admissibility and the issuance of visas and the -- and tried to express if they are indistinct fears, all of the provisions that the Supreme Court relied on to talk about sort of ineligibility for entry or for admissibility to the United

States and also ineligibility to enter -- excuse me -- to receive a visa -- again, that goes to the distinction that the *Gomez* court found between 1182(a), which, again, specifies those individuals who are both ineligible to enter the United States and ineligible to receive a visa. But 1182(f) is separate. It only speaks to entry.

And my friend here is trying to muddy the waters. And that's not actually what the Supreme Court did. And the *Gomez* court does provide a very good explication of a statutory structure there.

And also *Sale* -- we discussed this in our papers. They were -- in *Sale*, the Government was enforcing an 1182(f) ban by denying entry. And so it doesn't speak to visa issuance or anything of that nature.

**THE COURT:** Let me ask this before we switch over to the APA issue. I did see in your papers -- and this was something that Judge Howell, in her opinion, ended up identifying as a potential difference between Ninth Circuit law and D.C. Circuit law, which is the principle from the preliminary injunction order in *Doe 1* that talks about, you know, essentially this domestic versus foreign affairs distinction.

But my reading was that the merits decision just flatly abrogated that. And I know that the merits decision was then vacated as moot too. But are you relying on that principle

from the *Doe* PI order in any way? Because it seemed to me that it didn't carry through to the merits decision.

**MS. SUNG:** No. Your Honor's right. And the Government likes to hold this up as a straw man, I would submit. Because that's actually not what we're arguing here.

And as you know, even in the Ninth Circuit in the decision that did get vacated, it found that the District Court's distinction between domestic and foreign impacts wasn't supported by the language of 1182(f), because 1182(f) itself does not say anything about domestic versus foreign.

What we were trying to do in our papers in bringing up the domestic impact of the $100,000 payment requirement is to speak to, again, the breadth of the power that the President is claiming here, and why, you know, with the benefit of the *Learning Resources* decision from the Supreme Court, it is an unconstitutional tax. Because the President is claiming, again, the unilateral power to impose a payment requirement of any kind, any amount, on anyone, including here, U.S. employers, so long as that payment requirement is made, again, nominally in connection with the entry of a foreign national.

And the language of the statute doesn't -- just doesn't support that. And as a matter of constitutionality, it's -- I think the *Learning Resources* case says that it's unconstitutional because only Congress is given the power to reach into the pockets of people in the United States. And --

Case: 26-6667, 11/06/2026, DktEntry: 30.1, Page 77 of 240

but that's the power that the President is claiming here.

**THE COURT:** All right. Then some questions about the APA claims for both sides. And, really, just for the plaintiffs, I'm trying to understand whether all of your APA claims are derivative of the claims against the proclamation or are there some that are freestanding? You know, so, for example, in the motion, you say section 1182(f) does not authorize either the President or executive agencies to go beyond the parameters that your cocounsel was just laying out.

But I'm interested in understanding which are arguments that would be maintained even if the proclamation were found to be lawful. Potentially, I think the procedural notice-and-comment claim probably is independent. I'm wondering if, for example, you're saying that there is a stand-alone claim of arbitrary and capricious action in determining eligibility for an exemption, for example, which is not spelled out in the proclamation, and was interpreted narrowly by the agency.

But, at any rate, which, if any, of your APA claims would independently proceed to be analyzed if I were to find that the proclamation was not *ultra vires*?

**MS. LIAO:** Cynthia Liao for the plaintiffs.

Yes, Your Honor. That's -- what you're saying is correct. There are APA claims here that would be an independent basis to set aside or enjoin the agencies of implementation. And those

are the arbitrary and capricious claims and the notice-and-comment claims.

**THE COURT:** But not the -- for example -- the contrary to law claim, because that would depend on -- that would rise and fall with the proclamation; wouldn't it? The idea that imposing a $100,000 payment is not authorized by the law -- that comes from the proclamation. And so that one's dependent on the proclamation; is it not?

**MS. LIAO:** Correct. If the proclamation -- if our tax argument goes the other way, then that would fall away. If it was lawful for the proclamation to cover more than just entry, then that would fall away, as well.

**THE COURT:** I see. And then one of the obvious disputes is over whether there was final agency action. And in that regard, what is it -- what are the actions that you've identified? I understand there are some memos. There's a frequently asked questions page. But what -- what, in your view, is the agency action that would be the subject of your APA claim? And what are you asking to have vacated? You know, in a normal APA case, there's a rule. And the request is for vacatur of the rule. Here, we have memos and website pages. But what is your conception, if I were to agree with you on the APA piece -- and, again, I'm not saying I've decided that -- but what would the relief be?

**MS. LIAO:** So the guidances that the agencies have put

out -- September guidance and the October guidance -- particularly the October guidance, since that's what seems to be operative right now -- those are the -- those are rules under the APA. And I would refer to the 5 USC 551(4), which defines "rule" as: "An agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy." And that definition includes prescription for the future of rates, prices, or practices bearing on the foregoing.

**THE COURT:** No, I get it. But the -- the discussion we're -- let's say I agree with you, there's final agency action, and it is these documents. What -- what is the ask? You know, normally, if it's vacating the rule, then the rule gets vacated, and it goes back to the agency, and they come up with a different rule or flesh out the record on the rule. What would you be seeking to have enjoined? The application of those processes? What's the -- what's the actual ask?

**MS. LIAO:** So we would ask that the agencies be enjoined from requiring the $100,000 payment from employers.

**THE COURT:** But, see, that part, it really does seem, is contingent on the proclamation. How could they not do -- if I found the proclamation was lawful, how could I order them not to follow the proclamation? I don't understand.

**MS. LIAO:** Yeah. So I'm happy to address that, Your Honor. So I think earlier you had mentioned that this might be

an area where there is a difference in terms of Ninth Circuit law versus other circuits' law. And I think this is hitting on that point. So in the *Nebraska v. Su* case, there were similar facts to what we have here, where there was an executive order that required $15 an hour minimum wage.

**THE COURT:** Right. And I've read *Su* really carefully. But what the court there didn't do is say you can't impose the $15. They -- the court said you should have considered other things. You've got to go back. You've got to do more work. But definitely the order there was not, we are directing you to not impose the $15 minimum wage. Do you read it differently than that?

**MS. LIAO:** Well, it's actually pretty typical practice for rules to fall in their entirety, even if there -- for those kinds of reasons, where the agency didn't consider something or didn't do notice-and-comment. That doesn't mean that after doing notice-and-comment are properly considering the factors that they should have considered, that they theoretically couldn't come to the same conclusion later. And that principle is illustrated in the *DHS v. Regents* case. But in the meantime, because they haven't followed the legal procedures under the APA, that rule should not be in place and should be set aside.

**THE COURT:** So, I see. It's the idea -- the idea would be essentially a bar on the implementation of the

proclamation, even if the proclamation itself is lawful, until the requirements of the APA are complied with.

**MS. LIAO:** Correct. And that comes, I think, from the -- it comes, in part, from how the language of the proclamation is written. So the proclamation gives the Secretary of DHS discretion to grant exceptions by industry, by company, or by individual, which really gives the agency a lot of discretion in shaping who is subject to this fee.

And because there's that kind of discretion, and because the agencies have gone out and exercised that, they are subject to the APA. And so they need to be reasonable and reasonably explain their decisions as to who is subject to the fee, because they are imposing real legal practical consequences on people.

For example, our plaintiff, BAE Industries, currently has an employee who's stuck outside the country because of the fee. And are plaintiff, Nephrology Associates, has their fourth nephrologist that they finally found, after nine months of recruiting, not able to start because of the fee. These are -- this is a final rule -- final agency action that is reviewable and needed to go through notice-and-comment.

**THE COURT:** All right.

So then, for the Government, on this point, I don't know how you read *Su* to say anything other than, even where there's a concrete directive from the executive, the agency still needs

to conduct inquiry and explain its reasoning. And I do think that probably is unique among circuits.

The *Bradford* case from the Tenth Circuit that you cited was one that the Ninth Circuit actually directly rejected in *Su*. And so why doesn't *Su* impose an obligation that is separate from the proclamation itself to, you know, conduct reasoned decision-making? And, there, they actually -- the agency went through notice-and-comment rulemaking. And even there, the Ninth Circuit found that it wasn't enough. So how is *Su* not controlling on this point?

**MR. DAVIS:** I think the fact that the agencies acknowledged and historically had done notice-and-comment rulemaking there cuts against its applicability here. Because, in *Nebraska v. Su*, that was an executive order. Executive orders generally don't have the force of law in and of themselves. They rely on agencies to then implement them.

And, historically, including the change under Obama, they had gone through notice-and-comment rulemaking. They had done sort of the normal APA analysis, but they just failed to do it for the $15 part. And that's what the court focused on.

But, here, the actual authority that Congress delegated in 1182(f) was that the President can issue proclamations. And that is what has the force of law. It's the President's proclamation that has the force of law. And the agencies are merely implementing it. And the agencies have no ability

under -- since that has the force of law -- to diverge from what the President lays out in the proclamation.

And I think plaintiffs are making very clear here today, and in their papers, that what they're really challenging is the $100,000 fee. But there's no discretion about that. That is required by the proclamation. And so -- you know --

**THE COURT:** But why -- but there was no discretion in *Su* either.

**MR. DAVIS:** Well, I think that -- again, the difference there, Your Honor, is that the Government essentially conceded they had to go through rulemaking; that they did arbitrary and capricious for everything but that; and historically had done so; and that that was an executive order, which, again, by itself, does not have the force of law. Where here, Congress gave the President the force of law through a proclamation. That's what 1182(f) is. That's why a proclamation is different than an executive order. And so the agencies have no ability to move off of that.

And I think, you know, that the plaintiffs sort of give the game away when, in a footnote, they hide *Trump v. Orr*, which is a Supreme Court stay. And, there, the plaintiffs were arguing, well, that even was an executive order saying, well, the agencies didn't engage in a clear review. And it's arbitrary and capricious that they made this change to the passport.

And the Supreme Court said, they're not likely -- the Government's likely to succeed on the merits on that, because the President has the authority to sort of dictate that. And they couldn't do differently.

And I think, you know, the D.C. Circuit -- and I don't think you have to read *Nebraska* and *Su* and the D.C. Circuit's decision in *Make the Road* separately. I think they can be read in harmony for this EO reason. But, there, the Secretary of DHS had a lot of discretion. And the D.C. Circuit unanimously said, well, if they have to -- if the DHS Secretary has a lot of discretion and can dictate this, there's no point making them go through notice-and-comment. There's no point with arbitrary and capricious, because they have to follow it, regardless of what the comments are. And that's the same here.

**THE COURT:** But I -- again, I -- it sounds like your only distinction as to the reasoning of *Nebraska v. Su* is that an executive order is different than a proclamation; is that fair?

**MR. DAVIS:** I think that is a core distinction. And I think that distinction matters. Because an EO, again, is a directive to agencies, but doesn't, by itself, have the force of law. Where a proclamation, especially under 1182(f), is Congress giving the President the power of law there. So they're just implementing it.

There's a long line of D.D.C. cases acknowledging this.

It would be a complete circumvention of the rule against applying the APA to the President. And especially when the power is given to him to issue a proclamation, to say that they then have to engage in arbitrary and capricious review or notice-and-comment for things that the proclamation says and dictates itself.

And the only thing that they say goes beyond the proclamation here are the exceptions. But they don't show that they're injured by the exceptions. They don't show how vacating the guidance would really remedy anything. That's just one USCIS guidance. There actually wasn't a rule there. The agency was just providing some notice to the public.

But the Secretary still has complete discretion to do any sort of exception she wants. And that would be committed to agency discretion. And I don't see how it's -- redresses their injuries to vacate that when they could literally just issue a new guidance without that exception piece in it.

What they're really trying to do is circumvent *Franklin* and attack the proclamation directly, which we think is impermissible. And we think there's plenty of case law that justifies that.

**THE COURT:** Yeah. The piece I really need is whatever cases you think stand for the idea that, for these purposes that we're talking about, which is what the APA requires in the face of a Presidential directive to action, that an executive

order is meaningfully different than a proclamation.

Because the *Su* case straightforwardly says that even with an executive order that directs particular action, APA processes are required. What cases do you think stand for the principle that the executive order at issue in *Su* is jurisdictionally or doctrinally different than the proclamation so as to make *Su* inapplicable?

**MR. DAVIS:** Well, I don't know that I have a case on the proclamation front, because, frankly, plaintiffs almost never bring these types of notice-and-comment challenges to the implementation of proclamations, even though 90 of them have been done since the '50s. I think that itself is telling.

I think *Trump v. Orr*, although it's not a massively explained interim order, does stand for the proposition that when the President has authority and dictates what the agencies should do, that it's not arbitrary and capricious for them to do that.

And I think one of the guidelines you can think about with *Nebraska v. Su* is there is a lot of cases saying that executive order themselves are -- do not have the force of law. But that's just not the case for proclamations. That's the whole point of Congress giving the President the power to issue the proclamations. That does have the force of law itself.

And it would be a complete circumvention of that -- of *Franklin* and of a lot of these doctrines -- if all the

plaintiffs had to do was say, well, the agencies are implementing it. So we get to challenge it, and essentially make them go through notice-and-comment, and say it's arbitrary and capricious that they're doing exactly what the President has the authority to say that they must do. Like, that is completely contrary to *Make the Road*. And I don't think *Make the Road* is contrary to *Nebraska v. Su*, Your Honor.

**THE COURT:** And the way that the *Su* court put it is that the Supreme Court has never accepted a final rule from APA review because it carried out a Presidential directive, nor have we or any other circuit. So what's the limiting principle to that?

**MR. DAVIS:** I think it's the same thing. It's the difference between a directive without the force of law, like an EO, versus a proclamation, which, itself, has the force of law.

And I think if we don't take that to be true, that's a complete circumvention of giving this power to the President. Because of course the President can't literally implement it by himself. *Tulare*, *Seila Law* acknowledges itself that of course the President has agencies, has officers that have to carry out his directives. But to say that just because -- that he has to have somebody implement it -- as long as they're just implementing the proclamation, that can't be challenged.

And, again, what they're really challenging here is the

$100,000 payment, saying, well, they have to go through notice and comment. And we would have told them why they shouldn't have imposed that. But they have no discretion to not impose it. The proclamation says so.

As *Make the Road* from the D.C. Circuit says, it's completely pointless to have them go through this process when they have literally no discretion. And they don't have any discretion here.

**THE COURT:** But they did have discretion to define the scope of exceptions. And they defined it exceedingly narrowly, with no input from anyone.

**MR. DAVIS:** Well, I would disagree with that, Your Honor. USCIS, in their guidance, which is not a substantive rule -- it's merely interpretive and has no real binding effect -- and, in fact, USCIS cannot bind the Secretary. The Secretary did not make a decision or a final agency decision to restrict her discretion. And even if she did, that's committed to agency discretion. She has complete ability to choose how to do exceptions the way that she wants to do. That's sort of the nature of the exceptions. Then I don't think that they can use that as a back door in order to take down the entire proclamation itself.

And sort of getting to what you asked here, Your Honor -- so we're just talking about the USCIS guidance document. If you vacate that, and you say the final agency action or the

thing they need to consider was the exceptions, I don't see why the agency just couldn't issue a new guidance not saying anything about exceptions. And then they still have to face the $100,000 fee. I think there's a real redressability issue here.

**THE COURT:** Why wouldn't I be able to order notice and comment if I find that it's a rule that should have been subject to notice-and-comment?

**MR. DAVIS:** Well, I -- that would be subjecting, essentially, the proclamation to notice-and-comment. And I don't think that that's permissible for then reasons *Make the Road* does.

And there's, I think, a few other responses there, Your Honor. That would completely undermine the point of 1182(f), which is that the President can quickly, whenever he finds, issue a proclamation to have any restrictions he deems appropriate. It completely undermines that if they have to do -- if the agency has to do notice-and-comment just to implement the exact things the President sets out.

And even if you think that that -- that these are final agency actions and substantive rules, which we disagree with -- we think, at best, they're interpretive rules of the proclamation, which has the force of law -- there are a couple of exceptions to notice-and-comment that are clearly applicable here.

One, being good cause, because, by the nature of proclamations, they're supposed to be whenever the President finds. And they're time limited. This one is only a year. But if you require them to go through notice-and-comment, people will come in, they'll get the petitions, and then they can't really easily be removed and subject to requirements for payment later. So it's kind of a one-way ratchet in that sense.

And, in fact, plaintiffs' own evidence that talks about even the 48 hours before the proclamation went into effect, a ton of people were rushing back and trying to get in petitions beforehand. So it completely undermined the purpose of 1182(f) to be this flexible tool of the President to quickly, whenever he shall find, make a proclamation, unless good cause applies.

We also think the foreign affairs exception applies. And in the Supreme Court's decision in *Hines*, in *Knauff v. Shaughnessy*, in *Hawaii*, they repeatedly make clear that issues of immigration are tied up with national affairs -- with foreign affairs and national security -- and that the President has a lot of authority there.

*Knauff* says, sure, Congress has authority here, but the executive also has inherent authority. And since Congress gave this delegation in this realm here, under *Youngstown*, this is the maximum of his power. And so we think, you know, given the international aspect of immigration that the Supreme Court has

repeatedly recognized, it obviously falls within foreign affairs. And the plaintiffs --

**THE COURT:** So, obviously, so did *Trump v. Hawaii*.

**MR. DAVIS:** Yes. I mean, I agree. And -- but, there, nobody argued about the cause of action. There was a judiciability argument about consular reviewability. And what the Supreme Court said was, that's a really difficult question. And we're not going to address it, because it's lawful.

So I don't think *Trump v. Hawaii* stands for the proposition that there can have these broad APA challenges. I think it's telling that nobody made those types of comment and comment challenges to the proclamation in *Trump v. Hawaii*, even though there were so many rounds of litigation against it. Because, again, I think it would undermine the core purpose of 1182 and how it has historically been used for over 90 proclamations since the 1950s.

And I'll just -- real quick, the main case that they rely on to be the contrary point is *East Bay*. *East Bay* was kind of a strange case, Your Honor, because DOJ and DHS actually did issue a rule, which they acknowledge was a rule, separate from the proclamation. And with the proclamation, they were supposed to work in tandem in order to change the rule of decision for asylum within the United States.

So it wasn't sort of an entry determination. And the rule for DHS and DOJ was issued under a separate authority from the

proclamation. And, there, they didn't go through notice-and-comment or do arbitrary and capricious for that rule. And the Ninth Circuit said, well, we don't necessarily think that it's exempt from going through rules there. But I don't think that necessarily would carry over to just a pure application of the proclamation that we have here.

**THE COURT:** And why, given that there was a rule and a proclamation that were essentially simultaneous, it looks like?

**MR. DAVIS:** Well, because they were mostly -- they were really challenging the rule. And the rule was promulgated subject to separate authority under DOJ and DHS's authority. It wasn't just implementing the proclamation. And they were supposed to work in tandem. And they sort of acknowledged that that was a rule. But they tried to get out of notice-and-comment for that separate rule.

So that's not the same as it just being the proclamation, and they're simply ministerially implementing the proclamation, which is precisely what's happening here.

**THE COURT:** Although, I guess -- I'm just looking at the *East Bay Sanctuary* at 770. And the Court said: We don't have any authority, under Section 706 of the APA, to review the proclamation, which is consistent with what you're saying. However, we may review the substantive validity of the rule together with the proclamation. What does that mean?

**MR. DAVIS:** I think, again, that goes to the fact that

DOJ and DHS were issuing a rule separate and under separate authority, and that's what was being challenged there. And, again, they acknowledged that that was a sort of separate rule under separate authority. They were just supposed to work in conjuncture. But also, those weren't entry restrictions. They were a rule of decision for asylum within the United States, which I think is also an important distinction when we're talking about the foreign affairs implications and the intersection of immigration law and also national security in foreign affairs that the Supreme Court has repeatedly recognized in *Hines*, *Fiallo v. Bell*, *Knauff v. Shaughnessy*, and *Hawaii* -- and that Bybee, at certain points in this opinion, in *East Bay*, also acknowledges.

**THE COURT:** And so I'm just reading same page: The rule and the proclamation together create an operative rule of decision for asylum eligibility. It is the substantive rule of decision, not the rule itself, that the organizations have challenged under the APA. And insofar as DOJ and DHS have incorporated the proclamation by reference into the rule, we may consider the validity of the agencies' proposed action, including its rule or the equivalent.

What does that mean?

**MR. DAVIS:** I think that I read that in conjunction with what I've been saying. That that was a separate rule under separate authority. And they were challenging that rule.

And to the extent the rule was just trying to rely on the proclamation or incorporate it, they could still be challenged. But they were doing something different there under different authorities, and they were working in conjunction.

But, again, here, all we have is the proclamation and the mere implementation of that proclamation. And if that's enough, then there are essentially no limits on challenging a proclamation. And the proclamation can be second-guessed by notice-and-comment and arbitrary and capricious, even though the agencies have no discretion, because Congress gave the lawful authority to issue proclamations and to set any restrictions he may deem appropriate.

And I would just -- want to pause real quick on the implications of applying arbitrary and capricious here. Because in *Trump v. Hawaii*, they said the proclamation -- the President doesn't have to lay out all of his justifications. We're not going to second-guess his policy choices. He doesn't have to connect all of the change and connect all of the dots to do it.

But that's precisely what's subjecting the proclamation vis-à-vis the implementation by agencies to arbitrary and capricious would be. It would be the public and courts second-guessing the policy determinations as plaintiffs want to of whether to impose $100,000. But the Supreme Court flatly rejected that in *Hawaii*. And I think it's telling that, until

recently, there haven't really been these notice-and-comment challenges to proclamations. And I think that's part of the reason why.

**THE COURT:** All right. Last word from the plaintiffs on this point.

**MS. LIAO:** Yes, Your Honor. That was a lot, so let me just go through point by point.

So in terms of *Nebraska*, the statute that the Government relied on there is similar to the one that is at issue here. It allowed the President to prescribe directives. So there's no meaningful difference between *Nebraska* and this case in that sense. And there -- there is discretion that the agencies have under the proclamation and that they have just simply been simply exercising on their own.

So one example is the development of the agencies' exceptions policy, which is much narrower than the exceptions provision in the proclamation.

Another example is what they did in the September and October guidance that we talked about in our reply brief, where, in September, the agencies created a rule that the fee applies to new petitions, but not to renewal positions. "Renewal" is not a term that's been used like that before. It's not in the statute. It's not in the regs. It's not in the proclamation. They created that new categorization for this new rule they were creating.

**THE COURT:** Right. But the challenge here -- I mean, I take -- I take your opposing counsel's point. And this is going to be tricky. And I'm going to have to really drill down into this, because this is a place where a misstep is very possible.

You're not saying, though, go back and come up with a better explanation for the exemptions or, you know, consider alternatives to the exemptions, the kind of things that *Su* was talking about. You're saying -- you said it, and it makes sense -- you're saying, until you do these things, you can't impose the $100,000 payment requirement. But how is that anything other than using the APA to negate the proclamation itself?

**MS. LIAO:** I feel it goes to the fundamental, I think, misconception underlying the Government's theory. So *Nebraska* was very clear that the APA's text doesn't carve out agency actions that implement Presidential directives.

**THE COURT:** Right. Although, what about this idea that proclamations are different than executive orders? I mean, I have to do a lot of research on that myself. But what's your response?

**MS. LIAO:** Well, the defendants haven't been able to point to anything. And, as I discussed, *Nebraska* involved a statute that had similar language to what we have here. That statute said prescribe directives -- the President can

prescribe directives. 1185 talks about the President prescribing rules, regulations, et cetera. There's not really a meaningful difference as far as we're aware.

So, here, even if you take what defendants call the "ministerial implementation" kind of approach to the APA, in that world, if the agency is just merely following what a proclamation says, then it's not subject to APA review. Even if that's the standard. That's not what the agencies are doing here. The agencies are, on their own, creating rules about who is going to be subject or excepted from this fee. And so notice-and-comment would have been meaningful here.

So as I was talking about, when the September guidance was the operative regime, BAE Industries employee went abroad under the understanding that if he was to renew his visa, even if he was abroad, his employer wouldn't have to pay the fee. But five days later, without notice, without comment, without advance warning, the agency issued new guidance changing the rules. They dropped the renewal language. Now if you're abroad, and you need to renew your visa, your employer does have to pay the fee.

And as a result --

**THE COURT:** But doesn't that cut against the idea that there's any final agency action? That's -- you're saying it wasn't final. They said one thing and then they did something else.

**MS. LIAO:** It wasn't --

**THE COURT:** What's the final action that you're challenging at this point?

**MS. LIAO:** So finality is -- there's two prongs; right? One, is that the agency has decided; right? And so at the time of the September guidance, that was their decision. That's how they wanted to slice and dice who is in and who is out. And then they had another final agency action in October, when they changed the rules and sliced it a different way.

And the second prong is that there needs to be legal consequences that flow, which can be met if there's direct and immediate effect on the day-to-day operations of the subject party. And that's exactly what we're seeing with BAE Industries. One day they were under one legal regime. The second day, they were under a different one.

And so those legal consequences really illustrate what -- why we have the APA, which is to promote reasonable, deliberative policymaking, as the Ninth Circuit talked about in *Nebraska*. If there had been an opportunity for employers like BAE Industries to chime in, they could have pointed out that, agency, as you are figuring out who to accept, which industries to grant exceptions to, or who this applies to, please consider that we have people in this kind of situation.

Plaintiffs like Nephrology Associates could point out that, you know, we're in rural North Carolina. We are in a

medically underserved area recognized by HHS. There's a specific pathway Congress created for J-1 physicians to work in those areas on H-1Bs. And please consider having an exception for -- for this pathway. But there was no such opportunity. And that failure to conduct notice-and-comment was prejudicial.

**THE COURT:** All right. Well, I think, here, the question that I'm going to have to figure out is whether just as a matter of law, notice-and-comment applies or not. I mean, really, that will be the driver of the result. And I think there's some more drill-down research I need to do on these questions we've been talking about.

**MR. DAVIS:** Your Honor, can I make two quick points?

**THE COURT:** Sure.

**MR. DAVIS:** So if you look at -- I believe this is 760 in *East Bay* -- the court in the background breaks down the rule and the proclamation. It says the rule was invoked under the Attorney General's power pursuant to 1158(b)(2)(C). Explains what that rule is.

If you go over to the analysis of the substantivity of the rule, *East Bay* makes clear they're not subject to -- they're not reviewing the proclamation, and talks about how the rule is contrary to other parts of 1158, which is the section that the rule was promulgated under.

**THE COURT:** Where are you -- where are you getting this?

**MR. DAVIS:** That's under -- let me see if I can find -- 770 through 771. And if you look, it says the INA grants the Attorney General the power to set additional limitations and conditions beyond those listed in 1155(a)(8)(B)(ii)(A). It's talking about the Attorney General's power, but then talks about how they believe that that's inconsistent with other parts of 1158.

And, briefly, on the -- whether this is ministerial or going beyond the proclamation, I don't -- I at least understand the exceptions argument. We disagree that that's a final agency action that the Secretary has made any sort of final decision or that that could be subject to review. I don't really understand their argument for there being any other action that goes beyond the proclamation.

What the guidance says and what I think they're talking about is that, if you're in the United States and you seek a change in status, an extension, an amendment, those change-in-status attempts are not subject to the proclamation.

Their own plaintiff, Phoenix Doe, is proof positive of that. She sought a change in status and received it without having to pay the fee and dropped out of the case. But people abroad, if you're trying to do that, or if you have to leave the country to make those sorts of things, then it does apply.

That follows directly from the proclamation, section 3, which is about the scope. Says that it applies on entry or

attempt of entry after the effective date. That's just the difference between them being in the United States or being in entry bar. So that's not an extension or a change in the proclamation. And even so, making more people not subject to the fee in no way harms plaintiffs. In fact, it's a benefit to them. And that can't be used as a back door to sort of bring down the entire proclamation the way plaintiffs want to.

**THE COURT:** Right. You're saying that narrowing the scope of the proclamation can't be injurious.

**MR. DAVIS:** Right. If that's the agency action that they say is going beyond implementation.

**MS. LIAO:** Your Honor, if I may be heard on that?

**THE COURT:** Sure.

**MS. LIAO:** So our point about the changes from September to October is not to say that narrowing the proclamation is something we want to take away. The point is to show that the agencies are making their own decisions as to who is subject to the fee, even apart from what is in the text of a proclamation. And because they're doing that, it's an agency action that's reviewable under the APA, and it's subject to arbitrary and capricious review. And because it's a legislative rule, it is also subject to notice-and-comment.

**THE COURT:** All right. Well, I'm going to have to decide that.

Those are the questions that I had. I actually don't need

to hear any argument on the class certification piece of it.

As to the motion to stay, I'll just deny it for reasons indicated already. I mean, obviously I think we're all in line to get some valuable guidance from what we hear from the D.C. Circuit. But given that the -- that that decision is not binding on the plaintiffs here, I don't think the equitable right direction is to formally stay this case.

Now, I will certainly be tuning in on March 9th to see what we hear in that argument. But I don't think a formal stay is warranted. And so I'll deny that motion for that reason.

**MR. DAVIS:** Understood, Your Honor.

**THE COURT:** All right. I'll take it under submission, pending the submission of your supplemental briefs a week from today. And then it will be considered submitted, unless I hear otherwise.

**MS. LIAO:** Thank you, Your Honor.

**MR. DAVIS:** Thank you, Your Honor.

**THE COURT:** All right. Thank you. Your arguments were helpful. Thank you.

(Proceedings adjourned at 3:31 p.m.)

---oOo---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Sunday, March 1, 2026

Kendra A. Steppler, RPR, CRR
Official Reporter, U.S. District Court

Cynthia Liao (CA Bar No. 301818)*
Johanna N. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending

[Additional co-counsel on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

GLOBAL NURSE FORCE; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 4811; INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO COMMITTEE ON INTERNS AND RESIDENTS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; GLOBAL VILLAGE ACADEMY COLLABORATIVE; SOCIETY OF THE DIVINE WORD; FATHERS OF ST. CHARLES; CHURCH ON THE HILL; JOHN SMITH; PHOENIX DOE; and

NEPHROLOGY ASSOCIATES OF THE CAROLINAS, PA, individually and on behalf of all others similarly situated; and

BAE INDUSTRIES, individually and on behalf of all others similarly situated; and

**Case No. 4:25-cv-08454-HSG**

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Administrative Procedure Act Case**

**Class Action**

LOWER BRULE DAY SCHOOL, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as Director, U.S. Citizenship and Immigration Services; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State,

*Defendants*.

## TABLE OF CONTENTS

I. INTRODUCTION .....1

II. JURISDICTION AND VENUE .....5

III. DIVISIONAL ASSIGNMENT .....6

IV. PARTIES .....6

- A. Employer Class Representatives .....6
- B. Other Employer Plaintiffs .....7
- C. Employee and Union Plaintiffs .....8
- D. Other Plaintiffs .....10
- E. Defendants .....11

V. LEGAL BACKGROUND .....12

- F. Congress Created the H-1B Visa to Ensure the U.S. Could Attract Necessary Workers in Specialty Occupations .....13
- G. In Designing the H-1B Program, Congress Included Protections for U.S. Workers .....14
- H. Congress Created a Detailed Statutory Scheme to Govern the H-1B Process That Balances Private and Public Sector Needs .....16
  - 1. H-1B Registration and Lottery for Cap-Subject H-1B Visas ..... 16
  - 2. Cap-Exempt H-1B Visas ..... 16
  - 3. H-1B Petition Process ..... 17
  - 4. Visa Issuance and Entry ..... 17
- I. Congress Established a Detailed Fee System for H-1Bs That Sets Parameters on Fees and Dictates Their Use .....18
- J. The President's Ability to Restrict Entry Under the INA Does Not Authorize Him to Override Congress's Comprehensive H-1B Statute .....20

VI. FACTUAL ALLEGATIONS .....21

- A. The President's Proclamation .....21

1. The Proclamation is Based on Multiple Errors of Fact and Ignores the Benefits of the H-1B Program to the American Economy ..... 23

2. The Proclamation's Exorbitant $100,000 Fee Is Unprecedented and Unjustified, and the Exception Process is Ripe for Abuse ..... 24

3. After the Ill-Planned Proclamation Caused Immediate Harm, the Government Began to Backtrack ..... 25

B. The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions. ..... 26

C. The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest ..... 29

1. Health care ..... 29

2. K-12 school systems ..... 36

3. Manufacturing ..... 41

4. Religious organizations ..... 43

5. Research and academic institutions ..... 52

VII. CLASS ALLEGATIONS ..... 54

VIII. CAUSES OF ACTION ..... 57

IX. PRAYER FOR RELIEF ..... 64

## I. INTRODUCTION

1. The H-1B visa program was established by Congress to provide a pathway for American employers to hire skilled non-U.S. workers in specialty occupations. There are around half a million H-1B workers in the United States[1] across a range of specialty fields, including researchers and workers in the science, technology, engineering, and mathematics (STEM) fields; doctors, other healthcare providers, and medical researchers; university professors and K-12 educators; and religious leaders. The standards for granting an H-1B petition focus on the worker's specialized knowledge and academic credentials. While many H-1B workers are employed in the computer technology industry, more than a third of all H-1B workers are in other fields.[2]

2. The H-1B visa program is a critical pathway to hiring educators and healthcare workers—two categories in high demand in the U.S.—who comprise 10% of all H-1B workers.[3] The United States faces a projected shortfall of nearly 86,000 physicians in the next decade, particularly in medically underserved areas of the United States and places with health professional shortages, where nearly two-thirds of all foreign-trained physicians in the United States—including almost 23,000 H-1B workers, between 2001 and 2024—practice.[4] Nurses, too, are in short supply, particularly after the COVID-19 pandemic drove many nurses out of the profession, and insufficient staffing raises nurses' stress levels. K-12 school districts also rely on the H-1B visa program to fill critical vacancies, especially in rural areas facing acute staffing shortages,[5] and the H-1B visa program allows colleges and universities to hire talented scholars

---

[1] Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Wash. Post (Sept. 24, 2025), https://perma.cc/4YEH-DGLY.
[2] *Id.*
[3] *Id.*
[4] *AMA urges DHS to exempt physicians from new $100,000 H-1B visa fee*, Am. Med. Ass'n (Sept. 25, 2025), https://perma.cc/T69U-67BY.
[5] *Administration Announces Changes to H-1B Visa Program*, The School Superintendents Association (Sept. 24, 2025), https://perma.cc/ZT2K-BB2T.

Case: 26-6667, 11/06/2026, DktEntry: 30.1, Page 109 of 240

and researchers from around the world, enabling American students to learn from and research under the supervision of these experts in specialized fields.[6]

3. The H-1B program also allows religious organizations to retain priests and pastors who have the language skills, cultural competency, and religious training needed to minister to underserved populations, including poor refugee and migrant communities and economically distressed Appalachian communities.

4. The H-1B program drives innovation and economic growth in the United States. It allows employers to fill labor shortages in specialized fields and fuels workers to invest additional dollars in the U.S. economy. It supports immigrants in creating new businesses that expand the U.S. labor market.

5. H-1B visas are issued for an initial three-year term, and workers who hold these visas can have either immigrant or nonimmigrant intent—meaning Congress intended there to be a path to permanent residency for some H-1B workers, who may ultimately become lawful permanent residents (i.e. "green card" holders)—and may freely travel in and out of the United States.

6. The Immigration and Nationality Act ("INA") sets forth a comprehensive and detailed scheme for the H-1B program and process, specifying qualitative and numeric limits on the number of H-1B visas to be granted, the standards for approving an H-1B petition from an employer, the standards for detecting and addressing unlawful use of the program by employers, and the fees to be charged and allocation and use of those funds by the government.

7. Without warning on Friday, September 19, 2025, President Trump issued a Proclamation titled "Restriction on Entry of Certain Nonimmigrant Workers"[7] (the "September 19 Proclamation"). The Proclamation "restricted" entry into the United States of workers on H-1B visas, conditioning it on their employers making a $100,000 "payment" to the federal

---

[6] Ellie Davis, *What Trump's $100,000 Fee for Skilled-Worker Visas Could Mean for Higher Ed*, Chron. Higher Educ. (Sept. 22, 2025), https://perma.cc/J6J5-UDAM.
[7] Proclamation No. 10,973, 90 Fed. Reg. 46,027 (Sept. 19, 2025).

government, starting less than 36 hours after issuance, at 12:01 am ET on Sunday, September 21, 2025.

8. At the Oval Office ceremony unveiling the Proclamation, Commerce Secretary Howard Lutnick stated that it would be "a hundred-thousand dollars a year for H-1B visas" and that "[e]ither the person is very valuable to the company and America, or they are going to depart, and the company is going to hire an American."[8]

9. The broad language of the Proclamation and the unprecedented changes to this long-standing program caused a widespread panic, with employers instructing employees to return to the United States before 12:01 am ET on Sunday, September 21, and/or not to leave the country at all. Workers rushed back to the United States, abandoning family events and vacations, while others frantically requested to de-plane flights they had already boarded before they left the United States.

10. Government agencies scrambled to respond to the chaos. Three agencies issued public statements over the weekend, in the days and hours after the Proclamation: the United States Citizenship and Immigration Services ("USCIS") which adjudicates the employer petitions; the United States Department of State ("State" or "State Department") which adjudicates visa applications submitted by H-1B nonimmigrant workers; and United States Customs and Border Protection ("CBP") which inspects and admits foreign nationals seeking to enter the United States.

11. Collectively, the agencies' statements reflected the new policies the agencies quickly adopted to implement the Proclamation: A one-time payment of $100,000 is required "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025 ("$100,000 Requirement"). Payment is a condition for adjudication of any such H-1B petition, consular processing for H-1B visas, and entry into the United States for H-1B workers.

---

[8] Johana Bhuiyan, *Trump signs proclamation imposing annual $100,000 fee on H-1B visas*, The Guardian (Sept. 19, 2025), https://perma.cc/GQ23-AX3U.

Case: 26-6667, 11/06/2026, DktEntry: 30.1, Page 111 of 240

12. While the agencies' policies limit the $100,000 Requirement to new petitions and carve out renewals, the new policies did not differentiate between petitions for workers who are outside of the United States and those for workers who are already inside the United States, seemingly expanding the Proclamation's "entry" ban to include individuals who have already entered the country, not just those "currently outside the United States" as stated in the Proclamation.

13. Shortly after Plaintiffs' filing of this lawsuit, USCIS issued new guidance on October 20, 2025. Under the new guidance, the $100,000 Requirement applies to any new H-1B petition filed after the effective date on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa at the time of filing. The guidance also provides that, in some cases, the $100,000 Requirement will apply even if the prospective worker is physically present in the United States at the time of filing. Individual exceptions to the $100,000 Requirement will be granted only in "extraordinarily rare circumstance[s]."

14. Defendants' abrupt imposition of the $100,000 Requirement is unlawful. The President has no authority to unilaterally alter the comprehensive statutory scheme created by Congress. Most fundamentally, the President has no authority to unilaterally impose fees, taxes, or other mechanisms to generate revenue for the United States, nor to dictate how those funds are spent. The Constitution assigns the "power of the purse" to Congress, as one of its most fundamental premises. Here, the President disregarded those limitations, asserted power he does not have, and displaced a complex, congressionally specified system for evaluating petitions and granting H-1B visas. The Proclamation transforms the H-1B program into one where employers must either "pay to play" or seek a "national interest" exemption, which will be doled out at the discretion of the Secretary of Homeland Security, a system that opens the door to selective enforcement and corruption.

15. Executive Branch agencies similarly cannot act contrary to or beyond the authority conferred by statute, nor can they act beyond or contrary to their own regulations. In immediately adopting the $100,000 Requirement without notice and comment, the agencies

failed to go through required regulatory processes. The $100,000 Requirement is also arbitrary and capricious. The government failed to consider how extorting exorbitant fees will stifle innovation. The government failed to consider harms to hospitals, churches, schools, and universities, and small businesses and non-profits, or how the fee will harm communities across the nation. Indeed, economic data and studies confirm that the new $100,000 Requirement will harm, not help, the U.S. economy and workers and their families in the United States.

16. Plaintiffs are a health care business that helps hospitals across the country fill critical vacancies with qualified nurses from abroad, schools, religious organizations, labor unions, and workers, who are all facing the sudden $100,000 Requirement. Plaintiffs bring this action against President Donald J. Trump, the U.S. Department of Homeland Security ("DHS"), its subagencies USCIS and CBP, the State Department, and the heads of these agencies (collectively, "Defendants"), to challenge the legality and implementation of the Proclamation. Plaintiffs seek declaratory relief and injunctive relief because the Proclamation and the agencies' subsequent actions exceed the President's Constitutional authority and contravene the statutory H-1B process and program.

## II. JURISDICTION AND VENUE

17. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(C). Plaintiff Local 4811 of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW Local 4811"), maintains its principal place of business in Berkeley, California. Plaintiff Phoenix Doe also resides in the Northern District of California. There is no real property at issue in this case.

19. Joinder is proper in this action as the questions of law are identical to all Plaintiffs in this action.

## III. DIVISIONAL ASSIGNMENT

20. Per N.D. Cal. Civ. L.R. 3-2(c), this action shall be assigned to the San Francisco/Oakland Division, because Plaintiff UAW Local 4811 is headquartered in Alameda County and has affected members at the University of California at San Francisco.

## IV. PARTIES

### A. Employer Class Representatives

21. **Plaintiff Nephrology Associates of the Carolinas, PA** ("Nephrology Associates") seeks to represent a class of similarly situated individuals under Rule 23. Nephrology Associates is a medical practice focused on serving patients with kidney issues. It is incorporated in the state of North Carolina, with a principal place of business in Shelby, North Carolina and an additional office in Rutherfordton, North Carolina. Nephrology Associates has approximately 19 employees, including three physicians, three nurse practitioners, and other medical, administrative, and support staff. Nephrology Associates' practitioners provide care at its two office locations, at five dialysis clinics, and at Cleveland County's only hospital, Atrium Health Cleveland, which is part of the Advocate Atrium Health System, the third-largest nonprofit hospital system in the nation. Nephrology Associates' practitioners are the only nephrologists who have privileges to provide kidney care at Atrium Health Cleveland.

22. **Plaintiff BAE Industries ("BAE")** seeks to represent a class of similarly situated individuals under Rule 23. BAE is a privately held automotive parts manufacturing company headquartered in Auburn Hills, Michigan, with approximately 250 employees. Founded in 1970, BAE specializes in precision metal stamping, assembly, and integrated component manufacturing. BAE provides support across the entire manufactured parts production cycle, from initial concept and prototyping through full-scale production and launch. BAE operates multiple production facilities across Auburn Hills, Warren, and Fraser in the Metro Detroit region. It plays an important role in the automotive supply chain and related manufacturing sectors, supplying components that must meet stringent quality, performance, and regulatory standards.

23. **Plaintiff Lower Brule Day School** seeks to represent a class of similarly situated individuals under Rule 23. Lower Brule Day School is a K-12 school serving the Lower Brule Sioux Tribe with a principal place of business on the Lower Brule Reservation in Lower Brule, South Dakota. Lower Brule is located in the rural central part of the state. The Lower Brule Sioux Tribe is part of the Great Sioux Nation, a historic alliance of the Lakota, Nakota, and Dakota people of the Northern Plains. There are approximately 3,400 enrolled members of the Lower Brule Sioux Tribe, of whom approximately half live on the Reservation. Lower Brule Day School serves approximately 350 K-12 children, of whom 99% are American Indian and 100% qualify for free or reduced-price lunch.

**B. Other Employer Plaintiffs**

24. **Plaintiff Society of the Divine Word—Chicago Province** (also known as "Societas Verbi Divina," "SVD," and the "Divine Word Missionaries") is a religious missionary order of Roman Catholic priests and brothers presently serving in almost eighty countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the Provincial Superior of the province—is a non-profit, tax-exempt organization employing several hundred employees. Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it depends on the availability of H-1B visas for foreign religious workers with specialized skillsets, including Polish, Spanish, and Vietnamese language abilities.

25. **Plaintiff Fathers of St. Charles** is a non-profit, tax-exempt religious organization and part of the Congregation of the Missionaries of St. Charles – Scalabrinians, a Roman Catholic international religious community dedicated to serving migrants and refugees of different cultures, religions and ethnicities in thirty-five countries on five continents. The Congregation was founded on November 28, 1887, by Saint John Baptist Scalabrini (1839-1905), the bishop of Piacenza, Italy, who at that time recognized the far-reaching social and religious implications of the massive emigration from Europe toward the Americas occurring at that time. Fathers of St. Charles, whose province (the St. John the Baptist Province) covers the United States, Canada, Mexico, Guatemala, and El Salvador, keeps its provincial office in Oak

Park, Illinois, and has been serving migrants for well over a century. It is a non-profit, tax-exempt religious organization that employs approximately thirty-five people in the United States. Fathers of St. Charles' missionary focus for the last twenty-five years has been to be in mission with migrants, with a focus on the very poorest migrants. This mission compels Fathers of St. Charles to provide all pastoral activities, including sacramental and liturgical activities, Bible study, and formation, in the native languages of the people they serve.

26. **Plaintiff Church on the Hill d/b/a Algood First Baptist ("Church on the Hill")** is a non-profit 501(c)(3)-approved religious organization. The church was formed seventy years ago but officially incorporated in its current structure in 2003. It has approximately five employees located in the Appalachia region. In 2021, the church branched out and established a new church congregation, which began with twenty members and has since grown to over 200 members. The new church is in a different location and serves an underserved, economically disadvantaged region in Appalachia. Both Church on the Hill and the new church have established ministries for children, youth, families and students, as well as community outreach that meets both practical and spiritual needs.

**C. Employee and Union Plaintiffs**

27. **Plaintiff John Smith** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. Pastor Smith arrived in the United States in 2021 on an R-1 nonimmigrant visa for foreign nationals in religious vocations and is currently working full-time at a church as a pastor in the Appalachia region. His R-1 nonimmigrant visa will expire next year. He has been instrumental in overseeing the expansion of the church's congregation to a second location, and provides essential pastoral and spiritual services and guidance to the congregation's members and the local community.

28. **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B change-of-status petition has been halted due to the $100,000 Requirement, putting at risk her work on detecting and treating blinding conditions and disrupting the laboratory that relies on her.

29. **Plaintiff UAW Local 4811** is a labor union headquartered in Berkeley, California that, jointly with the UAW International, is the exclusive collective bargaining representative for 48,000 workers at the University of California ("UC") across three distinct bargaining units and has a membership comprised of graduate student employees and non-student academic employees at UC. The Academic Student Employees unit, represented by UAW International and Local 4811, consists of over 36,000 UC employees working in positions such as graduate student researcher, teaching assistant, reader, and tutor. The Postdoctoral Scholars unit represented by UAW International and UAW Local 4811 consists of over 7,000 UC non-student employees working as postdoctoral scholars, who are early career scientists with doctorate degrees that perform research. The Academic Researchers unit represented by UAW International and UAW Local 4811 consists of over 5,000 UC non-student employees working in positions such as researcher, project scientist, specialist, and coordinator of public programs.

30. **Plaintiff the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW International")** is one of the largest and most diverse unions in North America. Headquartered in Detroit, Michigan, the UAW International has members in the United States, Canada, and Puerto Rico, and in virtually every sector of the economy. From its earliest days, the UAW International has been a leader in the struggle to secure economic and social justice for all people. The UAW International has nearly 1,000,000 active and retired members and represents approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at institutions across the country including the University of California, California State University, University of Southern California, California Institute of Technology, UC Law San Francisco, California Institute of the Arts, University of Oregon, University of Washington, Washington State University, Columbia University, New York University, Harvard University, University of Pennsylvania, Princeton University, and Johns Hopkins University, among many others.

31. **Plaintiff Committee of Interns and Residents, SEIU ("CIR")** is a local union of the Service Employees International Union, AFL-CIO ("SEIU"). CIR is headquartered in Long Island City, New York, and represents more than 40,000 interns, residents, and fellows in hospitals throughout the United States including California, Delaware, Florida, Idaho, Illinois, Massachusetts, Minnesota, New Jersey, New Mexico, New York, Pennsylvania, Rhode Island, Vermont, Washington, and Washington, D.C. CIR and CIR members are dedicated to improving residency training and education, advancing patient care, and expanding access to healthcare.

32. **Plaintiff American Association of University Professors ("AAUP")** is a non-profit membership association and labor union of faculty and academic professionals throughout the country. AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. The AAUP has approximately 50,000 members on college and university campuses across the country. AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good. The AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities.

**D. Other Plaintiffs**

33. **Plaintiff Global Nurse Force** is a limited liability company with its principal place of business in Laguna Beach, California. For the past decade, Global Nurse Force has been connecting talented international nurses with healthcare facilities around the world. Global Nurse Force has placed over 10,000 nurses at more than 175 hospitals throughout the UK, Ireland, Canada, Australia and the Middle East. In the United States, where there has been a growing nursing shortage, Global Nurse Force has assisted U.S. health systems to recruit highly skilled

and experienced international nurses on H-1B specialty worker visas. Global Nurse Force operates a direct-hire model where the nurses come in as permanent employees of the hospital and receive the same pay and benefits as the hospital's regular staff. Global Nurse Force takes care of the logistics, including recruitment, credentials verification, licensing, immigration, and relocation. Although Global Nurse Force operates in various countries, its business model for its U.S. operations relies on the H-1B system and the ability of U.S. healthcare facilities to sponsor nurses for H-1B visas.

34. **Plaintiff Global Village Academy Collaborative ("GVAC")** is a public, non-profit organization established in 2013, authorized under Colorado statute, and headquartered in Thornton, Colorado. For over a decade, GVAC has operated similar to a school district, providing centralized operational and educational support services to its member schools (the Global Village Academies, or "GVA") and its staff across Colorado. Global Village Academies are tuition-free, public charter schools providing English and second language immersion instruction (K-8) in Spanish, Mandarin Chinese, Russian, or French to its students. There are currently 3 Global Village Academy schools across the cities of Aurora, Thornton, and Parker, Colorado, which currently serve around 2,200 students collectively.

**E. Defendants**

35. **Defendant Donald J. Trump** is the President of the United States and is sued in his official capacity.

36. **Defendant U.S. Department of Homeland Security ("DHS")** is a federal Department headquartered in Washington, D.C. It is responsible for administering immigration law, including H-1B adjudications through USCIS**.**

37. **Defendant Kristi Noem** is the Secretary of Homeland Security and is sued in her official capacity.

38. **Defendant U.S. Citizenship and Immigration Services ("USCIS")** is a component agency of DHS, headquartered in Camp Springs, MD. It is responsible for adjudicating H-1B petitions and other immigration petitions.

39. **Defendant Joseph B. Edlow** is the Director of USCIS and is sued in his official capacity.

40. **Defendant U.S. Customs and Border Protection ("CBP")** is a component agency of DHS, headquartered in Washington, D.C. It is responsible for inspecting and admitting foreign nationals into the United States.

41. **Defendant Rodney Scott** is the Commissioner of CBP and is sued in his official capacity.

42. **Defendant U.S. Department of State ("State" or "State Department")** is a federal Department headquartered in Washington, DC. It is responsible for administering U.S. visa programs, including consular processing for H-1B visas.

43. **Defendant Marco Rubio** is the Secretary of State and is sued in his official capacity.

## V. LEGAL BACKGROUND

44. The purpose of the H-1B provisions is to "help employers who cannot otherwise obtain needed business skills and abilities from the U.S. workforce by authorizing the temporary employment of qualified individuals who are not otherwise authorized to work in the United States." *MadKudu Inc. v. USCIS*, No. 20-CV-02653-SVK, 2020 WL 7389419, at *1 (N.D. Cal. Nov. 17, 2020); 8 U.S.C. § 1101(a)(15)(H)(i)(b); 8 C.F.R. § 214.2(h)(1)(i).

45. The H-1B visa has been the subject of more legislation than any other visa category and has been repeatedly modified and changed over the last 35 years. Congress has created a complex, but consistent, visa category to give U.S. employers access to the talent they need from every part of the world for jobs in any field that require at least a bachelor's degree as an entrance requirement.

46. While many H-1B employers and workers are in the information technology ("IT") industry, H-1B workers are a diverse group, and do not solely reside in Silicon Valley. There are H-1B employers and workers living across the United States, including Texas, New

York, California, Colorado, and Illinois.[9] They work in religious organizations like churches, rural medical clinics, and local high schools. Some are entrepreneurs while others serve the public or work in non-profits. All pay taxes and bring value to their communities.

47. As set forth in more detail below, Congress carefully designed the H-1B program to attract highly skilled workers to the United States while also protecting workers already in the United States. For example, Congress set annual limits on the number of H-1B workers and requires that employers pay a mandated prevailing wage and abide by other worker-protection rules. Congress also established detailed filing fee provisions. Congress crafted this framework to balance the interests of workers inside the United States and employers needing to fill vital roles, support innovation, and provide services in communities that would not be possible without H-1B workers.

**F. Congress Created the H-1B Visa to Ensure the U.S. Could Attract Necessary Workers in Specialty Occupations**

48. The United States offers a range of visa categories that Congress created and spelled out in the INA. H-1B visas are awarded to individuals who are sponsored by employers to work temporarily in qualified specialty occupations. *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b). Typically, they are initially granted for three years and can be extended to six years. 8 U.S.C. § 1184(g)(4), 8 C.F.R. § 214.2(h)(13)(iii)(A).

49. A "specialty occupation" is an occupation that "requires theoretical and practical application of a body of highly specialized knowledge in fields of human endeavor." 8 C.F.R. § 214.2(h)(4)(ii). These fields include, but are not limited to, "architecture, engineering, mathematics, physical sciences, social sciences, medicine and health, education, business specialties, accounting, law, theology, and the arts." *Id.*; *see also* 8 U.S.C. § 1184(i)(1). To qualify as a "specialty occupation," the occupation must require a bachelor's or higher degree in a directly related specific specialty, as a minimum for entry. 8 U.S.C. § 1184(i)(1); 8 C.F.R.

---

[9] *See, e.g.*, Carolyne Im, et al., *What we know about the U.S. H-1B visa program*, Pew Research Center (Mar. 4, 2025), https://perma.cc/GCE3-3AG7.

§ 214.2(h)(4)(ii). A medical doctor, for example, is a specialty occupation because generally one must obtain a medical degree to work as a doctor.

### G. In Designing the H-1B Program, Congress Included Protections for U.S. Workers

50. Congress has highly regulated the H-1B visa category, particularly since 2000, to ensure that the United States enjoys the benefits of bringing in highly-skilled workers from abroad while ensuring that all workers—both workers coming to the U.S. and workers already in the U.S.—are protected from depressed wages and exploitation.

51. For example, Congress sets numerical limits on the annual number of H-1B workers, except for those employed by higher education or research institutions, who are exempt from the statutory "cap" on the number of visas available per fiscal year. 8 U.S.C. § 1184(g)(1)(A), (5). The statutory cap is 65,000, plus an additional 20,000 available only for individuals who have earned a master's or higher degree from a United States institution of higher learning. *Id.* § 1184(g)(1)(A)(vii), (5)(C).

52. Congress also requires that the employer pay the H-1B worker the higher of: (1) the actual wage the employer already pays to similar workers in that occupation; or (2) the prevailing wage for the occupation in the geographic area of intended employment. 8 U.S.C. § 1182(t)(1)(A)(i); 20 C.F.R. § 655.731(a). This prevailing wage requirement is designed to ensure that employers cannot undercut the U.S. labor market by hiring H-1B workers and paying them lower wages than those typical for their job in the U.S. labor market.

53. The employment of the H-1B worker also cannot adversely affect the working conditions of similarly employed workers, and the Department of Labor ("DOL") must certify that there is no such adverse impact. 8 U.S.C. § 1101(a)(15)(H)(i)(b), 1182(t)(1)(A)(ii). Likewise, an employer may not bring in H-1B workers to work during a strike or lockout. 8 U.S.C. § 1182(t)(1)(C); 20 C.F.R. § 655.733.

54. Employers may not discriminate against U.S. citizens based on citizenship status. *See* 8 U.S.C. § 1324b(a)(1).

55. Another safeguard is the anti-displacement provision that applies to employers considered "H-1B dependent"[10] and those considered "willful violators" of employment protections.[11] Such employers must attest that the employment of a U.S. worker will not result in the displacement of a U.S. worker either 90 days before, or 90 days after, the filing of such a petition. An employer placing an H-1B worker at a third-party worksite must attest that it has made a good faith effort to determine that the employee's placement will not displace a U.S. worker. 8 U.S.C. § 1182(n)(1)(E)-(F); 20 C.F.R. § 655.738(c)-(d).

56. When an employer misuses the H-1B program, it can face orders to pay back wages, civil monetary fines, and debarment, among other penalties. 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.810. A debarred employer is prohibited from receiving approval for future H-1B petitions and other employment-based visa petitions. 8 U.S.C. § 1182(n)(2)(C); 20 C.F.R. § 655.810(d). This penalty is intended to protect both American and foreign workers from exploitation and unlawful practices.

---

[10] The statute and corresponding regulations include a very specific definition of H-1B dependence: an employer that has 25 or fewer full-time equivalent employees and employs more than 7 H-1B workers; or an employer that has 26 to 50 full-time equivalent employees and employs more than 12 H-1B workers; or 51 or more full-time equivalent employees and at least 15 percent of its workforce are H-1B workers. *See* 8 U.S.C. § 1182(n)(3)(A); 20 C.F.R. § 655.736(a).

[11] An employer is classified as a willful violator if, during the preceding five years, the Secretary of Labor has found, after notice and opportunity for a hearing, that the employer has committed either: willful failure to meet the conditions of the Labor Condition Application; or a willful misrepresentation of a material fact in the LCA. 8 U.S.C. § 1182(n)(1)(E)(ii); 20 C.F.R. § 655.736(f).

## H. Congress Created a Detailed Statutory Scheme to Govern the H-1B Process That Balances Private and Public Sector Needs

### 1. H-1B Registration and Lottery for Cap-Subject H-1B Visas

57. As discussed above, the INA sets a statutory "cap" on the number of new H-1B petitions each fiscal year. "Cap-subject" employers generally are for-profit companies in the private sector.

58. To petition for H-1B status for a worker, cap-subject employers must first register the prospective employees in an annual lottery that is generally held in March of each year for employment starting at the beginning of the federal fiscal year in October. 8 C.F.R. § 214.2(h)(8)(iii).

59. After the close of the registration period, USCIS performs a computer-generated lottery selection. *Id.* § 214.2(h)(8)(iii)(A)(5)(ii), (6)(ii).

60. USCIS then notifies those petitioners whose registrations were selected that they are eligible to file a H-1B cap-subject petition and sends them filing instructions. *Id.* § 214.2(h)(8)(iii)(C). The selected petitioners may then file a petition. *Id.* § 214.2(h)(8)(iii)(D).

### 2. Cap-Exempt H-1B Visas

61. Certain types of employers are "cap-exempt," meaning they are not subject to the numeric cap specified in the statute. Institutions of higher education, non-profit organizations (*e.g.*, certain hospitals, K-12 schools) affiliated with institutions of higher education, non-profit research organizations, and government research organizations are not subject to the annual numerical limitations. 8 U.S.C. § 1184(g)(5)(A)-(B); 8 C.F.R. § 214.2(h)(8)(iii)(F)(1), (2) and (3).

62. Cap-exempt employers do not need to register or to participate in the annual lottery, but they do need to establish, to the satisfaction of USCIS, their cap-exempt status. They can file petitions directly and are not limited to filing on a particular cycle.

**3. H-1B Petition Process**

63. Whether "cap-subject" or "cap exempt," an employer must petition for an H-1B employee by first submitting a Labor Condition Application ("LCA") to DOL. *See* 8 U.S.C. § 1182(n)(1); 20 C.F.R. § 655.730.

64. In the LCA, the employer attests that it will follow the wage and working condition requirements. *See* 20 C.F.R. § 655.730(d). DOL then reviews these forms and must certify them. DOL typically does so in seven working days. 20 C.F.R. § 655.730(b).

65. Once DOL certifies the LCA, the employer files a Form I-129 petition with USCIS to classify the foreign worker as an H-1B nonimmigrant. *See* 6 U.S.C. § 271(b)(5); 8 U.S.C. § 1184(c)(1); 8 C.F.R. §§ 103.2(a)(1), 214.2(h)(1)(i), (2)(i)(A).

66. An employer can petition on behalf of workers who are physically located inside or outside of the United States. *See ITServe All., Inc. v. United States*, 122 F.4th 1364, 1366 (Fed. Cir. 2024); *see also* 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a), (c). The individual may already be in the United States if, for example, their employer is petitioning to change their status from another immigration status to H-1B visa status. For example, many of the Plaintiff Unions' members are currently in the United States in lawful student or exchange status, including on F-1 visas, F-1 OPT, STEM OPT, or J-1 programs, and—until the Proclamation—expected that a current or prospective employer would be able to file H-1B petitions on their behalf, either to change their status within the United States or through consular processing abroad.

**4. Visa Issuance and Entry**

67. Once USCIS approves an H-1B petition, if the worker is outside the United States, the worker generally must then obtain an H-1B visa from a United States consulate abroad before traveling to the United States. *ITServe*, 122 F.4th at 1367. Even some workers who are inside the United States when their H-1B petition is approved, depending on the specific case circumstances, may have to go abroad to receive consular processing in order to effectuate their H-1B status. The individual may then travel to a port of entry for inspection by CBP and, if

authorized, be admitted in H-1B nonimmigrant status and enter the United States. *See* 8 U.S.C. §§ 1101(a)(13)(A), 1184(a)(1), 1225(a)(1); 8 C.F.R. § 212.1(a)(1).

68. Workers who are able to change to H-1B status from within the United States may still need to travel abroad for work, for family emergencies, or to renew a passport. These workers typically must obtain an H-1B visa stamp at a U.S. consulate abroad before reentering. 8 U.S.C. § 1184(a).

69. Once an H-1B worker is in the United States, employers may need to file additional petitions with USCIS if there is a material change in the worker's employment conditions, such as a change in worksite, or if the worker changes employers. 8 C.F.R. § 214.2(h)(2)(i)(D)-(E), 8 C.F.R. § 274a.12(b)(9). As the initial three-year work authorization period expires, employers can petition for an extension of another three years, and additional extensions are possible, beyond the 6 years, under limited circumstances. 8 CFR § 214.2(h)(13)(iii)(D).

### I. Congress Established a Detailed Fee System for H-1Bs That Sets Parameters on Fees and Dictates Their Use

70. Congress has established a clear framework for fees charged to H-1B petitioning employers. These include the adjudication fees that USCIS sets by regulation, as authorized by 8 U.S.C. § 1356(m), and certain statutory fees charged to certain H-1B employers, authorized in 8 U.S.C. § 1184(c)(9)-(14). Required fees must be paid by H-1B employers, not by the H-1B workers or their families. *See* 20 C.F.R. § 655.731(c)(9)(iii)(C)(10).

71. DHS may charge fees for adjudication of petitions under 8 U.S.C. § 1356(m), but Congress limited those fees. The statute provides that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.*

72. DHS sets the amounts of adjudication fees through notice-and-comment rulemaking. *See*, *e.g.*, *USCIS Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6,194 (Jan. 31, 2024). Under the latest 2024 rule, for instance, H-1B employers must pay a fee to register for the lottery, a fee to file Form I-129, and an "asylum program fee," meant to subsidize USCIS's costs for processing asylum applications. 8 C.F.R. § 106.2(a)(3), (c)(11), (c)(13). At full price, these fees for adjudication total $1,595. *Id.*

73. Because DHS has historically factored in an employer's ability to pay, the adjudication fees are discounted for small employers (25 or fewer full-time employees) and non-profits. *See id.* § 106.2(a)(3), (c)(13).

74. Congress, through the INA, set additional mandatory statutory fees to be paid by employers.

75. First, Congress set an American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA") fee of $1,500. The statute effectively requires consideration of ability to pay; there is a discount for employers with 25 or fewer employees, who pay $750, and cap-exempt employers are exempt. The ACWIA fee is required only for the first two petitions filed on behalf of each individual. *See* 8 U.S.C. § 1184(c)(9)-(14).

76. Second, Congress set a fraud prevention and detection fee of $500. The fraud fee is required with initial petitions and petitions to change employers. *Id.*; *see* 8 U.S.C. § 1184(c)(12)(A)(i)-(ii).

77. Congress spoke clearly as to where these fees should go and for what purpose. For example, in establishing the ACWIA fee, Congress intended to support the American labor market by upskilling its workforce to "address a growing shortage of skilled worked for certain high technology positions important to American business." 144 Cong. Rec. S10877 (daily ed. Sept. 24, 1998). The INA directs that ACWIA fees be segregated into a special account and used for specified purposes. *See* 8 U.S.C. § 1356(s). The revenue is primarily split among: (1) DOL workforce training programs (50%), (2) National Science Foundation low-income STEM

scholarships (30%), and (3) National Science Foundation K-12 stem initiatives (10%). 8 U.S.C. § 1356(s)(2)-(4).

78. The fraud prevention and detection fee's name indicates its purpose. The revenue is split equally among the three agencies responsible for administering the H-1B program: DOL (who oversees the Labor Condition Application and wage payment to the H-1B worker), DHS (who adjudicates requests for H-1B status), and the State Department (who decides whether to issue visas). 8 U.S.C. § 1356(v)(2)(A)-(C).

79. Additionally, certain employers pay enhanced fees. For example, currently, a "50/50 employer" must pay an additional "Public Law 114-113 Fee" of $4,000. 8 C.F.R. § 106.2(c)(8); USCIS, H and L Filing Fees for Form I-129.[12] A "50/50 employer" is an entity that employs over 50 employees, with over half comprising nonimmigrant workers in H-1B or L-1 status.[13] *ITServe*, 122 F.4th at 1367 n.2; 8 C.F.R. § 106.2(c)(8).

80. An employer that pays the full amount of these regulatory and statutory fees would pay a total of $7,595, nowhere near the $100,000 Defendants now demand.

81. The $100,000 Requirement does not account for ability to pay, unlike many of the regulatory and statutory fees, which are discounted for small employers and non-profits.

### J. The President's Ability to Restrict Entry Under the INA Does Not Authorize Him to Override Congress's Comprehensive H-1B Statute

82. The Proclamation invokes two provisions of the INA: sections 212(f) and 215(a), 8 U.S.C. §§ 1182(f) and 1185.

83. Section 212(f) of the INA, 8 U.S.C. § 1182(f), provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he

---

[12] *See* USCIS, *H and L Filing Fees for Form I-129, Petition for a Nonimmigrant Worker*, https://perma.cc/5RRV-26DG.

[13] The L-1 visa "allows multinational corporations to sponsor visas for temporary intra-company transfers to the United States" for individuals working in a managerial, executive, or specialized knowledge capacity. *Nat'l Ass'n of Manufacturers v. DHS*, 491 F. Supp. 3d 549, 556 (N.D. Cal. 2020); 8 U.S.C. § 1101(a)(15)(L).

> may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

84. This statutory provision is designed to "regulate and influence conduct abroad, rather than at home," and does not authorize the President to effectuate "domestic policy as opposed to foreign policy or national security." *President & Fellows of Harvard Coll. v. DHS*, No. 25-cv-11472, --- F. Supp. 3d. ----, 2025 WL 1737493, at *10 (D. Mass. June 23, 2025). The Proclamation makes clear that it is concerned with domestic policy—charging domestic employers unprecedented fees, changing the conduct of employers and workers inside the United States, and raising revenue for domestic purposes. But 8 U.S.C. § 1182(f) does not permit the President to restrict entry for these purposes.

85. In addition, section 215(a), 8 U.S.C. § 1185(a)(1), allows the President to "prescribe" "reasonable rules, regulations, and orders" governing who may "enter . . . the United States." *Id.* (emphasis added).

86. Nothing in either statute authorizes the President to rewrite Congress's comprehensive H-1B statute by denying entry to all H-1B workers unless an employer pays $100,000 or is granted an exemption at the discretion of the Secretary of DHS.

## VI. FACTUAL ALLEGATIONS

### A. The President's Proclamation

87. Late in the day on Friday, September 19, 2025, the White House issued a Presidential Proclamation pursuant to 8 U.S.C. § 1182(f) and § 1185(a) conditioning the adjudication of H-1B petitions and entry of H-1B beneficiaries into the United States on a $100,000 payment.

88. Among other things, the Proclamation requires a $100,000 payment in connection with any H-1B petition for workers currently outside the U.S. seeking entry under the H-1B program, stating: "[e]ntry into the United States of [H-1B workers] is restricted, except for those

aliens whose petitions are accompanied or supplemented by a payment of $100,000." Proclamation § 1(a). The Proclamation directs DHS to "restrict decisions on petitions not accompanied by a $100,000 payment," *id.* § 1(b), and directs State to "approve only those visa petitions for which the filing employer has made the [$100,000] payment," *id.* § 2(b). DHS and State must "deny entry to the United States to any H-1B nonimmigrant" whose employer has not made the $100,000 payment. *Id.* § 2(c).

89. The Proclamation made these new requirements effective as of 12:01 am ET Sunday, September 21, 2025. But the Proclamation does not specify to which agency the $100,000 "payment" should be made, how it should be paid, where it will be deposited, or how it will be used.

90. The President's key advisor on this Proclamation appears to be Howard Lutnick, who outlined the scope and rationale of the Proclamation when it was issued. Speaking alongside the President at an Oval Office ceremony unveiling the Proclamation on September 19, Lutnick said: "a hundred-thousand dollars a year for H-1B visas, and all of the big companies are on board. We've spoken to them."[14]

91. Lutnick also stated that current visa-holders would be subject to the fee and would have to leave the country if it was not paid: "Either the person is very valuable to the company and America, or they are going to depart and the company is going to hire an American," Lutnick said at the briefing. "And that's the point of immigration. Hire Americans and make sure the people coming in are the top, top people. Stop the nonsense."[15]

92. Lutnick also made clear that the fee would be charged annually: "The company needs to decide . . . is the person valuable enough to have a $100,000-a-year payment to the government, or they should head home, and they should go hire an American."[16]

---

[14] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, Wash. Post (Sept. 19, 2025), https://perma.cc/N7PP-Y53G.
[15] *Id.*
[16] *Id.*

**1. The Proclamation is Based on Multiple Errors of Fact and Ignores the Benefits of the H-1B Program to the American Economy**

93. The Proclamation's preamble solely identifies concerns with the program's use in the information technology fields, but employers seek and obtain H-1B visas for workers in a wide range of specialty occupations, including healthcare workers, researchers, clergy, university professors, K-12 teachers, and more. The Proclamation does not identify widespread fraud and misuse of the program in those fields nor otherwise justify why a market-wide penalty is an appropriate remedy.

94. Even as to the IT industry, the Proclamation ignores pertinent facts reflecting that the H-1B program supports economic growth. Indeed, from 1990 to 2010, H-1B holders caused 30-50 percent of all productivity growth in the U.S. economy.[17] As one economist explained, "[W]orkers on H-1B visas cause dynamism and opportunity for natives. They cause more patenting of new inventions, ideas that create new products and even new industries. They cause entrepreneurs to found more (and more successful) high-growth startup firms. The resulting productivity growth causes more higher-paying jobs for native workers, both with and without a college education, across all sectors. American firms able to hire more H-1B workers grow more, generating far more jobs inside and outside the firm than the foreign workers take."[18]

95. The Proclamation also ignores other benefits of bringing H-1B workers to the United States, where they consume goods and services and pay taxes in the United States. Cutting off employers' ability to employ H-1B workers will likely push some employers to outsource their work to other countries.

96. The Proclamation claims, without evidence or explication, that abuses of the H-1B program are so serious as to be a threat to national security. But the government's own enforcement reflects otherwise: DOL is charged with investigating fraud and abuse of the Labor

---

[17] Giovanni Peri, Kevin Shih & Chad Sparber, *STEM Workers, H-1B Visas, and Productivity in US Cities*, 33 J. Lab. Econ. S1(2) S225, S250-52 (2015), https://perma.cc/PK6F-KN6K.
[18] Michael A. Clemens, *New US curb on high-skill immigrant workers ignores evidence of its likely harms*, Peterson Inst. Int'l Econ. (Sept. 22, 2025), https://perma.cc/Y4DL-VSRQ.

Condition Application portion of the H-1B program and maintains a database of companies that abused the H-1B program and were banned from it. *See* 8 U.S.C. § 1182(n)(2), 20 C.F.R. 655.800 *et seq.*; *H-1B Willful Violator List of Employers*, U.S. Dep't Lab., https://perma.cc/4RPD-X7JT (effective as of Sept. 1, 2025). There are just eight companies on this list and only two were added in 2025, while tens of thousands of employers have used this program in recent years.

**2. The Proclamation's Exorbitant $100,000 Fee Is Unprecedented and Unjustified, and the Exception Process is Ripe for Abuse**

97. The Proclamation's imposition of a draconian fee is unprecedented. No President has, without Congressional authorization and by fiat, imposed a market-wide penalty for purported misuse of a program—disregarding and overriding an existing, complex statutory scheme—on employers seeking to hire workers under a visa program Congress created specifically for that purpose. Nor may Presidents impose a tax or other general revenue-generating requirement without Congressional authorization.

98. Here, the President appears determined to raise general revenue using the $100,000 Requirement, suggesting that this is a tax, not a fee for use of the program. While announcing the Proclamation, the President alluded to the ultimate use of the revenue generated from these $100,000 payments: "The main thing is we're going to have great people coming in and they're going to be paying. We're going to take that money and we're going to be reducing taxes and we're going to be reducing debt."[19]

99. The Proclamation also provides an exception to the payment requirement in section (c), which states that "[t]he restriction imposed pursuant to subsections (a) and (b) of this section shall not apply to any individual alien, all aliens working for a company, or all aliens working in an industry, if the Secretary of Homeland Security determines, in the Secretary's

[19] *Trump unveils $100K yearly fee on H-1B visas in clampdown on legal immigration*, *supra* n.14.

discretion, that the hiring of such aliens to be employed as H-1B specialty occupation workers is in the national interest and does not pose a threat to the security or welfare of the United States."

100. The Proclamation includes no guidance, direction, or parameters for this purported national interest exception, which was created from whole cloth. As drafted, the standardless exception process is an open invitation for selective and arbitrary treatment. It invites lobbying; it permits favoritism, ideologically based bias, and corruption.

**3. After the Ill-Planned Proclamation Caused Immediate Harm, the Government Began to Backtrack**

101. Shortly after this announcement, current H-1B workers that were outside the country started receiving urgent messages from their employers to return to the United States before the Proclamation became effective at 12:01 am ET on Sunday, September 21. Many were advised to remain in the United States until further notice.[20] Some workers spent thousands of dollars on return travel to the United States.[21] Others cancelled planned trips, and some workers who had already boarded flights made panicked requests to deplane after receiving news of the Proclamation.[22]

102. As this chaos unfolded on Saturday, September 20, the Administration began to backtrack. An unnamed White House source, speaking on condition of anonymity to the press, contradicted Lutnick's statements from the Oval Office and stated that the new requirement was a "one-time fee" and "currently does not apply to renewals but that policy is under discussion."[23] The source did not say whether existing visa-holders would be prevented from returning to the

[20] Madeleine Ngo, Lauren Hirsch & Pranav Baskar, *Trump's $100,000 Visa Fee Spurs Confusion and Chaos*, N.Y. Times (Sept. 22, 2025), https://perma.cc/EJ5T-RK6F.
[21] Emma Rossiter & Ishadrita Lahiri, *I spent $8,000 to get back to US after fears over Trump visa deadline*, BBC (Sept. 20, 2025), https://perma.cc/3NHM-JD39.
[22] Aditya Soni & Echo Wang, *'Fast and furious': H-1B workers abroad race to US as Trump order sparks dismay, confusion*, Reuters (Sept. 21, 2025), https://perma.cc/J82X-GHGH.
[23] *White House clarifies $100K H-1B visa fee won't apply to existing holders as Trump stirs anxiety*, PBS News (Sept. 21, 2025), https://perma.cc/SN9S-435A.

country, under the Proclamation's language broadly barring entry of individuals for whom the fee had not been paid.

103. At 4:16 pm ET on Saturday, September 20, White House Press Secretary Karoline Leavitt posted another attempt at re-writing the Proclamation on the social media platform X:[24]




**B. The Agency Defendants Imposed a $100,000 Requirement for "Any" New H-1B Petitions.**

104. The Proclamation tasked DHS, including its component agencies USCIS and CBP, and the State Department (collectively with the heads of those agencies and components, the "Agency Defendants") with the implementation of its requirements.

105. The Agency Defendants issued a series of public statements in the hours and days following the Proclamation's late Friday, September 19, 2025, issuance.[25] After this lawsuit was filed, USCIS issued additional FAQs.

[24] Karoline Leavitt (@PressSec), X (Sept. 20, 2025, 4:16 PM), https://perma.cc/Y7WY-NHN9?type=image.

[25] Joseph B. Edlow, *Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B*, USCIS (Sept. 20, 2025), https://perma.cc/U54U-4UWD; Matthew S. Davies, *Proclamation,*

106. Collectively, these documents reflect the new policies the Agency Defendants have adopted to implement the Proclamation.

107. Starting in September, the Agency Defendants required a one-time payment of $100,000 "on submission" of "any" new H-1B petition filed after 12:01 am ET on September 21, 2025. Payment is a condition for adjudication of "any" new H-1B petition, as well as for consular processing and entry into the United States of any beneficiary of a new petition (the "Agency Policies").

108. The Agency Policies were in some ways narrower than the Proclamation. They specify, for example, that the $100,000 Requirement only applies to new petitions and not to "renewals"[26]—a term that is not used in the existing statutory and regulatory scheme. The Agencies also chose not to condition entry into the United States on receipt of the $100,000 payment for existing H-1B visa holders or beneficiaries of petitions submitted before the effective date.[27]

109. However, the new Agency Policies swept more broadly than the Proclamation in that they appeared to apply to *any* new H-1B petition submitted on or after September 21, 2025. They did not clearly differentiate between petitions for workers who are "currently outside the United States" and those for workers who are already inside the United States. Accordingly, the $100,000 Requirement applied even where workers were already lawfully present in the United States under, for example, a student visa or another immigration status, and were seeking to change to H-1B status.

110. On October 20, 2025, two weeks after Plaintiffs filed this lawsuit, USCIS issued FAQs modifying the Agency Policies.

---

*Restriction on Entry of Certain Nonimmigrant Workers [H-1B]*, USCBP (Sept. 20, 2025), https://perma.cc/K9VG-QCYS; *H-1B FAQ*, U.S. Dep't State (Sept. 21, 2025), https://perma.cc/6DYF-9SCE; *H-1B FAQ*, White House (Sept. 21, 2025), https://perma.cc/G37A-W3AK; *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.

[26] *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/R8CD-CK2A.

[27] *Id.*

111. Under the new FAQs, the $100,000 Requirement does not apply to change of status, amendment, or extension petitions for individuals inside the United States *if* USCIS exercises its discretion and approves the change of status, amendment, or extension. *See* 8 U.S.C. § 1258(a) ("The Secretary of Homeland Security *may*, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification . . . .") (emphasis added); 8 C.F.R. § 214.1(c)(7) ("Where an applicant or petitioner demonstrates eligibility for a requested extension or amendment of stay, USCIS may grant the extension or amendment in its discretion."); USCIS Policy Manual Vol. 2, Part A, Ch. 4.A ("The decision to grant or deny an extension of stay or change of status request involves an exercise of discretion by USCIS.").

112. The $100,000 Requirement remains in place, however, for workers outside of the United States seeking entry on an H-1B visa. It also continues to apply to those already in the United States who categorically cannot change their status to H-1B from within the United States,[28] as well as those who, in USCIS's discretion, are not granted a change of status, amendment, or extension.

113. USCIS's FAQs also provide that exceptions to the $100,000 Requirement will be granted only "in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States." Under this regime, to petition for an H-1B worker without paying the extra-statutory $100,000 fee, an employer must satisfy a "high threshold" by meeting criteria that

[28] Individuals with certain immigration statuses or individuals who lack lawful status, such as Deferred Action for Childhood Arrivals (DACA) recipients, are categorically ineligible to change status to H-1B from within the United States and thus must leave and come back to obtain H-1B status, which under USCIS's current guidance triggers the $100,000 fee. *See, e.g.*, 8 U.S.C. § 1258(a); 8 C.F.R. § 248.1(a)-(b); *id.* § 248.2(a).

is also nowhere in the INA. To date, Plaintiffs are not aware of any exemptions that have been granted.

### C. The Proclamation and Agency Policies Will Harm Plaintiffs and the Public Interest

114. The Proclamation and new Agency Policies harm both Plaintiffs and the broader public.

#### 1. Health care

115. **Nephrology Associates** is headquartered in Shelby, which is in Cleveland County, North Carolina. Cleveland County is a rural community of approximately 100,000 people located in the south-central part of the state. Nephrology Associates' second office is in Rutherfordton, in neighboring Rutherford County. Rutherford County's population is also rural, with a population of approximately 64,000 people. Both Cleveland and Rutherford Counties are designated as Medically Underserved Areas and Health Professional Shortage Areas as defined by the Bureau of Health Workforce ("BHW") within the Health Services and Resource Administration ("HSRA"), an agency of the U.S. Department of Health and Human Services ("HHS"). This designation reflects a federal determination of inefficient access to care in an area with documented provider deficits and elevated health risks.[29] Approximately 75% of Nephrology Associates' patients are on Medicare and another 15-20% are uninsured.

116. The Cleveland County and Rutherford County communities are home to a large population of patients with a high incidence of problems related to the kidneys, high blood pressure, or certain metabolic disorders. These conditions, while prevalent, are often underdiagnosed or inadequately managed due to limited access to nephrologists.

117. Most patients are not diagnosed with kidney disease until later in life because the likelihood increases significantly with age. The vast majority of Nephrology Associates patients are over 65, which is the most common age group diagnosed with chronic kidney disease.

---

[29] *See* Health Resources and Services Administration, "What Is Shortage Designation," https://bhw.hrsa.gov/workforce-shortage-areas/shortage-designation.

Case: 26-6667, 11/06/2026, DktEntry: 30.1, (137 of 240)

Conditions like diabetes, hypertension, and heart disease affect the kidneys but can take years to cause damage that would require a nephrology appointment. Kidney function also starts to naturally decline after the age of fifty. Kidney disease is classified into five stages based on the level of kidney function, with Stage Five being failure or near-failure of the kidneys. Nephrology Associates' practitioners see patients at all stages of kidney disease. Nephrology Associates' practitioners serve as the medical directors at five kidney dialysis centers in the area.

118. Recruiting physicians with the right specialized knowledge and willingness to work in Nephrology Associates' geographic location has been challenging for many reasons, including that the community is rural. Nephrology Associates has only been able to meet its physician staffing needs through the H-1B program. Its physician staff includes two individuals currently on H-1B visas (a Pakistani national and an Ecuadorian national). Nephrology Associates' owner is originally from Bangladesh and required visa sponsorship as well. Today he is a U.S. citizen. Nearly all of Nephrology Associates' physicians have been or are currently on an H-1B visa.

119. In August 2024, Nephrology Associates lost an H-1B sponsored physician who relocated across the country. To replace this physician, Nephrology Associates retained a recruiting company. Over the course of nine months of active recruiting, Nephrology Associates received ten applications; eight of those applicants were foreign nationals requiring visa sponsorship. Only one applicant, an Indian physician completing her fellowship in the U.S. on a J-1 visa, was qualified for the position and willing to accept its terms. Nephrology Associates offered this prospective employee the position.

120. It is common for foreign national medical graduates on J-1 status to continue practicing in the United States if an employer, such as Nephrology Associates, is willing to sponsor them for an H-1B visa. This process involves obtaining a waiver of the general requirement to return to their country for two years by agreeing to work in an underserved area like the areas served by Nephrology Associates for at least three years. Following completion of

her J-1 program in June 2025, the prospective employee returned to India to see her family and wait for the J-1 waiver and H-1B visa petition to be approved.

121. Nephrology Associates filed the H-1B petition for the prospective employee, which was receipted by USCIS on September 24, 2025, and simultaneously requested that USCIS approve the J-1 waiver, the last step necessary for the H-1B petition to be approved. Nephrology Associates paid an additional $2,805 to request premium processing of the petition, which typically means that decisions are to be made within 15 business days.

122. While the J-1 waiver was approved, the H-1B petition remains pending. After USCIS published additional guidance regarding the fee on October 20, Nephrology Associates submitted a request for a "national interest" exception ("NIE") for the prospective employee. Then, in early November, Nephrology Associates received a request for evidence ("RFE") from USCIS stating that because the prospective employee was outside of the United States at the time the H-1B petition was filed, Nephrology Associates is required to demonstrate that it has either paid the $100,000 fee or received a NIE, before USCIS will resume processing of the case. Nephrology Associates, as a small practice in a rural community serving a low-income population, cannot afford to pay the $100,000 fee for the prospective employee. However, Nephrology Associates to date has also not received a decision on the NIE request, thereby impeding its ability to respond to the RFE, which has a response deadline of January 29, 2026.

123. Because of the unanticipated delay in bringing the prospective employee on board, Nephrology Associates has had to move patient appointments, delaying critical care for members of the community whose needs will otherwise be unmet. Nephrology Associates currently has approximately100 people on its waiting list. Without relief from this Court, Nephrology Associates will not be able to bring the prospective employee aboard, will face months or years of additional recruiting, and may never be able to find a qualified and willing physician to replace the physician it lost. Meanwhile, hundreds of people with kidney disease will experience delays in essential care. The hurdles Nephrology Associates faces in filling this open position are also negatively impacting their revenue.

124. For over a decade, Plaintiff **Global Nurse Force**, a California limited liability company, has connected healthcare systems across the globe with highly skilled and experienced nurses to ensure their staffing needs are met. Global Nurse Force has placed over 10,000 nurses at leading hospitals around the world. In the United States, Global Nurse Force's clients include healthcare systems in Washington, Ohio, Louisiana, California and the District of Columbia who have used Global Nurse Force's "direct hire" model to hire hundreds of nurses on H-1B visas to fill critical staffing shortages.

125. The United States has been suffering from a nursing shortage for decades, and this shortage will only intensify as the Baby Boomer generation ages and their need for health care grows. The COVID-19 pandemic drove many nurses out of the profession; nursing schools suffer from a faculty shortage as well as depressed enrollment; and insufficient staffing itself raises the stress level of nurses, has a negative impact on their job satisfaction, and motivates many nurses to retire or otherwise leave the profession. Inadequate levels of nurse staffing lead to errors and increased mortality rates, a decrease in the quality of patient care, and unit or full hospital closures, especially in rural areas.

126. Global Nurse Force offers a direct hire model to U.S.-based healthcare systems that allows these healthcare systems to hire the experienced and specialized nurses they need by sponsoring them for H-1B specialty worker visas. Global Nurse Force provides "end to end" services that include facilitating the employer's interview and selection process, which usually involves preliminary online interviews followed by international travel that allows the employer to meet, interview, and select in person the nurses needed; providing support for the H-1B application process; and providing logistical travel support for the hired nurses, including arranging travel, airport pickup, and temporary housing for nurses and their families arriving in the United States. Directly hiring skilled nurses on H-1B visas allows healthcare systems to meet their staffing needs without relying on short-term hiring of so-called "travel nurses," which is a far more expensive staffing solution that, in a year, can cost healthcare systems millions of dollars more in fees paid to staffing providers.

127. Global Nurse Force's business model for its U.S. clients is entirely based on the H-1B visa system and the ability of healthcare facilities to sponsor for H-1B visas the specialized nurses they need. As a result, the harmful impact of the Proclamation and the $100,000 Requirement on Global Nurse Force and its healthcare system clientele has been immediate. A health system in Louisiana, for example, recently went through the interview and selection process with Global Nurse Force and selected over two hundred nurses. When the Proclamation was issued, Global Nurse Force was in the process of assisting the hospital with preparing the H-1B applications for these nurses to be filed over the next two quarters. But that healthcare system, like most of Global Nurse Force's clients, cannot afford to pay an additional $100,000 fee for each nurse, and the healthcare system is now at a loss for how to fill the staffing shortages that are affecting its patients now. Indeed, many of Global Nurse Force's clients hire over a hundred nurses through each interview and selection cycle, which would translate into tens of millions of dollars in extra fees required by the Proclamation. Many of Global Nurse Force's clients are non-profit hospitals operating on thin margins and cannot absorb the $100,000 fee per nurse. If required to pay this fee, they will be forced to cancel international recruitment, leaving their positions unfilled.

128. If the $100,000 Requirement remains in effect, it would force Global Nurse Force to close its U.S.-based operations, which would translate into a loss of millions of dollars in revenue. Without access to international nurses, their clients will be forced to reduce capacity in ICUs, emergency rooms and surgical units. Wait times will increase and patient outcomes will worsen. This proclamation directly threatens Global Nurse Force's operations and forces hospitals towards staffing models that are significantly more expensive—raising healthcare costs rather than reducing them, so that the ultimate victims are patients, especially in rural and inner-city communities.

129. **Plaintiff CIR**, whose membership consists of medical interns, residents, and fellows, has numerous members who plan to seek H-1B visas and who have applications for H-

1B visas pending with their employers and may lose their ability to live and work in the United States as a result of the Proclamation.

130. For example, a Pakistani physician and member of CIR is currently completing a fellowship in palliative care at a hospital that is part of an academic health care system on the East Coast. The physician is married and has a two-year-old son who is a U.S. citizen. As our population ages, the United States is facing an acute shortage of palliative care doctors who provide end of life care; his expertise is therefore particularly valuable.

131. This CIR member holds a J1 visa. Foreign physicians come to the United States on J1 visas to complete their medical training. Generally, J1 visa holders must return to their country for two years at the end of their training, unless they obtain a waiver of this requirement. Foreign physicians generally apply for a waiver program, which allows them to change their immigration status from a J1visa to an H-IB visa while remaining in the United States, if they commit to practicing in communities with the greatest need. The United States provides these waiver programs as a way to help address severe physician shortages in underserved areas.

132. This CIR member is currently applying and interviewing with facilities located in federally-designated Health Professional Shortage Areas and Medically Underserved Areas, the first step toward securing the employment offer needed to apply for a waiver. Because of the new $100,000 Requirement, however, employers who would normally petition for an H-1B visa on his behalf are unable to do so. If the physician is unable to secure a position with H-1B visa (as is likely), his years of training and his specialization will be for naught, and the United States will lose a physician trained in a critical field who is ready to serve in precisely the communities that most need him. He will be forced to return to Pakistan, where he is unlikely to find employment adequate to support himself and his family.

133. A Canadian CIR member is in his third year of a residency program in internal medicine in a city on the East Coast. Like many foreign physicians, he is training in the United States on a J1 visa, which requires him to pursue a waiver in order to remain and serve after completing his residency.

134. This member will complete his residency next year, apply for positions in underserved areas and apply for a waiver. Like many current and former CIR members before him, his prospective employer would then file an H-1B petition on his behalf. The new $100,000 Requirement, however, places sponsorship entirely out of reach for the very medical facilities Congress intended to benefit from these programs. If such facilities had the resources to pay this fee, they would not be struggling to recruit physicians through waiver programs in the first place.

135. The Proclamation will harm the career prospects and lives of this CIR member and others similarly situated. Since sponsoring organizations are unlikely to be able to afford to pay $100,000, this member will likely face a two-year separation from his U.S. citizen fiancée and would need to incur costs to get recredentialed as a physician in his home country of Canada. This would set him back 1-2 years professionally.

136. The loss of these medical workers will harm communities around the United States. The American Medical Association ("AMA") has expressed grave concerns about the impact of the $100,000 Requirement on the availability and quality of medical care in the United States. In a September 25, 2025, letter to DHS Secretary Kristi Noem urging DHS to exempt foreign-trained physicians from the fee, the AMA, along with more than 50 national specialty societies and state medical associations, noted that the United States is projecting a shortfall of 86,000 physicians by 2036.[30] This is especially concerning because America's population is aging, and there will not be enough doctors to care for older adults, many of whom suffer increased rates of chronic disease and have other complex medical needs.[31] Noting that of the 23% of physicians in the United States who are foreign trained, 65% practice in Medically Underserved Areas or Health Professional Shortage Areas and of those, 46% practice in rural areas, the letter explains that the fee endangers access to quality care for some of the Americans who most need it.[32]

---

[30] *Letter to Kristi Noem from National Medical Societies and State Medical Associations* (Sept. 25, 2025), https://perma.cc/2VP2-B6Q5.
[31] *Id.*
[32] *Id.*

137. Many of the hospitals that hire foreign trained physicians are non-profits and will not be able to afford this fee. As the President of the AMA explained, "[i]f a hospital needs 50 foreign residents, and it's $100,000 each for each one, that's $5 million, and that's not going to happen . . . . There will be shortages." The consequences, he explained, are that "spots at hospitals will not be filled. Wait times will go up, and people will wait even longer at emergency departments." The fee, coupled with cuts in health insurance subsidies and reduced Medicaid payments, will exacerbate the financial stress many hospitals are already experiencing.[33]

138. A 2023 study by the National Bureau of Economic Research found that foreign-born doctors help serve rural and low-income communities without reducing the employment of U.S.-trained physicians.[34] The study notes that while about 20% of the U.S. population lives in rural areas, only about 11% of physicians practice in these locations; and disparities in access to physicians contribute to disparities in population health.[35] After examining the data, the study concluded that foreign-born doctors were not "crowding out" U.S. born physicians, but rather that foreign-born physicians were filling essential gaps in coverage, particularly in rural areas.[36]

**2. K-12 school systems**

139. At a time when communities around the country are facing acute teacher shortages, the $100,000 Requirement means that school districts risk losing valuable teachers in both urban areas suffering from staffing shortages and in rural districts where teachers are difficult to recruit. For example, Texas public schools, which have historically employed more H-1B visa holding teachers than any other state education system, currently employ about 500 teachers on H-1B visas.[37] The $100,000 Requirement is approximately double the average

[33] Roni Caryn Rabin, *Medical Groups Warn Against Visa Fees for Foreign Doctors*, N.Y. Times (Sept. 26, 2025), https://perma.cc/Q243-3LTU.
[34] Breno Braga, Gaurav Khanna & Sarah Turner, *Migration Policy and the Supply of Foreign Physicians: Evidence from the Conrad 30 Waiver Program*, Nat'l Bureau of Econ. Research Working Paper No. 32005 (Dec. 2023), https://perma.cc/V8HK-LANH.
[35] *Id.*
[36] *Id.* at 3.
[37] Isaac Yu & Nusaiba Mizan, *Hundreds of Texas teachers are on H-1B visas. Could that change after Trump's new $100k fee?*, Hous. Chron. (Sept. 25, 2025), https://perma.cc/ED5L-9U28.

teacher salary in Texas.[38] A spokesperson for the Alief Independent School District ("ISD"), outside Houston, said the $100,000 Requirement "would be a significant financial barrier for public school districts and an unsustainable cost for Alief ISD."[39] Similarly, school officials in North Carolina expressed concern about how the new fee would impact their ability to hire teachers in a state that started the new school year with 2,155 teaching vacancies.[40] A spokesperson for a charter school system that operates schools across North Carolina said the $100,000 Requirement "would create a significant barrier for non-profit, tax-exempt, and public institutions such as ours. Simply put, most schools could not sustain such costs."[41] She concluded that "without an exemption, the results could be a severe shortage of qualified teachers at a time when schools nationwide already face staffing challenges."[42] The Superintendent of the Kodiak Island Borough School District in Alaska, which relies on H-1B workers to fill staffing gaps, was more direct, saying "[w]ith a pen stroke, we have possibly ruined the future of education for Alaska students."[43]

140. **Plaintiff Lower Brule Day School** is a K-12 school located on the Lower Brule Sioux Reservation, which covers approximately 400 square miles in rural central South Dakota along the Missouri River. Lower Brule Day School was originally known as the Lower Brule Boarding and Day School and was founded in 1895 as part of the federal government's forced assimilation of American Indian children. The Lower Brule Sioux Tribe manages the school pursuant to a grant with the Bureau of Indian Education, an agency within the U.S. Department of the Interior.

---

[38] *Id.*
[39] *Id.*
[40] T. Keung Hui & Brian Gordon, *New $100,000 fee for H-1B Visas Could Hurt Teacher Recruitment for NC Schools*, Herald Sun (Sept. 23, 2025), https://perma.cc/T3MQ-LYY7.
[41] *Id.*
[42] *Id.*
[43] Brian Venua, *The White House Upped the Cost of H-1B Visas. Alaska Schools Could Face Major Consequences*, KXMT (Sept. 24, 2025), https://perma.cc/6LDV-SHD2.

141. Lower Brule Day School serves approximately 350 children. The student population is 99% American Indian and 100% of the students qualify for free or reduced-price meals. Lower Brule Day School is guided by the twelve Wolakota ("Lakota Way") values of the Kul Wicasa Oyate: humility, perseverance, respect, honor, love, sacrifice, truth, compassion, bravery, fortitude, generosity, and wisdom. Lower Brule Day School prioritizes integrating native language and culture into daily school life.

142. Lower Brule Day School has had trouble recruiting teachers due to the nationwide shortage of teachers and its rural location. The shortage of teachers is particularly acute in special education. There are 45 teachers at Lower Brule Day School, ten of whom are on H-1B visas. Four of the ten teachers on H-1B visas teach in special education, and they are the only teachers currently teaching in special education at the school. Without the H-1B visa program, Lower Brule Day School would not have an adequate number of certified teachers to teach its students. Teachers on H-1B visas provide continuity to Lower Brule Day School's students and to the community. Teacher turnover has a very negative impact on Lower Brule Day School's students, many of whom are already dealing with instability at home.

143. Lower Brule Day School will be recruiting at least one new teacher for the 2026-2027 school year when its recruiting season starts in February 2026. While Lower Brule Day School will hire any qualified candidate, based on the school's experience it is highly likely that the most qualified and available candidates will come from outside of the United States and will require H-1B visas.

144. Lower Brule Day School cannot afford to pay the $100,000 fee for an H-1B petition because it is approximately twice a teacher's starting salary. Within days of the Proclamation, the Lower Brule Sioux Tribal Council passed Resolution No. 2-26-006, "Resolution to Request Waiver from the Presidential Proclamation Restriction On Entry of Certain Non-immigrant Workers.'" Noting that the Lower Brule Day School uses H-1B visas to hire for hard-to-fill professional positions and that the school does not have sufficient funding to pay the $100,000 fee for the teachers requiring H-1B sponsorship  who need a visa in the future,

the Resolution calls on the Director of the Bureau of Indian Education to advocate for the waiver of the fee for Lower Brule Day School.

145. **Plaintiff Global Village Academy Collaborative ("GVAC")** is headquartered in Thornton, Colorado and operates similar to a school district and provides operational and educational services to its member schools (Global Village Academies, or "GVA"), including, but not limited to, staff recruitment, legal services, human resources, facilities and site support, curriculum and material development, and financial management.

146. GVAC's mission is to provide these essential services to its Global Village Academies to cultivate academic excellence, high levels of linguistic proficiency, and cultural competences in all of its students, starting as early as kindergarten and through the eighth grade, so that these students may achieve a higher level entrance in their language of choice by high school and develop the global perspectives and 21st century skills necessary to live and work with others internationally.

147. Each Global Village Academy is a member of GVAC. GVAC has a charter school collaborative contract with each of its schools under Colorado law. Apart from the services GVAC provides to all its member schools, GVAC also provides strategic planning and policy development for its schools and maintains regular communication with each school through monthly meetings with principals and other methods of communication. GVAC regularly speaks on behalf of all GVA schools publicly regarding any issues or incidents concerning the schools.

148. The Global Village Academies are tuition-free, public charter schools (K-8) providing English and second language immersion instruction to about 2,200 students across its schools in Aurora, Thornton, and Parker, Colorado. The Global Village Academies are centered on providing second language instruction in Spanish, Mandarin Chinese, Russian, or French using an immersion model. Parents select the language, or "village," their child begins learning, and for at least half of their school day, students learn all their core subjects immersed in their chosen language or village and taught by GVA's world language teachers. For the other half of the day, students receive this instruction in English.

Case: 26-6067, 11/06/2026, DktEntry: 30.1, Page 147 of 240

149. Global Village Academies heavily rely on GVAC to recruit and retain native-speaking world language teachers from all over the globe to provide their students with second language instruction through an immersion model that is consistent with an internationally benchmarked curriculum. The immersion model depends on GVA world language teachers who are highly qualified, experienced teachers with native-language skills who also bring their unique cultural perspectives and competencies from their home countries into the classroom. For this reason, GVAC does not recruit world language teachers who learned the language as a second language. The special combination of native-language skills and cultural competencies that GVAC seeks is not easily found through recruiting only U.S. workers. It is necessary for GVAC to attract world language teachers from outside the United States.

150. Since 2007, GVAC has regularly relied on and engaged in the H-1B visa process to recruit and retain native-speaking world language teachers from around the world for its three GVA schools. Each year, GVAC recruits roughly 2-5 new world language teachers, but sometimes more, across their GVA schools. As part of this process, GVAC consistently recruits teachers from abroad who come to the United States on a H-1B visa to work at a GVA school. For the current 2025-2026 academic year underway, GVA schools are employing ten world language teachers who required H-1B visa sponsorship, three of whom came to the United States from abroad. Without the H-1B visa system, GVAC would not be able to continue recruiting qualified world language teachers for GVA schools to hire to carry out their unique educational model and provide the level of instruction that they have in the past.

151. The $100,000 Requirement would significantly hinder GVAC's and its member schools' ability to recruit and hire new and qualified teachers for the upcoming academic year, particularly given the challenging teacher recruitment market and the need for world language teachers with both native-language skills and cultural competencies to achieve their mission. Given that GVA schools do not charge tuition and have a limited budget that largely comes from the state of Colorado, paying $100,000 for each new H-1B petition that the schools anticipate filing for the 2026-2027 academic year would have a significant financial impact on GVAC and

its schools. GVA schools could not afford to make even one $100,000 payment to continue hiring qualified world language teachers through H-1B petitions in line with its mission and model. As a result, GVAC would have to take significant, drastic measures to offset such a cost, like cutting down on current staffing or placing a cap on enrollment, that would have a vast impact on the GVA schools' funding, which is allocated by the state per pupil enrolled. Most of GVAC's funding then comes directly as a percentage of the schools' budget, so lower enrollment would directly mean less funding both for the schools and GVAC.

152. The $100,000 Requirement would also harm GVAC's and its member schools' programmatic work, and the thousands of students they serve. If GVA schools cannot afford to hire world language teachers through the H-IB visa process, GVAC would be forced to fundamentally change its unique educational model that sets its schools apart for parents and students, undermining GVA schools' ability to provide the quality language immersion instruction and cultural competencies they are known for.

**3. Manufacturing**

153. **Plaintiff BAE Industries** is a privately held automotive parts manufacturing company headquartered in Auburn Hills, Michigan. Founded in 1970, BAE Industries specializes in precision metal stamping, assembly, and integrated component manufacturing. BAE operates multiple production facilities across Auburn Hills, Warren, and Fraser in the Metro Detroit region. It plays an important role in the automotive supply chain and related manufacturing sectors, supplying components that must meet stringent quality, performance, and regulatory standards.

154. Recruiting has been a challenge for BAE due to the highly competitive nature of the market in Detroit, often referred to as "Motor City" and recognized as the center of automobile manufacturing in the United States. As a small private company, BAE supplies products to larger companies that ultimately end up in vehicles produced by large-scale American automakers such as Ford and General Motors. Operating a smaller company in such a

competitive market makes it particularly difficult for BAE to hire and retain talent. To address these challenges, BAE has hired several employees through the H-1B visa program.

155. In July 2018, BAE hired an international student from India who was in the United States and had completed his master's degree at Wayne State University. BAE filed an H-1B petition on his behalf, which was approved, and he transitioned into H-1B status on October 1, 2019.

156. This employee works in BAE's Quality Department as a Senior Quality Engineer. The Quality Department is responsible for ensuring compliance with the strict performance and safety requirements that apply to automotive and industrial component manufacturing. He works in the BAE plant that is responsible for manufacturing stampings that are assembled into highly engineered seat mechanisms, subject to Fair Motor Vehicle Safety Standards.

157. As he had been a member of the team for several years and was a valued contributor to the company's workforce, BAE began the process to sponsor him for employment-based permanent residence (colloquially, a "green card") and USCIS approved the immigrant visa petition (Form I-140) that BAE filed for the employee on September 24, 2025. The employee is still waiting for an immigrant visa to become available, however, so that he can apply for permanent resident status.

158. Although the employee's H-1B status reached the statutory six-year maximum period of stay on October 16, 2025, USCIS's approval of the Form I-140 allows BAE to seek an extension of his H-1B status while he awaits an immigrant visa.

159. BAE prepared to file an H-1B extension petition to continue the employee's H-1B status while he awaited the availability of an immigrant visa. This process begins with filing a Labor Condition Application (LCA) to the Department of Labor ("DOL"), which BAE filed on September 25. Under normal circumstances, an LCA is certified within seven working days. However, the government shut down on October 1. As a result, the DOL did not certify the LCA until November 4, 2025. Because the LCA remained pending, BAE was unable to file the H-1B extension petition before the employee's H-1B status expired on October 16, 2025. As a result,

the employee, who did not want to be out of status, took leave from BAE and reluctantly departed the United States on October 15, 2025.

160. Five days later, the government issued guidance stating that H-1B petitions filed on or after September 21, 2025, for workers who are outside the United States and require a new H-1B visa would be subject to the $100,000 fee. Because the employee is now outside the United States and his previous H-1B visa had expired, any H-1B petition BAE would file for him appears to be subject to the $100,000 fee under USCIS's October 20, 2025 guidance.

161. BAE just lost a significant amount of its business and has had to undergo cost-saving measures, so it cannot afford the $100,000 fee to file an H-1B petition for the employee. After nearly six years with the company, this employee is a critical member of BAE's Quality Department. Moreover, BAE had planned to promote this employee into a Quality Manager position, which he would assume when the current Quality Manager retires after serving BAE for over a decade. Without this employee, BAE is suffering immediate harm due to the importance of his role, his tenure with the company, and the respect he has developed within the company.

**4. Religious organizations**

162. **Plaintiff Society of the Divine Word** (also known as "Societas Verbi Divina," "SVD," and the "Divine Word Missionaries") is a religious missionary order of Roman Catholic priests and brothers presently serving in almost eighty countries around the world. The Chicago Province—headed by Father Adam Oleszczuk, the Provincial Superior of the Province—is a non-profit, tax-exempt organization employing several hundred employees.

163. There are approximately 195 Divine Word Missionaries in the Chicago Province. The Divine Word Missionaries work in the states of Illinois, Iowa, Wisconsin, Ohio, Missouri, Tennessee, New Jersey, and Washington D.C; in several island nations in the Caribbean including Antigua, Jamaica, B.V.I., Montserrat, St. Kitts, and St. Maarten; as well as in various provinces in Canada. Divine Word Missionaries are involved in a variety of ecclesiastical duties—or ministries—including parish administration and communications, Catholic formation,

Catholic Biblical Apostolate, spiritual direction, vocation recruitment, fundraising, and other specialized ministries.

164. SVD has three formation centers which educate future SVD members in the pre-novitiate, novitiate, and post-novitiate formation programs: Divine Word College in Epworth, Iowa; Divine Word Theologate in Chicago, Illinois; and Catholic Theological Union in Chicago, Illinois. Divine Word Missionaries oversee and implement each of these programs.

165. As an international religious missionary order, SVD's members can be assigned to other countries by the SVD Generalate in Rome. Each year, Rome assigns newly final professed members to various countries around the world where the Society works, including the United States. Additionally, the Chicago Province often invites foreign Divine Word Missionaries to come to the United States to maintain its missionary outreach. Many of the members who are assigned to the United States will remain in this country for years, including members who eventually become U.S. citizens or lawful permanent residents.

166. Because of the diverse communities, cultures, and nationalities that Society of the Divine Word serves, it is critical that Divine Word Missionaries have the cultural and language skills to properly perform their duties. In the Chicago Province alone, Society of the Divine Word has particularly large Spanish-, Polish-, and Vietnamese-speaking populations that require Divine Word Missionaries with those language skills to receive spiritual guidance and instruction, ministry, and sacraments. Individuals with the proper skillset and experience for these roles are hard to find and hard to replace. Additionally, given the ongoing changing realities in the American Catholic Church, such as an aging native-born clergy and religious community, and fewer American (born and naturalized) candidates becoming priests, many dioceses and religious orders, including SVD, are becoming increasingly dependent on foreign born priests. This trend is expected to worsen in the near future.

167. Three SVD Divine Word Missionaries currently hold an H-1B visa. Each of these Divine Word Missionaries were carefully selected for their unique skills, spoken languages, and expertise, and they are critical for their respective ministries. This includes pastoring parishes,

Case: 26-6067, 11/06/2026, DktEntry: 30.1, (152 of 240)

performing administrative work, mentoring newly professed members working in the parish, providing spiritual counsel and guidance in a variety of languages, and serving as church canon law consultants (which requires further specialized training). These individuals' skills are necessary to serve their ethnically diverse parishes.

168. Although the Chicago Province of SVD has at least eight priests working in nonimmigrant status with an R-1 visa—an immigration status which allows a nonimmigrant worker in a religious occupation to temporarily live and work in the United States, under certain conditions—there are key limitations on this status that prevent it from being a long-term solution for SVD's ministerial needs. For example, an individual in R-1 status can only maintain that status for up to five years. Although there is a path to a green card from R-1 status, it is a long, involved process and currently has a lengthy backlog for an immigrant visa to become available. Given this backlog, the ability to change nonimmigrant status to H-1B status is the only lawful alternative available to SVD to maintain its priests' legal status in the United States. SVD planned to petition for H-1B status for each of these individuals prior to the expiration of their R-1 status, to ensure they could continue their work uninterrupted. If this is not possible because of the prohibitive fee under the Proclamation, a Divine Word Missionary would need to leave the U.S. and wait abroad for at least one year before he could receive another R-1 visa. This would cause significant disruption and severely impact the parishes where these priests perform vital services.

169. The H-1B visa is the lawful pathway SVD must use to continue its critical religious services ministry in the United States. As a non-profit, paying the $100,000 fee per employee would create a crippling burden on the Chicago Province, and would pose serious barriers to the continuity of its ministry in key areas. If SVD is unable to apply for H-1B visas for its staff, it will be unable to continue providing critical language- and culturally-accessible religious services to its congregants, impacting its congregants' spiritual needs and interfering with SVD's religious exercise. In other words, SVD's inability to employ these professionals will harm not only the organization, but also the communities it serves, especially those which

require the unique skillset of the individuals who would otherwise apply for H-1B visas. Furthermore, SVD had already begun plans and reserved the fees already required to apply for H-1B visas for its necessary religious workers, to fill roles for which U.S. citizens are simply not available. These plans must now be placed on hold since SVD cannot afford to pay the extravagant $100,000 fee for each necessary individual.

170. **Plaintiff Fathers of St. Charles** is a part of the Congregation of the Missionaries of St. Charles – Scalabrinians, an international community of brothers who have felt the call to consecrate themselves to a missionary life in service of migrants. The Congregation serves migrants and refugees all over the world and is divided into several provinces or regions, each responsible for serving certain countries. The province of Fathers of St. Charles is the St. John the Baptist Province, whose jurisdiction covers the United States, Canada, Mexico, Guatemala, and El Salvador. The provincial office is located in Oak Park, Illinois and supports a membership of brothers hailing from thirteen different countries who minister in locations all over the province.

171. Because Fathers of St. Charles are called by their faith to be in mission with migrants and refugees, with a special priority for the poorest migrants, it is critical for the members of Fathers of St. Charles to be able to perform all sacramental and liturgical activities in a linguistically and culturally appropriate manner for the communities they serve. For the St. John the Baptist Province, this requires the language and cultural competency to be able to minister to Latin American, Vietnamese, and Brazilian communities throughout the province's jurisdiction. Most members of Fathers of St. Charles speak at least two to three different languages and rotate to different locations both within the province as well as to other Scalabrinian provinces and regions outside the province as part of their calling and mission to be in community with migrants and refugees.

172. The unique mission of the Congregation of the Missionaries of St. Charles and the Fathers of St. Charles requires the St. John the Baptist Province be able to bring members of the Congregation into the United States on visas so that they can work with and serve the ethnic

communities in the parishes entrusted to Fathers of St. Charles by the bishops. In the past, Fathers of St. Charles has used (and continues to use) R-1 religious worker visas to enable its members to live and work in the United States, and it has also subsequently sponsored its members for permanent residency so that they may remain with the province on a long-term basis. But because R-1 visas are valid only for five-year periods before the recipient must leave the United States for at least a year, and due to processing backlogs that have made it nearly impossible for R-1 visa holders to adjust status to lawful permanent residency before the five-year term of their visa expires, it has recently become necessary for Fathers of St. Charles to sponsor its members already in the United States on R-1 visas for H-1B visas so that they may maintain legal status and continue their work here.

173. Fathers of St. Charles currently has three members here on R-1 visas that will expire imminently, and for whom Fathers of St. Charles had planned to petition for H-1B visas in the next few months. The mission and religious calling of Fathers of St. Charles depends heavily on the H-1B visa system and the ability of Fathers of St. Charles to be able to bring members of the Congregation from abroad to work in the United States on H-1B visas on a regular basis.

174. The Proclamation and the $100,000 Requirement is therefore devastating to Fathers of St. Charles and their religious calling. Fathers of St. Charles cannot afford to pay $100,000 for each new H-1B visa application. The province's many humanitarian duties would be severely impacted if the province had to find hundreds of thousands of dollars within its budget to cover new H-1B visa applications on an ongoing basis in future years. If the Proclamation remains in effect, Fathers of St. Charles will not be able to maintain the legal status of the three members currently here on R-1 visas and would be forced to send them abroad, with no ability to fill the positions those members would leave vacant. In turn, the communities in those parishes would not be able to convene and worship in their own language and would be deprived of spiritual guidance and service, in contravention of the mission and spiritual calling of Fathers of St. Charles. The $100,000 Requirement substantially burdens Fathers of St. Charles's mission and ability to serve the poorest of migrants, and it currently unclear how Fathers of St.

Case: 26-0067, 11/06/2026, DktEntry: 30.1, (155 of 240)

Charles will be able to continue their spiritual work if they cannot access the H-1B visa system going forward.

175. **Plaintiff Church on the Hill** is a religious institution located in the Appalachia region of the United States. The church congregation was formed seventy years ago but was officially incorporated in its current structure in 2003.

176. In 2021, Church on the Hill decided to branch out and establish a new church, also known as a "church plant." The church plant, which began with twenty members from Church on the Hill, formed a new congregation in a nearby city. The new church serves an underserved, economically disadvantaged region in Appalachia and now has approximately 200 members in its congregation.

177. Both Church on the Hill and the church plant have established ministries for children, youth, families, and students, as well as community outreach that meets both practical and spiritual needs. Some of the ministries in the church plant work with local schools to support parents who are financially struggling and teachers who work with these low-income families. Church members regularly visit sick and elderly community members in the hospital and in their homes. Through these efforts, the church has become a trusted presence in the community, standing alongside families in hardship and serving as a stabilizing and hope-filled influence in a region marked by economic challenge.

178. The church would not be what it is today if it had not hired foreign talent through the visa system to assist with establishing this second church. Several years ago, Church on the Hill hired a pastor from the United Kingdom on an R-1 visa, a temporary non-immigrant visa available for religious workers. Prior to working for Church on the Hill, this pastor shared with the Church Board his vision and calling to start a new church. The Board found this vision so compelling that they offered a job to the pastor and then became the sponsor for his new petition for nonimmigrant worker status and green card petition, which allowed him to adjust to legal permanent residency from his R-1 visa. This pastor was and is integral to the church's mission and work.

179. To help make this vision of a second church a reality, Church on the Hill sponsored for an R-1 visa a second pastor from the United Kingdom, Plaintiff John Smith, who was a colleague of the first pastor the church had sponsored for an R-1 visa. The two pastors' work has allowed Church on the Hill to expand to its second location. John Smith's relationship to the first pastor, their long history, their common vision, their complementary qualifications, skills, and giftings create a unique synergy so that together they can co-pastor the church plant and its local community.

180. Pastor John Smith is a native of England and is currently present in the U.S. on an R-1 visa. It was important to hire Pastor John Smith with an R-1 visa because of his unique qualifications and partnership with the first pastor. In addition, he brings extensive experience and training in cross-cultural mission work, having served and trained in diverse contexts overseas. This background has shaped his ability to minister effectively across generational, cultural, and socioeconomic boundaries within the Appalachian Highlands. Combined with his theological preparation, pastoral leadership, and long history of shared vision with the first pastor, his contribution could not be replicated by hiring unrelated local talent. Pastor Smith's leadership is critical for the growth and development of the church plant.

181. Pastor John Smith's R-1 visa is set to expire on November 1, 2026, at which time he will have reached the maximum five-year stay on his R-1 visa in the United States. The church has sponsored Pastor John Smith for a green card, and that application has been approved, but there is a long processing backlog that is delaying his ability to adjust status to lawful permanent residency. Prior to the Proclamation, Church on the Hill planned to apply for an H-1B visa for Pastor John Smith so that he could remain in the U.S. and continue his ministry with the church while he waits to be able to adjust status. The church had retained immigration counsel to apply for an H-1B visa for him just prior to the Presidential Proclamation at issue.

182. After the $100,000 Requirement was instituted, the church was forced to notify Pastor Smith that it cannot afford to pay this fee. Without an H-1B visa, John Smith will be unable to continue working for Church on the Hill after November 2026.

183. The required fee directly harm Church on the Hill, their mission, and their members. The church is worried that the fee will prevent them from retaining the pastoral leadership that is central to their mission and the stability of their congregation. The fee has created real concern about the future of the church and the community that depends on it.

184. If the H-1B fee continues in force, the church and its members will face a staffing shortage. Pastor John Smith has played a pivotal role growing the church, including shepherding the church plant in a nearby city. Pastor Smith leads many of the church's ministries and participates in preaching, teaching and mentoring new leaders. He also plays a key role in developing religious education programs for the church, leading worship and performing outreach to underserved families in the community. As part of Pastor John Smith's ministry, he has developed important and meaningful relationships with members of Church on the Hill's congregation and community that would be immediately weakened, if not severed completely, if he and his family no longer had legal status in the United States and were forced to leave the country. Many of the church's ministries and programs will be paused or cut back if Church on the Hill is unable to change Pastor John Smith's status to H-1B. Church on the Hill's existing church staff would not be able to fill the hole in our workforce that Pastor John Smith would leave if it cannot convert his status to continue his employment.

185. If Pastor John Smith is unable to lawfully remain and work in the United States, the essential services he provides to the congregations and the community will be critically impacted, leaving a vulnerable population and community without the support it needs. Because the other pastor who co-leads the church is dealing with significant health issues, Pastor John Smith's absence would place considerable strain on him and on the church as a whole. Instead of continuing to expand and develop new ministries and outreach, the church would be forced into a position of simply trying to maintain what already exists. This would prevent further growth, limit innovation, and hinder the broader impact the church has been having.

186. **Plaintiff John Smith** is a citizen of the United Kingdom who currently lives in the Appalachia region of the United States with his wife and four children. John Smith came to

the United States in 2021 on an R-1 nonimmigrant visa for foreign nationals in religious vocations, and is currently working as a full-time pastor at a church in his area. In addition to his rewarding and important work with the church, Pastor Smith's family have also established deep roots in their local community, where his children attend school, and have developed meaningful connections with their church and broader community. Pastor Smith's elderly mother and step-father also live close by, which allows Pastor Smith and his family to be close to them and continue these familial relationships. Pastor Smith and his wife are in the process of purchasing a home for their family.

187. Pastor Smith's R-1 visa allows him to reside in the United States for up to five years until November 1, 2026, but his church offered him a permanent position if he could continue maintaining legal immigrant status in the country, and sponsored him for a green card with an I-360 petition. This I-360 petition was approved last year; however, due to an extreme backlog in visa processing, Pastor Smith cannot file to adjust his status to lawful permanent residency before his R-1 visa will expire. Thus, Pastor Smith's church retained immigration counsel to file an H-1B petition on Pastor Smith's behalf so he can continue working at the congregation while he waits for the opportunity to adjust his status.

188. Before the church could file Pastor Smith's H-1B petition, however, the Proclamation went into effect. It is not possible for the church to pay such a high fee. The news has left Pastor Smith heartbroken and filled with uncertainty. He too cannot afford to pay this fee, and without the H-1B visa process, he will lose his job at the church and will not be able to remain in the United States beyond his five-year maximum stay on his R-1 visa. This would undermine his ability to continue providing the essential pastoral and community to his church. The new $100,000 fee would not only upend Pastor Smith's plans to remain in the United States and much of the spiritual work he has devoted himself to for the past several years, but also his family's lives and the relationships and plans they had for their future.

### 5. Research and academic institutions

189. **Plaintiff UAW International** represents 120,000 members in higher education, and **Plaintiff UAW Local 4811** represents nearly 50,000 members employed at the University of California. These members include post-doctoral researchers, graduate students, and teaching assistants who drive innovation and advances in multiple fields. Plaintiffs UAW International and Local 4811 have numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

190. For example, one UAW International and Local 4811 member is a 31-year-old Indian post-doctoral researcher at a major U.S. research institution whose work focuses on biomedical modeling and developing tools to simplify and accelerate drug discovery. His current projects support advances in treatment for tuberculosis and breast cancer and he is the only person in his lab working on these projects. He is presently employed on a STEM OPT extension, but his projects will not be completed by the time it expires, and his laboratory recommended that the research institute file an H-1B petition on his behalf. The imposition of a $100,000 fee imposed by the Proclamation would be extremely burdensome on the research institution and thus jeopardize both his research and the institution's investment. Since he found out about the Proclamation, he has felt depressed and hopeless about his own future and the future of his work and is finding it difficult to concentrate on his research.

191. A European UAW International member is currently in a postdoctoral position at a major research institution on the East Coast. He is a neuropharmacologist who studies the impacts of opioids generally and fentanyl specifically on pain management, in an effort to identify ways to reduce the risk of addiction. He chose to do his postdoctoral work in the United States specifically because he is aware of the acuity of the opioid epidemic here and hopes to find ways to reduce it. He is currently in the U.S. through a J-1 visa and his current institution planned to sponsor him for an H-1B visa so he could continue this critical work. He is also preparing to submit a major grant application for funding to continue and expand his work at that

institution, on which he would be the primary investigator. If he is unable to obtain an H-1B visa, his institution will lose access to any potential grant funding, and he will not be able to continue this critical research. When he became aware of the Proclamation, he was also personally devastated and has suffered from anxiety and insomnia because his entire career and the future of his research are now up in the air.

192. **Plaintiff AAUP** has 50,000 members who are faculty and other academic professionals. Plaintiff AAUP has numerous members whose employers had planned to file H-1B petitions with USCIS on their behalf. These members may lose their ability to live and work in the United States as a result of the Proclamation.

193. For example, one AAUP member had an offer from the major research university where that member is currently completing a postdoc. The university intended to seek an H-1B visa for this member, and they expected the H-1B process to be completed this fall. However, the university has placed the processing of this member's H-1B visa on hold indefinitely due to the $100,000 fee.

194. The potential loss of these postdoctoral researchers, scientists, and academics will not just harm the individuals and the institutions that employ them. It will result in significant and potentially catastrophic setbacks to research that benefits the American public and ensures the United States remains a leading source of innovation and expertise. For example, the fee will likely result in sharp cutbacks in the employment of highly talented foreign workers and severe setbacks for university research, graduate programs, and clinical care, compounding an anticipated shortfall of 5.3 million skilled workers over the next decade.[44] Faculty search committees are already being told they have to exclude top candidates if those candidates would need H-1B visas. Andrea Liu, a physicist at the University of Pennsylvania, said the fee would

[44] Michael T. Nietzel, *Universities May Face Huge Costs From Trump's $100,000 H-1B Visa Fee*, Forbes (Sept. 26, 2025), https://perma.cc/FB3Y-LNJ4.

Case: 26-6067, 11/06/2026, DktEntry: 30.1, Page 161 of 240

damage the future of her research group and described the impact as "an utter disaster—yet another body blow to science."[45]

195. **Plaintiff Phoenix Doe** is a citizen of India residing in the Northern District of California. She is a postdoctoral researcher at a U.S. university whose cap-exempt H-1B petition has been halted due to the $100,000 fee imposed by the Proclamation. Her research focuses on identifying the genetic and epigenetic causes of vision loss due to aging, diseases such as diabetes, and rare inherited genetic abnormalities of unknown etiology, with the goal of finding new ways to diagnose and treat blinding conditions. Her laboratory relies on her as its first postdoctoral scholar to build and advance its research program, and her ongoing work requires a minimum of two more years. Due to the value of her skills and research expertise in both computational biology as well as wet-lab bench research, her university employer approved her for H-1B sponsorship, and she expected the process to be completed by this December, allowing her to visit her home country for the first time in six years. Instead, as a result of the Proclamation, her university has indefinitely paused moving forward with the processing of her application. She is suffering debilitating stress and anxiety due to the uncertainty of her position, which exacerbates the PTSD from which she suffers. Without relief, Plaintiff Phoenix will be forced to leave her postdoctoral position the United States within four months, causing serious professional and personal harm. Her departure will set back the crucial research she is conducting, disrupting the lab's ongoing work and ability to secure future research funding, preventing her department from getting any future funding through her, and potentially delaying the availability of treatment for the conditions that are the focus of her research.

## VII. CLASS ALLEGATIONS

196. Plaintiffs Nephrology Associates, BAE Industries, and Lower Brule Day School ("Class Plaintiffs") seek prospective injunctive and declaratory relief on behalf of a class of

[45] Natasha Gilbert, *Trump's $100K Visa Fee for Foreign Talent: How Will It Affect Researchers?*, Nature (Sept. 24, 2025), https://perma.cc/2BUK-T49N.

similarly situated individuals under Rule 23(b)(2) of the Federal Rules of Civil Procedure ("Employer Class").

197. The Employer Class comprises all U.S. employers who have filed or will file an H-1B petition that is subject to the $100,000 fee under the September 19, 2025 Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," or the Proclamation's implementing guidance, or would file such a petition but for the fee, with the United States Citizenship and Immigration Services received on or between September 21, 2025 and September 21, 2026, to employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States under 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 C.F.R. § 214.2(h)(1)(i).

198. The $100,000 Requirement imposes the burden on H-1B employers to either pay an onerous fee to meet the labor needs of their business or to forgo or delay hiring altogether. In this way, Defendants force Class Members to make the painful choice between incurring expense or forgoing hiring, often into professions, areas, and industries suffering critical shortfalls—thus imposing an ongoing threat to the Employer Class's ability to petition for H-1B visas.

199. Numerosity: The Class is so numerous that joinder of all individual members would be impracticable. Upon information and belief, in addition to Class Plaintiffs, the proposed class includes thousands of employers who have filed or will file an H-1B petition that is subject to the Proclamation or the Proclamation's implementing guidance, or would file an H-1B petition but for the $100,00 Requirement.

200. According to data maintained by USCIS, on average, between FY 2022 and FY 2024, approximately 14,000 employers filed petitions that, if filed today, would or could be subject to the $100,000 Requirement under the Proclamation, as implemented.

201. Commonality: Class Plaintiffs and all members of the proposed class have been harmed by Defendants' abrupt imposition of the $100,000 Requirement. This action requires a determination of whether the imposition of the $100,000 Requirement exceeds the President's authority and otherwise violates the Administrative Procedure Act. The questions of fact and law arising from the adjudication of this issue are common to all members of the Class, including:

202. Whether the President exceeded his authority by unilaterally changing a statutory scheme created by Congress;

203. Whether the President exceeded his authority by unilaterally imposing a fee, tax, or other mechanism to generate revenue for the United States;

204. Whether the $100,000 Requirement violates the APA because it is not in accordance with the law and in excess of statutory authority;

205. Whether the $100,000 Requirement violates the APA because it is arbitrary and capricious; and

206. Whether the $100,000 Requirement violates the APA due to Defendants' failure to observe the procedures required by law, including notice and comment rulemaking, before imposition of the $100,000 Requirement;

207. Typicality: Class Plaintiffs' claims for relief are typical of the claims of the Class. Class Plaintiffs are employers that have filed or will file an H-1B petition subject to the $100,000 fee under the Proclamation or the implementing guidance, or would file such a petition but for the fee, so that they can employ a qualified temporary nonimmigrant worker in a specialty occupation in the United States. Class Members are similarly all employers that, since September 21, 2025 have or will file an H-1B petition that is subject to the $100,000 fee under the Proclamation or the Proclamation's implementing guidance, or would file such a petition but for Defendants' imposition of the $100,000 Requirement.

208. Adequacy of Representation: Class Plaintiffs can protect the interests of all members of the class fairly and adequately, as they have no conflicts of interest with any members of the Employer Class. Class Plaintiffs have retained counsel who are experienced in litigating both the substantive areas of law and complex class action cases.

209. Injunctive and Declaratory Relief for the Class: Defendants created and implemented the $100,000 Requirement such that it applies to all members of the putative class. Class Plaintiffs and the putative class seek to establish that the $100,000 Requirement is unlawful. They also seek injunctive relief to remove the $100,000 Requirement and declaratory

relief to declare it unlawful and set it aside to permit them to move forward with current or future H-1B petitions without incurring this fee. Class Plaintiffs and the putative class are and will continue to be subject to the unlawfully implemented fee by Defendants' continued maintenance and enforcement of the $100,000 Requirement, and they are or will continue to be injured as a result.

210. Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Class Plaintiffs and members of the proposed class.

## VIII. CAUSES OF ACTION

### COUNT 1

### Against Defendant Trump

### On behalf of all Plaintiffs and the Employer Class

### Actions *ultra vires*, in excess of statutory authority

211. Plaintiffs incorporate the factual allegations above as if set forth herein.

212. The Proclamation cites Sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1182(f) and 1185(a), as providing statutory authority for imposing a requirement that employers submitting a petition for an H-1B visa make a "payment" of $100,000 to the United States.

213. Neither INA § 212(f) nor § 215(a) authorizes the President to impose the $100,000 Requirement.

214. Nor has Congress or the Constitution otherwise authorized the President to impose this fee, tax, or other revenue-generating requirement on H-1B petitioners. To the contrary, under the Constitution, the power of taxation belongs to Congress. U.S. Const. art. I, § 8, cl. 1.

215. The cited statutes, INA §§ 212(f) and 215(a), cannot be reasonably interpreted to be a delegation of Congress's tax power.

216. If these provisions were interpreted to provide this authority, they would violate the nondelegation doctrine because they contain no intelligible principles to guide decision-making on the amount of money that can be raised or the use of the money collected.

217. That interpretation would also violate the major questions doctrine because these provisions contain no clear Congressional authorization for this action of great political and economic significance. And, there is no basis for delegated authority for the President to raise and spend money as he sees fit.

218. INA § 212(f) and § 215(a) also do not authorize the President to override other provisions of the INA. *Trump v. Hawaii*, 585 U.S. 667, 689 (2018).

219. In separate provisions, the INA sets standards for and limits on the entry into the United States of H-1B visa recipients and authorizes DHS—not the President—to impose limited fees in connection with H-1B visa petitions:

220. The INA sets specific requirements for approval under the H-1B visa program. See 8 U.S.C. § 1101(a)(15)(H)(i)(b). It also sets specific caps on the number of people who may be admitted under this program, see 8 U.S.C. § 1184(g), reflecting a careful balancing of policy interests between employers' need to hire foreign workers for certain kinds of roles and the interests of American workers in the labor market.

221. The INA also limits the fees that DHS may impose under 8 U.S.C. § 1356(m) for adjudication and naturalization services. Such fees "may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." 8 U.S.C. § 1356(m). In accordance with the APA, DHS sets the amounts of these fees through notice-and-comment rulemaking. *See, e.g.*, 89 Fed. Reg. 6194.

222. Beginning with the passage of the American Competitiveness and Workforce Improvement Act of 1998, Congress (via the INA) imposed additional fees on employers specifically in connection with H-1B visa petitions. *See* 8 U.S.C. § 1184(c)(9)-(14). The INA

also directs that these fees be segregated into a special account and used for specified purposes. 8 U.S.C. § 1356(s). Congress set these limits for the purpose of balancing impacts to the labor market for American workers while permitting foreign workers in this category to be hired for certain kinds of roles.

223. The INA also includes detailed provisions to address misuse of the H-1B visa program. *See* 8 U.S.C. § 1182(n)(2); 20 C.F.R. § 655.800 *et seq*.

224. In directing DHS to require a $100,000 "payment" to an unspecified account and for unspecified uses, in connection with H-1B visa petitions, the Proclamation conflicts with and supplants the structure Congress has established for approval and entry into the United States of H-1B visa recipients, including the fee structure for adjudication services in general and for the H-1B visa program in particular.

225. Nor does the President have authority under 8 U.S.C. § 1182(f) to restrict workers from entering the United States because their employers failed to make this payment.

226. The Proclamation's requirement to pay $100,000 as a condition of entry or re-entry to the United States, combined with the expansive and effectively standardless discretion of the Secretary of Homeland Security to disregard the Proclamation's dictates and Congressional intent, adds novel eligibility requirements, conflicts with, and supplants the structure Congress has established for the adjudication of H-1B petitions, issuance of H-1B visas, and entry into the United States for those with H-1B visas.

**COUNT 2**

**Against Agency Defendants**

**On behalf of all Plaintiffs and the Employer Class**

**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A), (C)**

***Not in Accordance with Law, In Excess of Statutory Authority***

227. Plaintiffs incorporate the factual allegations above as if set forth herein.

228. Agency Defendants require a $100,000 fee as a mandatory requirement upon submission of any new H-1B petition received after 12:01 a.m., September 21, 2025.

229. The new $100,000 Requirement, an extortionate fee, constitutes final agency action under 5 U.S.C. § 704.

230. Agency Defendants each lack statutory authority to impose the $100,000 Requirement.

231. The $100,000 Requirement is contrary to and/or in excess of the authority provided in provisions of the INA, including (1) the standards for approval and entry into the United States of H-1B visa applicants, as set forth in 8 U.S.C. § 1101(a)(15)(H)(i)(b) and 8 U.S.C. § 1184(g); (2) the fees to be charged to employers submitting petitions for H-1B visa applicants, including the amount of those fees and the purposes for which they may be used, as set forth in 8 U.S.C. § 1184(c)(9)-(14) and 8 U.S.C. § 1356(s); and (3) the fees to be charged generally for adjudication and naturalization services, as set forth in 8 U.S.C. § 1356(m).

232. Nor do the Agency Defendants have the statutory authority to stop adjudicating petitions and visas or to bar individuals from entering the country unless their employers have paid $100,000.

233. The $100,000 Requirement is contrary to law and in excess of statutory authority and must be set aside under 5 U.S.C. § 706(2).

234. In the alternative to the APA, Plaintiffs bring this claim pursuant to the Court's inherent equitable authority to declare unlawful and enjoin unlawful agency action.

**COUNT 3**

**Against Agency Defendants**

**On behalf of all Plaintiffs and the Employer Class**

**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**

***Arbitrary and Capricious***

235. Plaintiffs incorporate the factual allegations above as if set forth herein.

236. Under the APA, a court shall set aside an action if it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency "relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "When an agency changes course . . . , it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

237. Agency Defendants failed to consider the carefully crafted fees and factors Congress intended for DHS to consider when adjusting fees for adjudication of H-1B petitions. 8 U.S.C. § 1356(m), for example, calls for DHS to consider the costs of providing adjudication and naturalization services. But the $100,000 payment is untethered from the cost of adjudicating H-1B petitions or any other petitions.

238. Agency Defendants failed to consider the adverse impacts of the $100,000 requirement on small businesses, non-profits, and governmental jurisdictions, as required by the Regulatory Flexibility Act. 5 U.S.C. §§ 603-604. Agencies are required to consider small entities' ability to pay and to consider creating exemptions, discounts, or other alternatives for small entities, and DHS typically has required small and non-profit employers to pay less in fees. But here, the Agency Defendants did not consider ability to pay the $100,000 Requirement or explain its unreasoned departure from that framework.

239. Agency Defendants failed to consider the substantial burden that the $100,000 Requirement places on religious organizations who cannot afford to pay that exorbitant amount and, as a result, will lose their pastors and priests.

240. Agency Defendants failed to consider the negative impacts of the $100,000 Requirement on schools, hospitals, and communities, especially in underserved areas where school districts and hospitals struggle to hire teachers and doctors and rely on the H-1B program to ensure effective health care and educational services for their communities.

241. Agency Defendants failed to consider the reliance interests of regulated parties like Plaintiffs and their members. The agencies have never increased H-1B fees by six figures in

one go and have never done it without warning. Agency Defendants should have considered the chaos that this enormous and sudden fee would predictably create for regulated parties, who were caught by surprise and had no opportunity to prepare for it.

242. Agency Defendants failed to consider alternative ways to address the purported problems with the H-1B program, such as more closely scrutinizing any employers who may be abusing the program, under the existing statutory enforcement mechanisms, rather than imposing a blanket $100,000 fee on all employers.

243. Agency Defendants did not consider how the $100,000 Requirement could encourage employers to improperly lower wages for their workers—U.S. workers or H-1B workers—in order to maintain needed staff but recoup additional costs paid to the government.

244. While employers must provide a $100,000 payment "to accompany any new H-1B visa petitions submitted after 12:01 a.m. . . . on September 21, 2025," *H-1B FAQ*, USCIS (Sept. 21, 2025), https://perma.cc/9UKN-ZYDG, Agency Defendants have failed to consider that, as of September 21, 2025, there was no mechanism by which petitioners could submit such a fee.

245. Agency Defendants have also failed to coherently explain other key information. For instance, the agencies have not explained what will happen to employers who file petitions before a payment system is set up, where the money will go, or how the money will be used.

246. DHS has also failed to explain what criteria or factors it will consider in determining whether an individual, an employer, or an industry will be exempt from the $100,000 requirement. This failure invites arbitrary, selective enforcement of the new requirement.

**COUNT 4**

**Against Agency Defendants**

**On behalf of all Plaintiffs and the Employer Class**

**Violations of the Administrative Procedure Act,**

**Regulatory Flexibility Act – 5 U.S.C. §§ 603-604, 706(2)(D)**

***Failure to Conduct Notice and Comment Rulemaking;***

***Rulemaking Without Observance of Procedure Required by Law***

247. Plaintiffs incorporate the factual allegations above as if set forth herein.

248. *Notice and comment.* The APA requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. See 5 U.S.C. §§ 553(b)-(c). The agency must "consider and respond to significant comments received." *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). When the final rule is promulgated, the agency must provide "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

249. The new requirement of a $100,000 payment is a legislative rule within the meaning of the APA. It "imposes new obligations" on H-1B petitioners, as the $100,000 payment must "accompany" their petition and the petitions will not be adjudicated and their workers will not be granted visas or be allowed to enter the United States without it. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). Legislative rules like the new $100,000 payment requirement must go through notice and comment rulemaking. See 5 U.S.C. § 553(b)-(c). USCIS has always provided notice and comment when adjusting fees for H-1B petitions except where Congress provided for the fees by statute. *See, e.g.*, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 Fed. Reg. 6194 (Jan. 31, 2024), *as corrected,* 89 Fed. Reg. 20101 (Mar. 21, 2024).

250. Agency Defendants failed to provide notice and an opportunity for comment as required by the APA and have thus violated 5 U.S.C. §§ 553(b), (c) and 706(2)(D).

251. *Effective date.* Agency Defendants also violated the APA by making the new $100,000 Requirement effective immediately without good cause. The APA requires that a substantive rule be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). If an agency claims good cause for making the rule effective in less than 30 days, it must publish its good cause explanation with the rule. *Id.* § 553(d)(3). Here, however, the new requirement became effective immediately. Agency Defendants failed to publish any good cause finding.

252. *Regulatory Flexibility Act.* Agency Defendants have violated the Regulatory Flexibility Act (RFA), 5 U.S.C. § 601 *et seq.* Whenever an agency is required to conduct notice and comment rulemaking, an agency must "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small entities." 5 U.S.C. § 603(a). The initial analysis must discuss significant alternatives such as establishing different compliance requirements or timetables "that take into account the resources available to small entities" or "exemption from coverage of the rule, or any part thereof, for such small entities." *Id.* § 603(c). A final rule must include a final regulatory flexibility analysis that discusses, among other things, significant issues raised by the public or the Chief Counsel for Advocacy of the Small Business Administration and the steps the agency has taken to "minimize the significant economic impact on small entities." *Id.* § 604(a). Agency Defendants never published an initial analysis for public comment and did not publish a final analysis either, even though the $100,000 requirement will have an enormous impact on small entities.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare unlawful and set aside sections 1, 2, and 3(a) of the Proclamation;
2. Declare unlawful and set aside enforcement and implementation of sections 1, 2, and 3(a) of the Proclamation, including the requirement to make a $100,000 payment as a prerequisite to adjudicate an H-1B petition or as a condition for visa issuance or entry into the United States for H-1B beneficiaries;

3. Declare unlawful and set aside any agency guidance, procedures, or determinations made pursuant to, or in implementation of, sections 1, 2, and 3(a) of the Proclamation, including the Agency Policies;

4. Enjoin Defendants from requiring the $100,000 payment and from conditioning H-1B petition adjudications, visa issuance, or entry on such payment;

5. Order Defendants to process H-1B petitions under existing law, without the $100,000 payment condition;

6. Grant such other and further relief as the Court deems just and proper.

Date: December 18, 2025

Respectfully submitted,

*/s/ Karen C. Tumlin*
Karen C. Tumlin (CA Bar No. 234691)
Esther H. Sung (CA Bar No. 255962)
Laura Flores-Perilla (CA Bar No. 355645)
Hillary Li (GA Bar No. 898375)*
Brandon Galli-Graves (TX Bar No. 24132050)*
Emily Satifka (NJ Bar No. 330452020)*
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
emily.satifka@justiceactioncenter.org

*/s/ Charles H. Kuck**
GA Bar No. 429940
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

/s/ *Zachary R. New*
Zachary R. New***

*/s/ Cynthia Liao*
Cynthia Liao (CA Bar No. 301818)*
Johanna N. Hickman (D.C. Bar No. 981770)*
Jennie L. Kneedler (D.C. Bar No. 500261)*
Steven Y. Bressler (D.C. Bar No. 482492)**
Elena Goldstein (D.C. Bar No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*/s/ Kalpana Peddibhotla*
Kalpana Peddibhotla (CA Bar No. 200330)
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

*/s/ Jesse M. Bless*
JESSE M. BLESS*

Case: 26-6067, 11/06/2026, DktEntry: 30.1, (173 of 240)

Atty. Reg. No. (Colorado): 53992
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

MA Bar # 660713
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

*<u>/s/ Harini Srinivasan</u>*
Harini Srinivasan (D.C. Bar No. 1032002)*
Aniko Schwarcz (D.C. Bar No. 980631)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivsan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Alexandra Gray (NY Bar No. 6019590)*
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

*<u>/s/ Greg Siskind</u>*
Greg Siskind***
TN Bar No. 14487
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
** Motion to appear *pro hac vice* pending
*** Motion to appear *pro hac vice* forthcoming

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

U.S. Citizenship and Immigration Services

September 20, 2025

# Memorandum

TO: Associate Directors,
Deputy Associate Directors,
Program Office Chiefs

FROM: Joseph B. Edlow
Director, United States Citizenship and Immigration Services

JOSEPH B EDLOW
Digitally signed by JOSEPH B EDLOW
Date: 2025.09.20 17:26:38 -04'00'

SUBJECT: Proclamation, Restriction on Entry of Certain Nonimmigrant Workers, H-1B

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H-1B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose petitions *are accompanied or supplemented* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This proclamation only applies prospectively to petitions that have not yet been filed.** The proclamation does not apply to aliens who: are the beneficiaries of petitions that were filed prior to the effective date of the proclamation, are the beneficiaries of currently approved petitions, or are in possession of validly issued H-1B non-immigrant visas. All officers of United States Citizenship and Immigration Services shall ensure that their decisions are consistent with this guidance. The proclamation does not impact the ability of any current visa holder to travel to or from the United States.

cc: David V. Roy, Chief Counsel (A)

1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and
Border Protection

September 20, 2025

MEMORANDUM FOR: Executive Directors
Directors, Field Operations
Office of Field Operations

FROM: Matthew S. Davies (b)(6);(b)(7)(c)
Executive Director, Admissibility and Passenger Programs
Office of Field Operations

SUBJECT: Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers* [H-1B]

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, to address systemic abuse of H1-B nonimmigrant visas. Pursuant to sections 212(f) and 215(a) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f) and 1185(a), the entry into the United States of aliens as nonimmigrants to perform services in a specialty occupation under section 101(a)(15)(H)(i)(b) of the INA, 8 U.S.C. 1101(a)(15)(H)(i)(b), is restricted, except for those aliens whose *petitions are" accompanied or supplemented"* by a payment of $100,000. This guidance applies to H-1B employment-based petitions filed after 12:01 AM ET on September 21, 2025.

**This Proclamation only applies prospectively to petitions that have not yet been filed.** It does not impact aliens who are the beneficiaries of currently approved petitions, any petitions filed prior to 12:01 AM ET on September 21, 2025, or aliens in possession of validly issued H-1B non-immigrant visas. United States Citizenship and Immigration Services and the Department of State have been instructed to begin implementing the new monetary requirements for employers submitting petitions on behalf of aliens outside the United States for new H-1B petitions only. The Proclamation does not impact the ability of any current visa holder to travel to or from the United States. CBP will continue to process current H-1B visa holders in accordance with all existing policies and procedures. Aliens found inadmissible should be processed in alignment with existing guidance for the appropriate Title 8 disposition.

Please ensure this memorandum is distributed to port personnel. Should you require additional information, please contact (b)(6);(b)(7)(c) Director, Enforcement Programs Division.

U.S. Citizenship and Immigration Services

MENU

Home > Newsroom > All News > Alerts > H-1B FAQ

# H-1B FAQ

Release Date : 09/21/2025

On Friday, Sept. 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

- Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on Sept. 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on Sept. 21, 2025.
- Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.
    - U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available here (PDF, 177.48 KB).
    - U.S. Customs and Border Protection has also issued guidance, available here.
    - The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

- Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on Sept. 21, 2025.
- Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.
- Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

- A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.
- A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.

For more information on USCIS and its programs, please visit uscis.gov or follow u

Need Help? Chat with Emma™

, Instagram, YouTube, Facebook and LinkedIn

Last Reviewed/Updated: 09/21/2025

An official website of the United States Government Here's how you know

Home > H-1B FAQ

# H-1B FAQ

SEPTEMBER 21, 2025

On Friday, September 19, 2025, President Donald J. Trump signed a Proclamation, "Restriction on Entry of Certain Nonimmigrant Workers," that took an important, initial, and incremental step to reform the H-1B visa program to curb abuses and protect American workers.

This Proclamation:

- Requires a $100,000 payment to accompany any new H-1B visa petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025. This includes the 2026 lottery, and any other H-1B petitions submitted after 12:01 a.m. eastern daylight time on September 21, 2025.
- Authorizes the Department of Homeland Security and the Department of State to coordinate to take all necessary and appropriate action to implement this Proclamation.
  - U.S. Citizenship and Immigration Services has so far taken such action by issuing guidance regarding the Proclamation, available **here** .
  - U.S. Customs and Border Protection has also issued guidance, available **here** .

Cookie Settings

ER-176

The Department of State has posted guidance to all consular offices, consistent with the guidance from U.S. Citizenship and Immigration Services and U.S. Customs and Border Protection guidance.

This Proclamation does not:

Apply to any previously issued H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025.

Does not change any payments or fees required to be submitted in connection with any H-1B renewals. The fee is a one-time fee on submission of a new H-1B petition.

Does not prevent any holder of a current H-1B visa from traveling in and out of the United States.

Further steps that will be taken to reform the H-1B program, as contemplated in the Proclamation, include:

A rulemaking by the Department of Labor to revise and raise the prevailing wage levels in order to upskill the H-1B program and ensure that it is used to hire only the best of the best temporary foreign workers.

A rulemaking by the Department of Homeland Security to prioritize high-skilled, high-paid aliens in the H-1B lottery over those at lower wage levels.

Additional reforms are also under consideration and will be announced in the coming months.

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

U.S. Citizenship and Immigration Services

MENU

Home > Working in the United States > Temporary Workers > H-1B Specialty Occupations

# H-1B Specialty Occupations

**ALERT:** On Sept. 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility. Additional information is available in the "Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers" section below.

**ALERT:** USCIS will process H-1B, H-2A, and H-2B related Form I-129 petitions and CW-1 related Form I-129CW petitions during the government shutdown. We recognize, however, that the shutdown may affect a petitioner's ability to get required documentation (such as a labor condition application or a temporary labor certification from the U.S. Department of Labor), which may delay their ability to file Form I-129 or Form I-129CW.

If an H-1B, H-2A, H-2B, or CW-1 petitioner meets all other applicable requirements and submits evidence establishing that the primary reason they did not timely file an extension of stay or change of status request was due to the government shutdown, we will consider the government shutdown an extraordinary circumstance beyond the petitioner's control when we determine whether to excuse their failure to timely file the extension of stay or change of status request. We will monitor the situation closely and publish additional guidance if needed. Find additional information in Vol. 2, Part A, Chapter 4 of the USCIS Policy Manual.

**Alert:** We have received enough petitions to reach the congressionally mandated 65,000 H-1B visa regular cap and the 20,000 H-1B visa U.S. advanced degree exemption, known as the master's cap, for fiscal year 2026.

This nonimmigrant classification applies to people who wish to perform services in a specialty occupation, services of exceptional merit and ability relating to a Department of Defense (DOD) cooperative research and development project, or services as a fashion model of distinguished merit or ability.

Close All Open All

Need Help?
Chat with Emma™

## Presidential Proclamation on Restriction on Entry of Certain Nonimmigrant Workers

On September 19, 2025, the President issued a Proclamation, *Restriction on Entry of Certain Nonimmigrant Workers*, an important initial step to reform the H-1B nonimmigrant visa program. Under the Proclamation, certain H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025 must be accompanied by an additional $100,000 payment as a condition of eligibility.

**Who is subject to the $100,000 payment:**

The Proclamation applies to new H-1B petitions filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, on behalf of beneficiaries who are outside the United States and do not have a valid H-1B visa. The Proclamation also applies if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests consular notification, port of entry notification, or pre-flight inspection for an alien in the United States.

In addition, if a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, requests a change of status or amendment or extension of stay and USCIS determines that the alien is ineligible for a change of status or an amendment or extension of stay (e.g., is not in a valid nonimmigrant visa status or if the alien departs the United States prior to adjudication of a change of status request), the Proclamation will apply and the payment must be paid according to the instructions provided by USCIS.

The Proclamation does not apply to any previously issued and currently valid H-1B visas, or any petitions submitted prior to 12:01 a.m. eastern daylight time on September 21, 2025. In addition, the Proclamation does not prevent any holder of a current H-1B visa, or any alien beneficiary following petition approval, from traveling in and out of the United States.

The Proclamation also does not apply to a petition filed at or after 12:01 a.m. eastern daylight time on September 21, 2025, that is requesting an amendment, change of status, or extension of stay for an alien inside the United States where the alien is granted such amendment, change, or extension. Further, an alien beneficiary of such petition will not be considered to be subject to the payment if he or she subsequently departs the United States and applies for a visa based on the approved petition and/or seeks to reenter the United States on a current H-1B visa.

**How to pay the $100,000 payment:**

Petitioners should submit the required $100,000 payment using pay.gov, following the instructions on pay.gov at the following link: https://www.pay.gov/public/form/start/1772005176.

**When to pay the $100,000 payment:**

Payment must be made prior to filing a petition with USCIS, as petitioners must submit proof that the payment has been scheduled from pay.gov or evidence of an exception from the $100,000 payment from the Secretary of Homeland Security at the time of filing the H-1B petition. Petitions subject to the $100,000 payment that are filed without a copy of the proof of the payment from pay.gov or evidence of an exception from the Secretary of Homeland Security will be denied.

**Exceptions granted by the Secretary of Homeland Security:**

Exceptions to the $100,000 payment are granted by the Secretary of Homeland Security in the extraordinarily rare circumstance where the Secretary has determined that a particular alien worker's presence in the United States as an H-1B worker is in the national interest, that no American worker is available to fill the role, that the alien worker does not pose a threat to the security or welfare of the United States, and that requiring the petitioning employer to make the payment on the alien's behalf would significantly undermine the interests of the United States. Petitioning employers who believe their alien worker satisfies this high threshold may seek an exception by sending their request and all supporting evidence to H1BExceptions@hq.dhs.gov.

## Eligibility Criteria

## H-1B Licensing

## H-1B Electronic Registration Process

## Petition Filing Process

## Labor Condition Application (LCA)

## Period of Stay

## H-1B Cap

## Changing Employers or Employment Terms with the Same Employer (Portability)

## Family of H-1B Nonimmigrants

## More Information

Close All Open All

Last Reviewed/Updated: 10/20/2025

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office Of Immigration Litigation

TIBERIUS DAVIS
Counsel To The Assistant Attorney General

DAVID J. BYERLEY
Senior Litigation Counsel

JAIME A. SCOTT
Trial Attorney
DC Bar # 90027182
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Washington, D.C. 20044
Telephone: (202) 305-3620
Email: Jaime.A.Scott@usdoj.gov

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GLOBAL NURSE FORCE, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States, *et al.*,<br><br>Defendants. | Case No. 4:25-cv-8454-HSG<br><br>**DEFENDANTS' NOTICE OF APPEAL** |

Notice is hereby given that Defendants appeal to the United States Court of Appeals for the Ninth Circuit from this Court's Order of September 30, 2026 (Dkt. No. 130) granting in part Plaintiffs' Motion for Preliminary Injunction. Defendants have attached the Ninth's Circuits Form 1 and 6 to this filing.

Dated: October 9, 2026

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General
Office Of Immigration Litigation

TIBERIUS DAVIS
Counsel To The Assistant Attorney General

DAVID J. BYERLEY
Senior Litigation Counsel

/s/ Jaime A. Scott
JAIME A. SCOTT (DC Bar # 90027182)
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Washington, D.C. 20044
Telephone: (202) 305-3620
Email: Jaime.A.Scott@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Jaime A. Scott
JAIME A. SCOTT
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation

*Attorney for Defendants*

## UNITED STATES DISTRICT COURT

**FOR THE DISTRICT OF** **Northern California**

### Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: 25-cv-08454-HSG

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 10/03/2025

Date of judgment or order you are appealing: 09/30/2026

Docket entry number of judgment or order you are appealing: Dkt. No. 130

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

○ Yes ◉ No ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Donald J. Trump; the U.S. Department of Homeland Security; Markwayne Mullin; U.S. Citizenship and Immigration Services; Joseph B. Edlow; U.S. Customs and Border Protection; Rodney Scott; U.S. Department of State; and Marco Rubio

Is this a cross-appeal? ○ Yes ◉ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case? ○ Yes ◉ No

If yes, what is the prior appeal case number?

Your mailing address (if pro se):

City: State: Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** **Date**

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

see attached word document

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit? ◉ Yes ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Appellants:**

Donald J. Trump, President of the United States; the U.S. Department of Homeland Security; Markwayne Mullin, Secretary of Homeland Security; U.S. Citizenship and Immigration Services; Joseph B. Edlow, Director of U.S. Citizenship and Immigration Services; U.S. Customs and Border Protection; Rodney Scott, Commissioner of U.S. Customs and Border Protection; U.S. Department of State; and Marco Rubio, Secretary of State

**Counsel for Appellants:**

Tiberius Davis
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530
(202)-860-8970
Tiberius.Davis@usdoj.gov

David J. Byerley
Jaime Scott
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Washington, D.C. 20044
202-532-4523; david.byerley@usdoj.gov
(202) 305-3620; Jaime.A.Scott@usdoj.gov

---

**Appellees:**

Global Nurse Force; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America Local 4811; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; Service Employees International Union, AFL-CIO Committee on Interns and Residents; American Association Oof University Professors; Global Villlage Academy Collaborative; Society of Tyhe Divine Word; Fathers of St. Charles; Nephrology Associates of the Carolinas, PA; BAE Industries; and Lower Brule Day School

**Counsel for Appellees:**

*on next page

Karen C. Tumlin
Esther H. Sung
Laura Flores-Perilla
Hillary Li
Brandon Galli-Graves
Emily Satifka
Vanessa Rivas
**JUSTICE ACTION CENTER**
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org
hillary.li@justiceactioncenter.org
brandon.galli-graves@justiceactioncenter.org
emily.satifka@justiceactioncenter.org
vanessa.rivas@justiceactioncenter.org

Cynthia Liao
Johanna N. Hickman
Jennie L. Kneedler
Steven Y. Bressler
Elena Goldstein
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 808-1982 (Liao)
cliao@democracyforward.org
hhickman@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

Charles H. Kuck
**KUCK BAXTER LLC**
365 Northridge Rd., Suite 300
Atlanta, GA 30350
404-949-8154
Ckuck@immigration.net

Kalpana Peddibhotla
**SOUTH ASIAN AMERICAN JUSTICE COLLABORATIVE (SAAJCO)**
333 W. San Carlos Street, Suite 600
San Jose, CA 95110
(408) 550-9240
kalpana@saajco.org

Zachary R. New
**JOSEPH & HALL, P.C.**
12203 East Second Ave.
Aurora, CO 80011
(303) 297-9171
zachary@immigrationissues.com

Jesse M. Bless
**BLESS LITIGATION LLC**
6 Vineyard Lane
Georgetown MA 01833
781-704-3897
jesse@blesslitigation.com

Harini Srinivasan
Aniko Schwarcz
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 800
Washington, D.C. 20005
(202) 408-4600
hsrinivsan@cohenmilstein.com
aschwarcz@cohenmilstein.com

Greg Siskind
**SISKIND SUSSER**
1028 Oakhaven Road
Memphis, TN 38119
(901) 682-6455
gsiskind@visalaw.com

Alexandra Gray
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St., 14th Floor
New York, New York 10005
(212) 838-7797
agray@cohenmilstein.com

ADRMOP,APPEAL,ProSe

# U.S. District Court
# California Northern District (Oakland)
# CIVIL DOCKET FOR CASE #: 4:25-cv-08454-HSG

Global Nurse Force et al v. Trump et al
Assigned to: Judge Haywood S Gilliam, Jr
Case in other court: Ninth Circuit, 26-06667
Cause: 05:551 Administrative Procedure Act

Date Filed: 10/03/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Global Nurse Force** represented by

**Brandon Galli-Graves**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-864-0798
Email: brandon.galli-graves@justiceactioncenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
713-560-7518
Email: esther.sung@justiceactioncenter.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-450-7262
Email: hillary.li@justiceactioncenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-450-7267
Email: laura.flores-perilla@justiceactioncenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
Cohen Milstein Sellers & Toll LLP
199 Water Street
21st Floor
New York, NY 10038
212-838-7797
Email: agray@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., N.W.
Ste 800
Washington, DC 20005
202-408-4600
Fax: 202-408-4699
Email: aschwarcz@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
Kuck Baxter Immigration, LLC
365 Northridge Road
Ste 300
Atlanta, GA 30350
404-816-8611
Email: ckuck@immigration.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-808-1982
Email: cliao@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
202-448-9090
Email: egoldstein@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-492-3804
Email:

emily.satifka@justiceactioncenter.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. N.W.
Suite 800
Washington, DC 20005
202-408-4600
Email: hsrinivasan@cohenmilstein.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
833-391-4732
Email: jkneedler@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
Bless Litigation
6 Vineyard Lane
Georgetown, MA 01833
781-704-3897
Email: jesse@blesslitigation.com
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: hhickman@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
South Asian American Justice Collaborative
333 W. San Carlos Street
Suite 600
San Jose, CA 95110
408-550-9240
Email: kalpana@saajco.org
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-455-9060
Email: rthurston@democracyforward.org

*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-982-1569
Email: sbressler@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
323-781-5270
Email:
vanessa.rivas@justiceactioncenter.org
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
Justice Action Center
P.O. Box 27280
90027
Los Angeles, CA 90027
323-316-0944
Email:
karen.tumlin@justiceactioncenter.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811** represented by

**Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America**

represented by

**Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Service Employees International Union, AFL-CIO Committee of Interns and Residents** represented by **Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Association of University Professors** represented by **Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Global Village Academy Collaborative** represented by

**Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Society of the Divine Word Chicago Province** represented by **Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fathers of St. Charles** represented by

**Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Church on the Hill**
*d/b/a Algood First Baptist*
*TERMINATED: 10/05/2026*

represented by **Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Smith**
*TERMINATED: 10/05/2026*

represented by **Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Phoenix Doe**
*TERMINATED: 01/23/2026*

represented by **Brandon Galli-Graves**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esther Hsiao-In Sung**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hillary Li**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Flores-Perilla**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Gray**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aniko Schwarcz**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles H. Kuck**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elena Goldstein**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Emily Satifka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Harini Srinivasan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennie L Kneedler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jesse Matthew Bless**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johanna Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karen Cassandra Tumlin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lower Brule Day School** represented by **Emily Satifka**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nephrology Associates of the Carolinas, PA** represented by **Emily Satifka**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BAE Industries** represented by **Emily Satifka**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vanessa Rivas-Bernardy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cynthia Liao**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Donald J. Trump**
*in his official capacity as President of the United States* represented by **David J. Byerley**
DOJ-Civ
P.O. Box 868 Ben Franklin Station
Washington, DC 20044
202-532-4523
Email: david.byerley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
DOJ-Civ
Office of Immigration Litigation

P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-305-3620
Email: jaime.a.scott@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
DOJ-Civ
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-746-2756
Email: thomas.vaseliou@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
DOJ-Civ
Civil Division
950 Pennsylvania Avenue
Suite 400
Washington, DC 20530-0001
202-514-4357
Email: Tiberius.Davis@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Homeland Security** represented by **David J. Byerley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kristi Noem**
*in her official capacity as Secretary of Homeland Security*
represented by **David J. Byerley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Citizenship and Immigration Services** represented by **David J. Byerley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph B. Edlow**
*in his official capacity as Director, U.S. Citizenship and Immigration Services*
represented by **David J. Byerley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kalpana V. Peddibhotla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Customs and Border Protection** represented by **David J. Byerley**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rodney Scott**
*in his official capacity as Commissioner of U.S. Customs and Border Protection*

represented by **David J. Byerley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of State**

represented by **David J. Byerley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaime A Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Samuel Vaseliou**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tiberius T Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Marco Rubio**<br>*in his official capacity as Secretary of State* | represented by | **David J. Byerley**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jaime A Scott**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Thomas Samuel Vaseliou**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED*<br><br>**Tiberius T Davis**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Movant**

| | | |
|---|---|---|
| **Piero Bugoni**<br>*TERMINATED: 12/30/2025* | represented by | **Piero Bugoni**<br>160 W. Camino Real, Suite 191<br>Boca Raton, FL 33432<br>PRO SE<br><br>**Charles H. Kuck**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Movant**

| | | |
|---|---|---|
| **Federation for American Immigration Reform** | represented by | **Jonathon Paul Hauenschild**<br>150 M St. NE<br>Room 8.1134<br>Washington, DC 20002<br>202-215-2110<br>Email: jonathon.hauenschild@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **State of New Jersey**<br>Office of the New Jersey Attorney General<br>25 Market Street<br>Trenton<br>Trenton, NJ 08625<br>United Sta | represented by | **Shefali Saxena**<br>New Jersey Attorney General<br>Division of Law, Civil Rights<br>124 Halsey Street<br>PO Box 45029<br>Ste 5th Floor<br>Newark, NJ 07102<br>609-696-5254<br>Email: shefali.saxena@law.njoag.gov<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 10/03/2025 | 1 | COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State ( Filing fee $ 405, receipt number ACANDC-21203853.). Filed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. (Tumlin, Karen) (Filed on 10/3/2025) (Entered: 10/03/2025) |
| 10/03/2025 | 2 | Certificate of Interested Entities by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill (Tumlin, Karen) (Filed on 10/3/2025) (Entered: 10/03/2025) |
| 10/03/2025 | 3 | Proposed Summons. (Tumlin, Karen) (Filed on 10/3/2025) (Entered: 10/03/2025) |
| 10/03/2025 | 4 | MOTION TO PROCEED UNDER PSEUDONYM re 1 Complaint,,, filed by John Smith, Phoenix Doe. Responses due by 10/17/2025. Replies due by 10/24/2025. (Attachments: # 1 Declaration Phoenix Doe, # 2 Declaration John Smith, # 3 Proposed Order)(Tumlin, Karen) (Filed on 10/3/2025) (Entered: 10/03/2025) |
| 10/03/2025 | 5 | MOTION for leave to appear in Pro Hac Vice *for Jesse M. Bless* ( Filing fee $ 328, receipt number ACANDC-21204223.) filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Certificate of Good Standing)(Bless, Jesse) (Filed on 10/3/2025) (Entered: 10/03/2025) |
| 10/03/2025 | 6 | Case assigned to Magistrate Judge Joseph C. Spero.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 10/17/2025. (cv, COURT STAFF) (Filed on 10/3/2025) (Entered: 10/03/2025) |

| | | |
|---|---|---|
| 10/03/2025 | 7 | **Order by Magistrate Judge Joseph C. Spero granting 5 Motion for Pro Hac Vice of Jesse M. Bless.(ec, COURT STAFF) (Filed on 10/3/2025) (Entered: 10/03/2025)** |
| 10/03/2025 | | Filer telephoned and requested that Nature of Suit be corrected to 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision (dhm, COURT STAFF) (Filed on 10/3/2025) (Entered: 10/03/2025) |
| 10/06/2025 | 8 | **ORDER REASSIGNING CASE**<br><br>IT IS ORDERED that this case is reassigned using a proportionate, random and blind system pursuant to General Order No. 44 to Judge Haywood S Gilliam, Jr. Magistrate Judge Joseph C. Spero no longer assigned to the case.<br><br>Counsel are instructed that all future filings shall bear the updated judicial initials immediately after the case number. Counsel are reminded to verify the location of the judge on the court website. All hearing and trial dates presently scheduled are vacated. However, existing briefing schedules for motions remain unchanged. Motions must be renoticed for hearing before the judge to whom the case has been reassigned, but the renoticing of the hearing does not affect the prior briefing schedule. Other deadlines such as those for ADR compliance and discovery cutoff also remain unchanged.<br><br>Mark B. Busby<br>Clerk, United States District Court<br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*<br><br>(kab, COURT STAFF) (Filed on 10/6/2025) (Entered: 10/06/2025) |
| 10/06/2025 | 9 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 12/30/2025. Initial Case Management Conference set for 1/6/2026 02:00 PM in Oakland, - Videoconference Only. (cv, COURT STAFF) (Filed on 10/6/2025) (Entered: 10/06/2025)** |
| 10/06/2025 | 10 | Summons Issued as to Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State, U.S. Attorney and U.S. Attorney General (cv, COURT STAFF) (Filed on 10/6/2025) (Entered: 10/06/2025) |
| 10/06/2025 | 11 | NOTICE of Appearance filed by Esther Hsiao-In Sung on behalf of John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill (Sung, Esther) (Filed on 10/6/2025) (Entered: 10/06/2025) |
| 10/06/2025 | 12 | NOTICE of Appearance filed by Laura Flores-Perilla on behalf of John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill (Flores-Perilla, Laura) (Filed on 10/6/2025) (Entered: 10/06/2025) |

| | | |
|---|---|---|
| 10/06/2025 | 13 | **Re-Filed as Docket No. 16 .**<br>MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21209726.) filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Exhibit Certificate of Good Standing)(Galli-Graves, Brandon) (Filed on 10/6/2025) Modified on 10/7/2025 (ndr, COURT STAFF). (Entered: 10/06/2025) |
| 10/06/2025 | 14 | CLERK'S NOTICE RE DOCKET NO. 13 . Applicant has a California address. This is a pro hac vice disqualification pursuant to local rule 11-3 (c). If the applicant (i) has been a resident of California for less than one year; (ii) has registered with, and completed all required applications for admission to, the State Bar of California; and (iii) has officially registered to take or is awaiting results from the California State Bar exam then a declaration should be e-filed with the application informing the Court.<br><br>Information on the application must also match the information on the docket then a declaration stating this information should be e-filed with the application. Your local co-counsel's name as listed on the application doesn't match the docket. Either update the docket or e-file a revised application (with attachments) with the correct information reflected on it. If you update the docket, please send the CRD an e-mail to alert her.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 10/6/2025) (Entered: 10/06/2025) |
| 10/07/2025 | 15 | CLERK'S NOTICE. Notice is hereby given that the Case Management Conference, previously set via Zoom for January 6, 2026, is continued to January 13, 2026, before Judge Haywood S. Gilliam, Jr., at 2:00 p.m. Case Management Statement due by January 6, 2026.<br><br>All attorneys and pro se litigantsappearing for the case management conference are required to join at least 15 minutes before thehearing to check-in with the CRD.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg<br><br>**Civ LR 77-3(d).** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*(ndr, COURT STAFF) (Filed on 10/7/2025) (Entered: 10/07/2025) |
| 10/07/2025 | 16 | MOTION for leave to appear in Pro Hac Vice *(Revised)* ( Filing fee $ 328, receipt number ACANDC-21209726.) Filing fee previously paid on 10/06/2025 filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of |

| | | |
|---|---|---|
| | | the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Certificate of Good Standing, # 2 Declaration of Brandon Galli-Graves)(Galli-Graves, Brandon) (Filed on 10/7/2025) (Entered: 10/07/2025) |
| 10/07/2025 | | ** 13 MOTION for leave to appear in Pro Hac Vice TERMINATED, Re-Filed as Docket No. 16 .** (ndr, COURT STAFF) (Filed on 10/7/2025) (Entered: 10/07/2025) |
| 10/07/2025 | 17 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 16 Motion for Pro Hac Vice for Brandon Galli-Graves. (ndr, COURT STAFF) (Filed on 10/7/2025) (Entered: 10/07/2025)** |
| 10/07/2025 | 18 | NOTICE of Appearance filed by Kalpana V. Peddibhotla on behalf of Global Nurse Force *PLAINTIFF* (Peddibhotla, Kalpana) (Filed on 10/7/2025) (Entered: 10/07/2025) |
| 10/08/2025 | 19 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21217553.) filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Certificate of Good Standing)(Liao, Cynthia) (Filed on 10/8/2025) (Entered: 10/08/2025) |
| 10/08/2025 | 20 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21217748.) filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Certificate of Good Standing)(Goldstein, Elena) (Filed on 10/8/2025) (Entered: 10/08/2025) |
| 10/08/2025 | 21 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 19 Motion for Pro Hac Vice for Cynthia Liao. (ndr, COURT STAFF) (Filed on 10/8/2025) (Entered: 10/08/2025)** |
| 10/08/2025 | 22 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 20 Motion for Pro Hac Vice for Elena Goldstein. (ndr, COURT STAFF) (Filed on 10/8/2025) (Entered: 10/08/2025)** |
| 10/08/2025 | 23 | NOTICE of Appearance filed by Brandon Galli-Graves on behalf of John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill (Galli-Graves, Brandon) (Filed on 10/8/2025) (Entered: 10/08/2025) |

| | | |
|---|---|---|
| 10/09/2025 | 24 | NOTICE of Appearance filed by Kalpana V. Peddibhotla on behalf of John Smith, Phoenix Doe, Joseph B. Edlow, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill *PLAINTIFF* (Peddibhotla, Kalpana) (Filed on 10/9/2025) (Entered: 10/09/2025) |
| 10/09/2025 | 25 | ***Re-Filed as Docket No. 27 .** MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21222974.) filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Certificate of Good Standing)(Hickman, Johanna) (Filed on 10/9/2025) Modified on 10/15/2025 (ndr, COURT STAFF). (Entered: 10/09/2025) |
| 10/09/2025 | 26 | CLERK'S NOTICE RE DOCKET NO. 25 . Information on the application must match the information on the docket. Your name as listed on the application doesn't match the docket. Either update the docket or e-file a revised application (with attachments) with the correct information reflected on it. If you update the docket, please send the CRD an e-mail to alert her. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 10/9/2025) (Entered: 10/09/2025) |
| 10/15/2025 | 27 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21222974.) Filing fee previously paid on 10/09/2025 filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Certificate of Good Standing)(Hickman, Johanna) (Filed on 10/15/2025) (Entered: 10/15/2025) |
| 10/15/2025 | 28 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 27 Motion for Pro Hac Vice as to Johanna Hickman. **Docket No. 25 TERMINATED, Re-Filed as Docket No. 27 .** (ndr, COURT STAFF) (Filed on 10/15/2025) (Entered: 10/15/2025)** |

| | | |
|---|---|---|
| 10/20/2025 | 29 | Re-Filed as Docket No. 31 .<br>MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21257185.) filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Exhibit Certificate of Good Standing)(Li, Hillary) (Filed on 10/20/2025) Modified on 10/24/2025 (ndr, COURT STAFF). (Entered: 10/20/2025) |
| 10/21/2025 | 30 | CLERK'S NOTICE RE DOCKET NO. 29 . Applicant has a California address. This is a pro hac vice disqualification pursuant to local rule 11-3 (c). If the applicant (i) has been a resident of California for less than one year; (ii) has registered with, and completed all required applications for admission to, the State Bar of California; and (iii) has officially registered to take or is awaiting results from the California State Bar exam then a declaration should be e-filed with the application informing the Court.<br>Information on the application must also match the information on the docket then a declaration stating this information should be e-filed with the application. Either update the docket or e-file a revised application (with attachments) with the correct information reflected on it. If you update the docket, please send the CRD an e-mail to alert her. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (nmh, COURT STAFF) (Filed on 10/21/2025) (Entered: 10/21/2025) |
| 10/22/2025 | 31 | MOTION for leave to appear in Pro Hac Vice *(Revised)* ( Filing fee $ 328, receipt number 21257185.) Filing fee previously paid on 10/20/2025 filed by John Smith, Phoenix Doe, Global Nurse Force, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, American Association of University Professors, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, Fathers of St. Charles, Church on the Hill. (Attachments: # 1 Declaration Attorney Declaration, # 2 Exhibit Certificate of Good Standing)(Li, Hillary) (Filed on 10/22/2025) (Entered: 10/22/2025) |
| 10/24/2025 | | *** 29 MOTION for leave to appear in Pro Hac Vice TERMINATED, Re-Filed as Docket No. 31 .*** (ndr, COURT STAFF) (Filed on 10/24/2025) (Entered: 10/24/2025) |
| 10/24/2025 | 32 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 31 Motion for Pro Hac Vice for Hillary Li. (ndr, COURT STAFF) (Filed on 10/24/2025) (Entered: 10/24/2025)** |
| 11/07/2025 | 33 | MOTION to Intervene as Co-Defendant filed by Piero Bugoni. Responses due by 11/21/2025. Replies due by 11/28/2025. (dhm, COURT STAFF) (Filed on 11/7/2025) (Entered: 11/10/2025) |
| 11/12/2025 | 34 | CERTIFICATE OF SERVICE by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province (Liao, Cynthia) (Filed on 11/12/2025) (Entered: 11/12/2025) |

| | | |
|---|---|---|
| 11/12/2025 | 35 | CERTIFICATE OF SERVICE by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province (Liao, Cynthia) (Filed on 11/12/2025) (Entered: 11/12/2025) |
| 11/12/2025 | 36 | CERTIFICATE OF SERVICE by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province (Liao, Cynthia) (Filed on 11/12/2025) (Entered: 11/12/2025) |
| 11/12/2025 | 37 | CERTIFICATE OF SERVICE by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province (Liao, Cynthia) (Filed on 11/12/2025) (Entered: 11/12/2025) |
| 11/12/2025 | | ***Incorrect event used. [err101] Please refile in its entirety, using event: Summons Returned Executed. When prompted, please select the applicable party(ies) and enter the dates(s) of service*** Electronic filing error. Incorrect event used. Re: 35 Certificate of Service,, filed by Church on the Hill, Fathers of St. Charles, American Association of University Professors, Service Employees International Union, AFL-CIO Committee of Interns and Residents, Phoenix Doe, John Smith, Global Village Academy Collaborative, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Global Nurse Force, 37 Certificate of Service,, filed by Church on the Hill, Fathers of St. Charles, American Association of University Professors, Service Employees International Union, AFL-CIO Committee of Interns and Residents, Phoenix Doe, Society of the Divine Word Chicago Province, Global Village Academy Collaborative, John Smith, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Global Nurse Force, 34 Certificate of Service,, filed by Church on the Hill, Fathers of St. Charles, American Association of University Professors, Service Employees International Union, AFL-CIO Committee of Interns and Residents, Phoenix Doe, Society of the Divine Word Chicago Province, Global Village Academy Collaborative, John Smith, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Global Nurse Force, 36 Certificate of Service,, filed by Church on the Hill, Fathers of St. Charles, American Association of University Professors, Service Employees International Union, AFL-CIO Committee of Interns and Residents, Phoenix Doe, Society of the Divine Word Chicago Province, Global Village Academy Collaborative, John Smith, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United |

| | | |
|---|---|---|
| | | Automobile, Aerospace and Agricultural Implement Workers of America, Global Nurse Force (cv, COURT STAFF) (Filed on 11/12/2025) (Entered: 11/12/2025) |
| 11/14/2025 | 38 | SUMMONS Returned Executed by Global Nurse Force. Joseph B. Edlow served on 10/10/2025, answer due 10/31/2025; U.S. Customs and Border Protection served on 10/10/2025, answer due 10/31/2025; U.S. Department of Homeland Security served on 10/10/2025, answer due 10/31/2025. (Attachments: # 1 Summons Bondi POS, # 2 Summons DHS POS, # 3 Summons Edlow POS)(Liao, Cynthia) (Filed on 11/14/2025) (Entered: 11/14/2025) |
| 11/19/2025 | 39 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. Kristi Noem served on 10/10/2025, answer due 10/31/2025. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 40 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. Marco Rubio served on 10/10/2025, answer due 10/31/2025. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 41 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. Rodney Scott served on 10/10/2025, answer due 10/31/2025. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 42 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. U.S. Department of State served on 10/10/2025, answer due 10/31/2025. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 43 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, |

| | | |
|---|---|---|
| | | John Smith, American Association of University Professors. Donald J. Trump served on 10/10/2025, answer due 10/31/2025. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 44 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/19/2025 | 45 | SUMMONS Returned Executed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors. U.S. Citizenship and Immigration Services served on 10/10/2025, answer due 10/31/2025. (Liao, Cynthia) (Filed on 11/19/2025) (Entered: 11/19/2025) |
| 11/21/2025 | 46 | OPPOSITION/RESPONSE (re 33 MOTION to Intervene ) filed byAmerican Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Declaration OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 2 Exhibit Ex. 1 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 3 Exhibit Ex. 2 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 4 Exhibit Ex. 3 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 5 Exhibit Ex. 4 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 6 Exhibit Ex. 5 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 7 Exhibit Ex. 6 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 8 Exhibit Ex. 7 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 9 Exhibit Ex. 8 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 10 Exhibit Ex. 9 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 11 Exhibit Ex. 10 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 12 Exhibit Ex. 11 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 13 Exhibit Ex. 12 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE, # 14 Exhibit Ex. 13 to DECLARATION OF CYNTHIA LIAO IN SUPPORT OF PLAINTIFFS OPPOSITION TO MOTION TO INTERVENE)(Thurston, Robin) (Filed on 11/21/2025) Modified on 11/21/2025 (cv, COURT STAFF). (Entered: 11/21/2025) |

| | | |
|---|---|---|
| 11/24/2025 | 47 | First MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21384027.) filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing in District of NJ)(Satifka, Emily) (Filed on 11/24/2025) (Entered: 11/24/2025) |
| 11/25/2025 | 48 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 47 Motion for Pro Hac Vice for Emily Satifka. (ndr, COURT STAFF) (Filed on 11/25/2025) (Entered: 11/25/2025)** |
| 12/03/2025 | 49 | **ORDER by Judge Haywood S. Gilliam, Jr. DENYING 33 MOTION TO INTERVENE. (ndr, COURT STAFF) (Filed on 12/3/2025)**<br>**Court staff has served a copy of the document to the applicable party by First Class Mail or to a secured email account.**<br>**(Entered: 12/03/2025)** |
| 12/03/2025 | 50 | NOTICE of Appearance filed by Jaime A Scott on behalf of Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State (Scott, Jaime) (Filed on 12/3/2025) (Entered: 12/03/2025) |
| 12/04/2025 | 51 | NOTICE of Appearance filed by David J. Byerley on behalf of Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State (Byerley, David) (Filed on 12/4/2025) (Entered: 12/04/2025) |
| 12/04/2025 | 52 | MOTION for Extension of Time to File Answer *or Other Responsive Pleading (Unopposed)* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Proposed Order)(Scott, Jaime) (Filed on 12/4/2025) (Entered: 12/04/2025) |
| 12/04/2025 | 53 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 52 (Unopposed) Motion for Extension of Time to Answer or Other Responsive Pleading. (ndr, COURT STAFF) (Filed on 12/4/2025) (Entered: 12/04/2025)** |
| 12/04/2025 | 54 | CLERK'S NOTICE CONTINUING CASE MANAGEMENT CONFERENCE.<br>Case Management Statement due by 2/3/2026.<br>Initial Case Management Conference set for 2/10/2026 02:00 PM via zoom. The Zoom information and instructions remain the same as previously provided in docket no. 15 . (ndr, COURT STAFF) (Filed on 12/4/2025) (Entered: 12/04/2025) |
| 12/11/2025 | 55 | MOTION for Leave to File Excess Pages *for Motion for Preliminary Injunction and Reply Brief* filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Stipulation to Exceed Page Limits Re: Plaintiffs' Motion for Preliminary Injunction, # 2 Proposed Order)(Liao, Cynthia) (Filed on 12/11/2025) (Entered: 12/11/2025) |

| | | |
|---|---|---|
| 12/12/2025 | 56 | MOTION for Leave to File filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Exhibit Opposition to 4 Motion to Proceed Under Pseudonym, # 2 Proposed Order)(Byerley, David) (Filed on 12/12/2025) Modified on 12/16/2025 (cv, COURT STAFF). (Entered: 12/12/2025) |
| 12/12/2025 | 57 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21446458.) filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Certificate of Good Standing)(Kneedler, Jennie) (Filed on 12/12/2025) (Entered: 12/12/2025) |
| 12/12/2025 | 58 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 57 Motion for Pro Hac Vice for Jennie L. Kneedler. (ndr, COURT STAFF) (Filed on 12/12/2025) (Entered: 12/12/2025)** |
| 12/12/2025 | 59 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 55 Motion for Leave to File Excess Pages for Motion for Preliminary Injunction and Reply Brief. (ndr, COURT STAFF) (Filed on 12/12/2025) (Entered: 12/12/2025)** |
| 12/15/2025 | 60 | ***Re-Filed as Docket No. 61 .***<br>MOTION for leave to appear in Pro Hac Vice *by Charles H. Kuck* ( Filing fee $ 328, receipt number ACANDC-21452336.) filed by Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Kuck, Charles) (Filed on 12/15/2025) Modified on 12/15/2025 (ndr, COURT STAFF). (Entered: 12/15/2025) |
| 12/15/2025 | 61 | Re-Filed as Docket No. 71 .<br>Second MOTION for leave to appear in Pro Hac Vice *for Charles H. Kuck* (Filing fee $ 328.) Filing fee previously paid on 12/15/2025 filed by American Association of University Professors, Piero Bugoni, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents. (Kuck, Charles) (Filed on 12/15/2025) Modified on 12/17/2025 (ndr, COURT STAFF). (Entered: 12/15/2025) |
| 12/15/2025 | | *** 60 MOTION for leave to appear in Pro Hac Vice *by Charles H. Kuck* TERMINATED, Re-Filed as Docket No. 61 .*** (ndr, COURT STAFF) (Filed on 12/15/2025) (Entered: 12/15/2025) |
| 12/15/2025 | 62 | REPLY (re 56 MOTION for Leave to File *Opposition to 4 Motion to Proceed Under Pseudonym* ) filed byAmerican Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees |

| | | |
|---|---|---|
| | | International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Li, Hillary) (Filed on 12/15/2025) (Entered: 12/15/2025) |
| 12/16/2025 | 63 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21454610.) filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Certificate of Good Standing)(Srinivasan, Harini) (Filed on 12/16/2025) (Entered: 12/16/2025) |
| 12/16/2025 | 64 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 63 Motion for Pro Hac Vice for Harini Srinivasan. (ndr, COURT STAFF) (Filed on 12/16/2025) (Entered: 12/16/2025)** |
| 12/16/2025 | 65 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21454825.) Filing fee previously paid on 12/16/2025 filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Certificate of Good Standing)(Gray, Alexandra) (Filed on 12/16/2025) (Entered: 12/16/2025) |
| 12/16/2025 | 66 | **ORDER by Hon. Haywood S. Gilliam, Jr. GRANTING Dkt. No. 56 Defendants' motion for leave to file an opposition to Plaintiffs' motion to proceed pseudonymously. Defendants are DIRECTED to file the opposition on the docket as a separate entry. Plaintiffs may file a reply brief by December 23, 2025. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc1, COURT STAFF) (Filed on 12/16/2025) (Entered: 12/16/2025)** |
| 12/16/2025 | 67 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21456283.) filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Certificate of Good Standing)(Schwarcz, Aniko) (Filed on 12/16/2025) (Entered: 12/16/2025) |
| 12/16/2025 | 68 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 67 Motion for Pro Hac Vice for Aniko Schwarcz. (ndr, COURT STAFF) (Filed on 12/16/2025) (Entered: 12/16/2025)** |
| 12/16/2025 | | Set Deadline as to 4 MOTION TO PROCEED UNDER PSEUDONYM re 1 Complaint, See Docket No. 66 :<br>Replies due by 12/23/2025.<br>(ndr, COURT STAFF) (Filed on 12/16/2025) (Entered: 12/16/2025) |
| 12/16/2025 | 69 | OPPOSITION/RESPONSE (re 4 MOTION TO PROCEED UNDER PSEUDONYM re 1 Complaint,,, ) filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, |

| | | |
|---|---|---|
| | | Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Proposed Order)(Scott, Jaime) (Filed on 12/16/2025) (Entered: 12/16/2025) |
| 12/16/2025 | 70 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 65 Motion for Pro Hac Vice for Alexandra Gray. (ndr, COURT STAFF) (Filed on 12/16/2025) (Entered: 12/16/2025)** |
| 12/17/2025 | 71 | MOTION for leave to appear in Pro Hac Vice *of Charles H. Kuck* (Filing fee $ 328.) Filing fee previously paid on 12/15/2025 filed by American Association of University Professors, Piero Bugoni, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Exhibit Certificate of Good Standing Kuck)(Kuck, Charles) (Filed on 12/17/2025) (Entered: 12/17/2025) |
| 12/17/2025 | | *** 61 Second MOTION for leave to appear in Pro Hac Vice *for Charles H. Kuck* TERMINATED, Re-Filed as Docket No. 71 .*** (ndr, COURT STAFF) (Filed on 12/17/2025) (Entered: 12/17/2025) |
| 12/17/2025 | 72 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 71 Motion for Pro Hac Vice for Charles H. Kuck. (ndr, COURT STAFF) (Filed on 12/17/2025) (Entered: 12/17/2025)** |
| 12/17/2025 | 73 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC-21461333.) filed by American Association of University Professors, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Certificate of Good Standing)(Bressler, Steven) (Filed on 12/17/2025) (Entered: 12/17/2025) |
| 12/18/2025 | 74 | AMENDED COMPLAINT against All Defendants. Filed by Phoenix Doe, Society of the Divine Word Chicago Province, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Church on the Hill, Fathers of St. Charles, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, American Association of University Professors, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, BAE Industries. (Liao, Cynthia) (Filed on 12/18/2025) (Entered: 12/18/2025) |
| 12/18/2025 | 75 | MOTION for Preliminary Injunction filed by BAE Industries, Phoenix Doe, Global Nurse Force, Global Village Academy Collaborative, Lower Brule Day School, Nephrology Associates of the Carolinas, PA. Motion Hearing set for 2/12/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 1/2/2026. Replies due by 1/9/2026. (Attachments: # 1 Exhibit List, # 2 Declaration of Dattie Michaelle Waters (Nephrology Associates), # 3 Declaration of Melynn Zylka (BAE Industries), # 4 Declaration of Lance Witte (Lower Brule Day School), # 5 Exhibit A to Witte Decl., # 6 Declaration of Michael Henderson (Global Village Academy Collaborative), # 7 Declaration of Lalit Pattanaik (Global Nurse Force), # 8 Declaration |

| | | |
|---|---|---|
| | | of Phoenix Doe, # 9 Declaration of Sarah K. Peterson, # 10 Declaration of Cynthia Liao, # 11 Exhibit 1 to Liao Decl., # 12 Exhibit 2 to Liao Decl., # 13 Exhibit 3 to Liao Decl., # 14 Exhibit 4 to Liao Decl., # 15 Exhibit 5 to Liao Decl., # 16 Exhibit 6 to Liao Decl., # 17 Exhibit 7 to Liao Decl., # 18 Exhibit 8 to Liao Decl., # 19 Exhibit 9 to Liao Decl., # 20 Exhibit 10 to Liao Decl., # 21 Exhibit 11 to Liao Decl., # 22 Exhibit 12 to Liao Decl., # 23 Exhibit 13 to Liao Decl., # 24 Exhibit 14 to Liao Decl., # 25 Exhibit 15 to Liao Decl., # 26 Exhibit 16 to Liao Decl., # 27 Exhibit 17 to Liao Decl., # 28 Exhibit 18 to Liao Decl., # 29 Exhibit 19 to Liao Decl., # 30 Exhibit 20 to Liao Decl., # 31 Exhibit 21 to Liao Decl., # 32 Proposed Order)(Liao, Cynthia) (Filed on 12/18/2025) (Entered: 12/18/2025) |
| 12/18/2025 | 76 | MOTION to Certify Class filed by BAE Industries, Lower Brule Day School, Nephrology Associates of the Carolinas, PA. Motion to Certify Class Hearing set for 2/12/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 1/2/2026. Replies due by 1/9/2026. (Attachments: # 1 Exhibit List, # 2 Declaration of Harini Srinivasan, # 3 Exhibit A to Srinivasan Decl., # 4 Proposed Order)(Liao, Cynthia) (Filed on 12/18/2025) (Entered: 12/18/2025) |
| 12/18/2025 | 77 | ADMINISTRATIVE MOTION Expedite Hearing Date re 75 MOTION for Preliminary Injunction , 76 MOTION to Certify Class filed by BAE Industries, Phoenix Doe, Global Nurse Force, Global Village Academy Collaborative, Lower Brule Day School, Nephrology Associates of the Carolinas, PA. Responses due by 12/22/2025. (Attachments: # 1 Declaration of Cynthia Liao, # 2 Proposed Order)(Liao, Cynthia) (Filed on 12/18/2025) (Entered: 12/18/2025) |
| 12/19/2025 | 78 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 73 Motion for Pro Hac Vice for Steven Y. Bressler. (ndr, COURT STAFF) (Filed on 12/19/2025) (Entered: 12/19/2025)** |
| 12/22/2025 | 79 | OPPOSITION/RESPONSE (re 77 ADMINISTRATIVE MOTION Expedite Hearing Date re 75 MOTION for Preliminary Injunction , 76 MOTION to Certify Class ) *AND CROSS-MOTION FOR A STAY OR EXTENSION OF TIME IN THE ALTERNATIVE* filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Declaration of Jaime Scott, # 2 Proposed Order)(Scott, Jaime) (Filed on 12/22/2025) (Entered: 12/22/2025) |
| 12/22/2025 | 80 | NOTICE of Appearance filed by Tiberius T Davis on behalf of Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State (Davis, Tiberius) (Filed on 12/22/2025) (Entered: 12/22/2025) |
| 12/22/2025 | 81 | CLERK'S NOTICE.<br>Reset Hearings as to 76 MOTION to Certify Class and 75 MOTION for Preliminary Injunction :<br>Motion Hearing set for 2/19/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S. Gilliam, Jr.<br>(ndr, COURT STAFF) (Filed on 12/22/2025) Modified on 12/22/2025 to add pos info (ndr, COURT STAFF).<br>Court staff has served a copy of the document to the applicable party by First Class Mail .<br>(Entered: 12/22/2025) |
| 12/23/2025 | 82 | MOTION for Leave to File *BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION* filed by State of New Jersey. (Attachments: # 1 Exhibit [PROPOSED] BRIEF OF AMICI CURIAE IN SUPPORT OF |

| | | |
|---|---|---|
| | | PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, # 2 Proposed Order [PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION)(Saxena, Shefali) (Filed on 12/23/2025) (Entered: 12/23/2025) |
| 12/23/2025 | 83 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 82 Motion for Leave to File BRIEF OF AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. (ndr, COURT STAFF) (Filed on 12/23/2025) (Entered: 12/23/2025)** |
| 12/23/2025 | 84 | **ORDER by Hon. Haywood S. Gilliam, Jr. DENYING Dkt. No. 77 Plaintiffs' motion to expedite the hearing on Dkt. No. 75 the motion for preliminary injunction and Dkt. No. 76 the motion to certify class. The hearing on the two motions is currently set for February 19, 2026. Plaintiffs argue that the motions must be heard by the end of January because USCIS will open registration and hold the lottery for H-1B visas in March. However, Plaintiffs waited over two months before filing their motions. The Court will aim to resolve the motions expeditiously, but will not move the current hearing date given this lack of prior urgency. The Court further notes that in their opposition, Dkt. No. 79 , Defendants have requested that the Court stay this case, or in the alternative, extend the briefing schedule on the pending motions. This is improper. Defendants should meet and confer with Plaintiffs, and to the extent there is a dispute, they should file a noticed motion for the Court's consideration. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc1, COURT STAFF) (Filed on 12/23/2025) (Entered: 12/23/2025)** |
| 12/23/2025 | 85 | MOTION for Extension of Time to File Response/Reply as to 75 MOTION for Preliminary Injunction , 76 MOTION to Certify Class filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Declaration of Jaime Scott, # 2 Proposed Order)(Scott, Jaime) (Filed on 12/23/2025) (Entered: 12/23/2025) |
| 12/23/2025 | 86 | MOTION to Stay filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Motion Hearing set for 2/26/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 1/6/2026. Replies due by 1/13/2026. (Attachments: # 1 Declaration of Jaime Scott, # 2 Proposed Order)(Scott, Jaime) (Filed on 12/23/2025) (Entered: 12/23/2025) |
| 12/23/2025 | 87 | CLERK'S NOTICE RE DOCKET NO. 86 . Motion is captioned for hearing for February 26, 2026 and noticed for hearing for February 12, 2026. Notice is hereby given that counsel must properly re-notice the motion for hearing for February 26, 2026. The motion should not be re-filed. Hearing date of February 26, 2026, is vacated. The briefing schedule remains in effect.<br><br>If counsel would like to request an earlier date, an administrative motion or a stipulation and proposed order should be e-filed after the motion is re-noticed. And if granted, the Court will advance the hearing date. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 12/23/2025) (Entered: 12/23/2025) |
| 12/23/2025 | 88 | NOTICE by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State re 86 MOTION to Stay (Scott, Jaime) (Filed on 12/23/2025) (Entered: 12/23/2025) |

| | | |
|---|---|---|
| 12/23/2025 | | Reset Hearing as to 86 MOTION to Stay, See Docket No. 88 :<br>Motion Hearing set for 2/26/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S. Gilliam, Jr.<br>(ndr, COURT STAFF) (Filed on 12/23/2025) (Entered: 12/23/2025) |
| 12/23/2025 | 89 | REPLY (re 4 MOTION TO PROCEED UNDER PSEUDONYM re 1 Complaint,,, ) filed byAmerican Association of University Professors, BAE Industries, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Satifka, Emily) (Filed on 12/23/2025) (Entered: 12/23/2025) |
| 12/23/2025 | 90 | **ORDER by Hon. Haywood S. Gilliam, Jr. GRANTING IN PART and DENYING IN PART Dkt. No. 85 Defendants' motion for an extension of time to respond to Dkt. No. 75 the motion for preliminary injunction and Dkt. No. 76 the motion to certify class. Given the complexity of the case and the Court's need to adequately prepare for the hearing, the Court RESETS the briefing schedule as follows: Defendants' oppositions to the motion for preliminary injunction and motion to certify class are due January 16, 2026. Plaintiffs' replies are due January 23, 2026. The Court further ADVANCES the hearing on Dkt. No. 86 the motion to stay to February 19, 2026, at 2:00 p.m., to be heard at the same time as the motion for preliminary injunction and motion to certify class. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc1, COURT STAFF) (Filed on 12/23/2025) (Entered: 12/23/2025)** |
| 12/24/2025 | 91 | Notice of Withdrawal of Motion *to Stay* (Attachments: # 1 Exhibit - Chamber of Commerce Memorandum Opinion)(Scott, Jaime) (Filed on 12/24/2025) (Entered: 12/24/2025) |
| 12/29/2025 | | Clear Pro Se Flag, See Docket No. 49 .<br>Reset Deadlines as to 75 MOTION for Preliminary Injunction, See Docket No. 90 :<br>Responses due by 1/16/2026.<br>Replies due by 1/23/2026.<br>(ndr, COURT STAFF) (Filed on 12/29/2025) (Entered: 12/29/2025) |
| 12/29/2025 | 92 | **ORDER by Hon. Haywood S. Gilliam, Jr. DIRECTING the Clerk to terminate pro se litigant Piero A. Bugoni from the docket in light of Dkt. No. 49 the order denying his motion to intervene. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc1, COURT STAFF) (Filed on 12/29/2025) (Entered: 12/29/2025)** |
| 12/30/2025 | | *** Party Piero Bugoni TERMINATED and Pro Se Flag Cleared, See Docket Nos. 49 and 92 .*** (ndr, COURT STAFF) (Filed on 12/30/2025) (Entered: 12/30/2025) |
| 01/05/2026 | 93 | CLERK'S NOTICE. Notice is hereby given that the Case Management Conference, previously set via Zoom for February 10, 2026 is vacated. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 1/5/2026) (Entered: 01/05/2026) |
| 01/06/2026 | 94 | MOTION to Stay filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Motion Hearing set for 2/26/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 1/20/2026. Replies due by 1/27/2026. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Attachment A, # 2 Proposed Order)(Scott, Jaime) (Filed on 1/6/2026) (Entered: 01/06/2026) |
| 01/08/2026 | 95 | OPPOSITION/RESPONSE (re 94 MOTION to Stay ) filed byAmerican Association of University Professors, BAE Industries, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Declaration of Cynthia Liao, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5)(Liao, Cynthia) (Filed on 1/8/2026) (Entered: 01/08/2026) |
| 01/09/2026 | 96 | REPLY (re 94 MOTION to Stay ) filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Scott, Jaime) (Filed on 1/9/2026) (Entered: 01/09/2026) |
| 01/16/2026 | 97 | OPPOSITION/RESPONSE (re 76 MOTION to Certify Class ) filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Scott, Jaime) (Filed on 1/16/2026) (Entered: 01/16/2026) |
| 01/16/2026 | 98 | OPPOSITION/RESPONSE (re 75 MOTION for Preliminary Injunction ) filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Exhibit Testimony of Richard L. Trumka. President, AFL-CIO, Hearing on the Immigration Reforms Needed to Protect Skilled American Workers Before the Senate Judiciary Committee (March 17, 2015), # 2 Exhibit Center for Strategic Research (AFL-CIO) Report Regarding H-1B Visa Abuse & Harm)(Byerley, David) (Filed on 1/16/2026) (Entered: 01/16/2026) |
| 01/20/2026 | 99 | MOTION for Leave to File filed by Federation for American Immigration Reform. (Attachments: # 1 Exhibit, # 2 Declaration, # 3 Proposed Order)(Hauenschild, Jonathon) (Filed on 1/20/2026) (Entered: 01/20/2026) |
| 01/23/2026 | 100 | NOTICE of Voluntary Dismissal *by Individual Plaintiff* by Phoenix Doe (Liao, Cynthia) (Filed on 1/23/2026) (Entered: 01/23/2026) |
| 01/23/2026 | 101 | REPLY (re 75 MOTION for Preliminary Injunction ) filed byBAE Industries, Global Nurse Force, Global Village Academy Collaborative, Lower Brule Day School, Nephrology Associates of the Carolinas, PA. (Attachments: # 1 Declaration of Melynn Zylka (BAE Industries), # 2 Declaration of Lance Witte (Lower Brule Day School), # 3 Declaration of Cynthia Liao, # 4 Exhibit 1 to Liao Decl., # 5 Exhibit 2 to Liao Decl.)(Liao, Cynthia) (Filed on 1/23/2026) (Entered: 01/23/2026) |
| 01/23/2026 | 102 | REPLY (re 76 MOTION to Certify Class ) filed byBAE Industries, Lower Brule Day School, Nephrology Associates of the Carolinas, PA. (Liao, Cynthia) (Filed on 1/23/2026) (Entered: 01/23/2026) |
| 01/23/2026 | | *** Party Phoenix Doe TERMINATED, See Docket No. 100 .*** (ndr, COURT STAFF) (Filed on 1/23/2026) (Entered: 01/26/2026) |
| 01/29/2026 | 103 | CLERK'S NOTICE. Notice is hereby given that the hearings on the 75 motion for preliminary injunction and the 76 motion to certify class, previously set for February 19, 2026, are is continued to February 26, 2026, before Judge Haywood S. Gilliam, Jr., at |

| | | |
|---|---|---|
| | | 2:00 p.m., to be heard along with the 94 motion to stay, in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 1/29/2026) (Entered: 01/29/2026) |
| 01/29/2026 | 104 | MOTION to Dismiss for Lack of Jurisdiction , MOTION to Dismiss *for Failure to State a Claim* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Motion Hearing set for 4/2/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 2/12/2026. Replies due by 2/19/2026. Motion to Dismiss Hearing set for 4/2/2026 02:00 PM in Oakland, Courtroom 2, 4th Floor. (Attachments: # 1 Proposed Order)(Scott, Jaime) (Filed on 1/29/2026) (Entered: 01/29/2026) |
| 02/02/2026 | 105 | **ORDER by Hon. Haywood S. Gilliam, Jr. GRANTING the administrative motion for leave to file an amicus curiae brief at Dkt. No. 99 . The Federation for American Immigration Reform is DIRECTED to file its amicus curiae brief as a separate entry on the docket by February 9, 2026. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc4, COURT STAFF) (Filed on 2/2/2026) (Entered: 02/02/2026)** |
| 02/03/2026 | 106 | Brief *Amicus Curiae* filed byFederation for American Immigration Reform. (Hauenschild, Jonathon) (Filed on 2/3/2026) (Entered: 02/03/2026) |
| 02/03/2026 | 107 | NOTICE of Appearance filed by Jonathon Paul Hauenschild on behalf of Federation for American Immigration Reform (Hauenschild, Jonathon) (Filed on 2/3/2026) (Entered: 02/03/2026) |
| 02/12/2026 | 108 | OPPOSITION/RESPONSE (re 104 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* ) filed byAmerican Association of University Professors, BAE Industries, Church on the Hill, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Declaration of Cynthia Liao, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10)(Liao, Cynthia) (Filed on 2/12/2026) (Entered: 02/12/2026) |
| 02/19/2026 | 109 | MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) (re 104 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* ) filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Scott, Jaime) (Filed on 2/19/2026) Modified on 2/20/2026 (kmg, COURT STAFF). (Entered: 02/19/2026) |
| 02/23/2026 | 110 | Statement *of Recent Decision* by American Association of University Professors, BAE Industries, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Exhibit Exhibit |

| | | |
|---|---|---|
| | | A, Learning Resources, Inc. v. Trump,607 U.S. ___ (Feb. 20, 2026))(Satifka, Emily) (Filed on 2/23/2026) (Entered: 02/23/2026) |
| 02/25/2026 | 111 | NOTICE of Appearance filed by Vanessa Rivas-Bernardy on behalf of American Association of University Professors, BAE Industries, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province (Rivas-Bernardy, Vanessa) (Filed on 2/25/2026) (Entered: 02/25/2026) |
| 02/26/2026 | 113 | **Minute Entry for proceedings held before Judge Haywood S. Gilliam, Jr.: Motion Hearing held on 2/26/2026.**<br><br>**Total Time in Court: 1 hour and 32 minutes.**<br>**Court Reporter: Kendra Steppler appearing via Zoom.**<br><br>**Plaintiff Attorney: Alexandra Gray, Cynthia Liao, Esther Hsiao-In Sung, Kalpana Peddibhotla, Harini Srinivasin, Karen Tumlin, and Vanessa Rivas-Bernardy.**<br>**Defendant Attorney: Tiberius Davis.**<br><br>**Motion for preliminary injunction and 5 U.S.C. § 705 stay (docket no. 75 ) is argued by the parties. Counsel are ordered to e-file simultaneous briefs, of no more than 10 pages, regarding the relevance of the Supreme Courts decision in Learning Resources, Inc., et al. v. Trump, et al. within a week from today (March 5). The motion for preliminary injunction will be deemed submitted on the papers once the briefs are e-filed on the docket. Written order to issue. Defendants' motion for a stay (docket no. 94 ) is DENIED by the Court. The Court advises counsel that the motion for class certification (docket no. 76 ) is deemed submitted on the papers. Written order to issue.**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(kmm2, COURT STAFF) (Date Filed: 2/26/2026) Modified on 2/27/2026 to edit text. (kmm2, COURT STAFF). (Entered: 02/27/2026)** |
| 02/27/2026 | 112 | TRANSCRIPT ORDER for proceedings held on 2/26/2026 before Judge Haywood S Gilliam, Jr by American Association of University Professors, BAE Industries, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province, for Court Reporter Kendra Steppler. (Liao, Cynthia) (Filed on 2/27/2026) (Entered: 02/27/2026) |
| 03/02/2026 | 114 | TRANSCRIPT ORDER for proceedings held on February 26, 2026 before Judge Haywood S Gilliam, Jr for Court Reporter Kendra Steppler (Steppler, Kendra) (Filed on 3/2/2026) (Entered: 03/02/2026) |
| 03/02/2026 | 115 | Transcript of Proceedings held on February 26, 2026, before Judge Haywood S. Gilliam, Jr.. Court Reporter Kendra Steppler, email at kendra_steppler@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until |

| | | |
|---|---|---|
| | | the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 112 Transcript Order,,, ) Release of Transcript Restriction set for 6/1/2026. (Related documents(s) 112 ) (Steppler, Kendra) (Filed on 3/2/2026) (Entered: 03/02/2026) |
| 03/05/2026 | 116 | Supplemental Brief re 75 MOTION for Preliminary Injunction filed byBAE Industries, Global Nurse Force, Global Village Academy Collaborative, Lower Brule Day School, Nephrology Associates of the Carolinas, PA. (Related document(s) 75 ) (Liao, Cynthia) (Filed on 3/5/2026) (Entered: 03/05/2026) |
| 03/05/2026 | 117 | Supplemental Brief re 75 MOTION for Preliminary Injunction filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Declaration of Cara Selby)(Related document(s) 75 ) (Scott, Jaime) (Filed on 3/5/2026) (Entered: 03/05/2026) |
| 03/06/2026 | 118 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Attachments: # 1 Exhibit Pacito v. Trump, --- F. 4th ----, 2026 WL 620449 (9th Cir. Mar. 5, 2026))(Byerley, David) (Filed on 3/6/2026) (Entered: 03/06/2026) |
| 03/09/2026 | 119 | **ORDER by Hon. Haywood S. Gilliam, Jr. DIRECTING the Parties to file by March 16, 2026 simultaneous supplemental briefs of no more than 5 pages regarding the relevance of *Pacito v. Trump*, No. 25-1313, --- F. 4th --, 2026 WL 620449 (9th Cir. Mar. 5, 2026) on Plaintiffs' pending motions, Dkt. Nos. 75 , 76 , and Defendants' pending motion to dismiss, Dkt. No. 104 . No further response is permitted once the supplemental briefs are filed. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc4, COURT STAFF) (Filed on 3/9/2026) (Entered: 03/09/2026)** |
| 03/16/2026 | 120 | Supplemental Brief re 75 MOTION for Preliminary Injunction , 76 MOTION to Certify Class , 104 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Related document(s) 75 , 76 , 104 ) (Scott, Jaime) (Filed on 3/16/2026) (Entered: 03/16/2026) |
| 03/16/2026 | 121 | Supplemental Brief *Regarding Pacito v. Trump* filed byAmerican Association of University Professors, BAE Industries, Church on the Hill, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Satifka, Emily) (Filed on 3/16/2026) (Entered: 03/16/2026) |

| | | |
|---|---|---|
| 03/25/2026 | 122 | MOTION to Vacate *Hearing Date (Unopposed)* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Responses due by 4/8/2026. Replies due by 4/15/2026. (Attachments: # 1 Proposed Order)(Scott, Jaime) (Filed on 3/25/2026) (Entered: 03/25/2026) |
| 03/26/2026 | 123 | **ORDER by Hon. Haywood S. Gilliam, Jr. GRANTING Dkt. No. 122 Defendants' unopposed motion to vacate the hearing on Defendants' motion to dismiss (Dkt. No. 104 ). Defendants' motion to dismiss is taken under submission. The hearing previously scheduled for April 2, 2026 is VACATED. The Court will issue a written order. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (hsglc4, COURT STAFF) (Filed on 3/26/2026) (Entered: 03/26/2026)** |
| 03/26/2026 | 124 | NOTICE by American Association of University Professors, BAE Industries, Church on the Hill, Phoenix Doe, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province re 75 MOTION for Preliminary Injunction , 104 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* (Attachments: # 1 Declaration of Cynthia Liao, # 2 Exhibit 1 to Liao Decl., # 3 Exhibit 2 to Liao Decl.)(Liao, Cynthia) (Filed on 3/26/2026) (Entered: 03/26/2026) |
| 03/26/2026 | | ***Hearing TERMINATED, See Docket No. 123 .*** (ndr, COURT STAFF) (Filed on 3/26/2026) (Entered: 03/26/2026) |
| 04/22/2026 | 125 | TRANSCRIPT ORDER for proceedings held on February 26, 2026 before Judge Haywood S Gilliam, Jr for Court Reporter Kendra Steppler (Steppler, Kendra) (Filed on 4/22/2026) (Entered: 04/22/2026) |
| 06/09/2026 | 126 | Statement *of Recent Decision* by American Association of University Professors, BAE Industries, Church on the Hill, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Exhibit A - California v. Mullin (D. Mass. June 8, 2026))(Liao, Cynthia) (Filed on 6/9/2026) (Entered: 06/09/2026) |
| 07/28/2026 | 127 | Statement *of Recent Decision* by American Association of University Professors, BAE Industries, Church on the Hill, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province. (Attachments: # 1 Exhibit A - California v. Mullin (1st Cir. July 24, 2026))(Liao, Cynthia) (Filed on 7/28/2026) (Entered: 07/28/2026) |
| 09/24/2026 | 128 | NOTICE by American Association of University Professors, BAE Industries, Church on the Hill, Fathers of St. Charles, Global Nurse Force, Global Village Academy |

| | | |
|---|---|---|
| | | Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, John Smith, Society of the Divine Word Chicago Province re 76 MOTION to Certify Class , 75 MOTION for Preliminary Injunction , 104 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss *for Failure to State a Claim* (Attachments: # 1 Declaration of Lalit Pattanaik, # 2 Declaration of Cynthia Liao, # 3 Exhibit 1 to Liao Decl., # 4 Exhibit 2 to Liao Decl.)(Liao, Cynthia) (Filed on 9/24/2026) (Entered: 09/24/2026) |
| 09/30/2026 | 129 | **ORDER by Judge Haywood S. Gilliam, Jr. DENYING 4 MOTION TO PROCEED UNDER PSEUDONYM. (ndr, COURT STAFF) (Filed on 9/30/2026) (Entered: 09/30/2026)** |
| 09/30/2026 | 130 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING IN PART AND DENYING IN PART PLAINTIFFS' 75 MOTION FOR A PRELIMINARY INJUNCTION, AND DENYING 76 MOTION FOR CLASS CERTIFICATION AND 104 MOTION TO DISMISS.**<br>**Case Management Statement due by 10/20/2026.**<br>**Further Case Management Conference set for 10/27/2026 02:00 PM via zoom. The zoom information and instructions remain the same as previously provided in docket no. 15 .**<br>**(ndr, COURT STAFF) (Filed on 9/30/2026) (Entered: 09/30/2026)** |
| 10/05/2026 | 131 | NOTICE of Voluntary Dismissal by Church on the Hill, John Smith (Liao, Cynthia) (Filed on 10/5/2026) (Entered: 10/05/2026) |
| 10/05/2026 | | *** Party Church on the Hill (d/b/a Algood First Baptist) and John Smith TERMINATED, See Docket No. 131 .*** (ndr, COURT STAFF) (Filed on 10/5/2026) (Entered: 10/05/2026) |
| 10/09/2026 | 132 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Appeal of Order on Motion for Preliminary Injunction, Order on Motion to Certify Class, Order on Motion to Dismiss/Lack of Jurisdiction 130 (Appeal fee: WAIVED) (Attachments: # 1 Form 1 and 6)(Scott, Jaime) (Filed on 10/9/2026) **(USCA Case No. 26-6667)** Modified on 10/15/2026 (slh, COURT STAFF). Modified on 10/16/2026 (kmg, COURT STAFF). (Entered: 10/09/2026) |
| 10/09/2026 | 133 | MOTION to Stay *Proceedings* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Responses due by 10/23/2026. Replies due by 10/30/2026. (Attachments: # 1 Proposed Order)(Scott, Jaime) (Filed on 10/9/2026) (Entered: 10/09/2026) |
| 10/09/2026 | 134 | CLERK'S NOTICE. Notice is hereby given that counsel must notice the 133 motion to stay for hearing. The briefing schedule remains in effect. The motion should not be re-filed. If counsel would like to request an earlier date, an administrative motion or a stipulation and proposed order should be e-filed after the motion is re-noticed. And if granted, the Court will advance the hearing date. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 10/9/2026) (Entered: 10/09/2026) |
| 10/09/2026 | 138 | USCA Case Number 26-6667 for Ninth Circuit for 132 Notice of Appeal to the Ninth Circuit,, filed by U.S. Department of Homeland Security, U.S. Department of State, |

| | | |
|---|---|---|
| | | Joseph B. Edlow, U.S. Customs and Border Protection, Kristi Noem, Rodney Scott, U.S. Citizenship and Immigration Services, Marco Rubio, Donald J. Trump. (jnk, COURT STAFF) (Filed on 10/9/2026) (Entered: 10/14/2026) |
| 10/13/2026 | 135 | NOTICE by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State re 133 MOTION to Stay *Proceedings* (Scott, Jaime) (Filed on 10/13/2026) (Entered: 10/13/2026) |
| 10/13/2026 | 136 | ADMINISTRATIVE MOTION re 135 Notice (Other), 133 MOTION to Stay *Proceedings* filed by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. Responses due by 10/19/2026. (Attachments: # 1 Proposed Order)(Scott, Jaime) (Filed on 10/13/2026) (Entered: 10/13/2026) |
| 10/14/2026 | | Set Hearing as to 133 MOTION to Stay *Proceedings*, See Docket No. 135 :<br>Motion Hearing set for 1/14/2027 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S. Gilliam, Jr.<br>(ndr, COURT STAFF) (Filed on 10/14/2026) (Entered: 10/14/2026) |
| 10/14/2026 | 137 | NOTICE of Change of Address by Alexandra Gray (Gray, Alexandra) (Filed on 10/14/2026) (Entered: 10/14/2026) |
| 10/14/2026 | 139 | ANSWER to 74 Amended Complaint by Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Scott, Jaime) (Filed on 10/14/2026) (Entered: 10/14/2026) |
| 10/15/2026 | 140 | OPPOSITION/RESPONSE (re 136 ADMINISTRATIVE MOTION re 135 Notice (Other), 133 MOTION to Stay *Proceedings* , 133 MOTION to Stay *Proceedings* ) filed byAmerican Association of University Professors, BAE Industries, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, Society of the Divine Word Chicago Province. (Attachments: # 1 Declaration of Lalit Pattanaik)(Liao, Cynthia) (Filed on 10/15/2026) (Entered: 10/15/2026) |
| 10/19/2026 | 141 | REPLY (re 136 ADMINISTRATIVE MOTION re 135 Notice (Other), 133 MOTION to Stay *Proceedings* , 133 MOTION to Stay *Proceedings* ) filed byJoseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State. (Byerley, David) (Filed on 10/19/2026) (Entered: 10/19/2026) |
| 10/20/2026 | 142 | JOINT CASE MANAGEMENT STATEMENT filed by American Association of University Professors, BAE Industries, Fathers of St. Charles, Global Nurse Force, Global Village Academy Collaborative, International Union, United Automobile, Aerospace And Agricultural Implement Workers of America Local 4811, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Lower Brule Day School, Nephrology Associates of the Carolinas, PA, Service Employees International Union, AFL-CIO Committee of Interns and Residents, Society of the Divine Word Chicago Province. (Liao, Cynthia) (Filed on 10/20/2026) (Entered: 10/20/2026) |
| 10/26/2026 | 143 | NOTICE of Appearance filed by Thomas Samuel Vaseliou on behalf of Joseph B. Edlow, Kristi Noem, Marco Rubio, Rodney Scott, Donald J. Trump, U.S. Citizenship and |

| | | |
|---|---|---|
| | | Immigration Services, U.S. Customs and Border Protection, U.S. Department of Homeland Security, U.S. Department of State (Vaseliou, Thomas) (Filed on 10/26/2026) (Entered: 10/26/2026) |
| 10/28/2026 | 144 | **Minute Entry for proceedings held before Judge Haywood S. Gilliam, Jr.: Further Case Management Conference held via zoom on 12/1/2026. Total Time in Court: 10 Minutes. Not Reported or Recorded.**<br><br>**Plaintiff Attorney: Cynthia Liao. Defendant Attorney: Thomas Vaseliou.**<br><br>**Motion for stay of proceedings (docket no. 133 ) is DENIED by the Court. The Court orders that the administrative record be produced within 21 days from today (November 17, 2026). Matter is continued to November 24, 2026, at 2:00 p.m. via zoom before Judge Haywood S. Gilliam, Jr. for a further case management conference. The zoom information and instructions remain the same as previously provided in docket no. 15 .**<br><br>***(This is a text-only entry generated by the court. There is no document associated with this entry.)*** **(ndr, COURT STAFF) (Date Filed: 10/28/2026) (Entered: 10/28/2026)** |
| 10/28/2026 | | *** 136 ADMINISTRATIVE MOTION TERMINATED, See Docket No. 144 .*** (ndr, COURT STAFF) (Filed on 10/28/2026) (Entered: 10/28/2026) |

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2026, I electronically filed the excerpts of record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system. Service will be accomplished by the ACMS system.

*/s/ Jaime A. Scott*
JAIME A. SCOTT
Trial Attorney
U.S. Department of Justice,
Civil Division
Office of Immigration Litigation

*Attorney for*
*Defendants-Appellants*