**No. 26-6667**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**GLOBAL NURSE FORCE; *et al.*,**

**Plaintiffs - Appellees,**

**v.**

**DONALD J. TRUMP, *et al.*,**

**Defendants - Appellants.**

On Appeal from the United States District Court
for the Northern District of California
No. 4:25-cv-08454 (Gilliam, J.)

# BRIEF OF *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF DEFENDANTS – APPELLANTS AND REVERSAL

Christopher J. Hajec
Matt A. Crapo
Federation for American Immigration Reform
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
(202) 328-7004
chajec@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Federation for American Immigration Reform makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

s/ Christopher J. Hajec

# TABLE OF CONTENTS

Page


CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF *AMICUS CURIAE*.......................................................................1

SUMMARY OF ARGUMENT ...........................................................................1

ARGUMENT ..........................................................................................................3

I. The President's Proclamation and the agencies' implementing guidance and memoranda are unreviewable ...........................................................3

II. Even if the Proclamation were subject to judicial scrutiny, it would clearly meet the statutory standard ...........................................................6

CONCLUSION ......................................................................................................11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 4

*Detroit Int'l Bridge Co. v. Gov't of Can.*,
189 F. Supp. 3d 85 (D.D.C. 2016) .......... 5

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 4

*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 4

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) .......... 5, 6

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 3

*Tulare Cty. v. Bush*,
185 F. Supp. 2d 18 (D.D.C. 2001) .......... 4

*Webster v. Doe*,
486 U.S. 592 (1988) .......... 4

### STATUTE

8 U.S.C. § 1182(f) .......... 3, 6

### MISCELLANEOUS

Proclamation No. 10973, *Restriction on Entry of Certain Nonimmigrant Workers*,
90 Fed. Reg. 46027 (Sept. 24, 2025) .......... 3, *passim*

## INTEREST OF *AMICUS CURIAE*[1]

The Federation for American Immigration Reform ("FAIR") is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C. FAIR's mission is to advocate for immigration policy that is in America's best interests. FAIR has been involved in hundreds of legal cases since 1980with the aim of advancing this mission.

The decision in this case, which concerns the imposition by the President of a $100,00 fee on H-1B visas, will impact the ability of the federal government to protect American workers. FAIR thus has a direct and vital interest in the outcome of this case.

## SUMMARY OF ARGUMENT

The Immigration and Naturalization Act (INA) grants the President the broadest possible authority to suspend the entry of aliens or impose restrictions on their entry. The only prerequisite to the President's exercise of this authority is that he issue a proclamation finding that the entry of a given alien or class of aliens would be detrimental to the interests of the United States. Here, the President found that the entry of excessive foreign workers under the H-1B

[1] Both parties have consented to the filing on this *amicus* brief. No counsel for any party authored this brief in whole or in part and no person or entity, other than *amicus curiae*, its members, or its counsel, has contributed money that was intended to fund preparing or submitting the brief.

program was detrimental to the interests of the United States because it harmed American workers, and that it was thus appropriate to charge a $100,000 fee for each H-1B visa.

Because the President is not an agency, the Administrative Procedure Act (APA) does not apply to the action he took here. The APA, likewise, does not apply to actions of subordinate executive officers to implement the President's proclamation. When such subordinates act pursuant to an order of the President issued under authority conferred on him by statute, their actions, too, are presidential actions immune from APA review. The case the district court relied on is not to the contrary, because it concerned executive orders that were not issued pursuant to the President's statutory authority, but (apparently) merely his implicit removal authority.

In any event, even if the President's judgment that excessive H-1B workers are detrimental to the interests of the United States were subject to judicial scrutiny, the President's judgment would clearly meet the statutory standard. The United States faces an immigration crisis caused, in part, by the H-1B nonimmigrant visa program. Most alien H-1B guestworkers are employed in computer occupations, and the number of H-1B workers imported each year exceeds the number of computer jobs created in the entire country. The saturation

of the job market with foreign workers creates unacceptably high unemployment for American graduates and the displacement of experienced Americans.

## ARGUMENT

### I. The President's Proclamation and the agencies' implementing guidance and memoranda are unreviewable.

The INA gives the President sweeping authority to control the entry of aliens as he sees fit. Specifically, under 8 U.S.C. § 1182(f), the President, when he "finds that the entry of any alien or of any class of aliens … would be detrimental to the interests of the United States" may "by proclamation … impose on the entry of any alien *any restriction* he may deem to be appropriate." (emphasis added). As the Supreme Court has noted, this provision "exudes deference to the President in every clause." *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). The "sole prerequisite" of this this provision is a presidential finding that the entry of given aliens "would be detrimental to the interests of the United State." *Id.* at 685. This finding of detriment to the national interest is at most subject to merely rational-basis review. *Id.* at 704-06.

Exercising his authority under 8 U.S.C. § 1182(f), President Trump issued Proclamation 10973 (published at 90 Fed. Reg. 46027), finding that excessive entries to the United States under the H-1B visa program were detrimental to the interests of the United States because they adversely affected American workers,

and imposed a $100,000 fee on new H-1B admissions to restrict H-1B visas to highly skilled workers.

This exercise of authority by the President to impose conditions on entry pursuant to the INA is not subject to review under the APA. The APA applies only to final agency actions. *E.g. Lincoln v. Vigil*, 508 U.S. 182, 190–92 (1993); *Webster v. Doe*, 486 U.S. 592, 599 (1988). The President, though, is not an agency, and thus his actions are not agency actions at all, let alone final agency actions. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992). *See also, e.g., Tulare Cty. v. Bush,* 185 F. Supp. 2d 18, 28 (D.D.C. 2001) ("A court has subject-matter jurisdiction to review an agency action under the APA only when a final agency action exists. Because the President is not a federal agency within the meaning of the APA, presidential actions are not subject to review pursuant to the APA.") (citing *Dalton v. Specter,* 511 U.S. 462, 470 (1994)) (other internal citations omitted).

The district court side-stepped the question of whether the President's Proclamation and the $100,000 restriction are reviewable under the APA, but then concluded that the agency guidance implementing the Proclamation violated the APA. ER-19–25. This conclusion was error.

Because Presidents must always act through subordinates, whether an action is that of the President or the head of an agency, for purposes of APA

reviewability, hinges not on whether agency personnel help perform a given action, but on whether the authority to take that action is presidential or delegated by Congress to an agency. As the U.S. District Court for the District of Columbia has explained:

> [A]n unreviewable presidential action must involve the exercise of discretionary authority vested in the President; an agency acting on behalf of the President is not sufficient by itself. Since the Constitution vests the powers of the Executive Branch in one unitary chief executive officer, *i.e.*, the President, an agency always acts on behalf of the President. Nonetheless, there is a difference between actions involving discretionary authority delegated by Congress to the President and actions involving authority delegated by Congress to an agency. Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action. However, "[w]hen the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001).

*Detroit Int'l Bridge Co. v. Gov't of Can.,* 189 F. Supp. 3d 85, 101-04 (D.D.C. 2016).

In concluding otherwise, the district court relied on *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024), which held that an agency action is not immune from APA review simply because it adopts a policy decision issued by the President in an executive order. *Id.* at 15-16; *see also* ER-22 ("[n]o language in the APA prevents or excepts review of an agency action that implements a presidential *action*") (quoting *Su*, 121 F.4th at 15) (emphasis by district court); ER-20–22 (discussing

*Su*). But this case is distinguishable from *Su*. In *Su*, the court looked "at whether the [federal statute] authorize[d] the minimum wage mandate" set forth in the President's executive order. *Su*, 121 F.4th at 11. The court found that "[n]one of [the federal statutes at issue] give the President authority to issue the minimum wage mandate." *Id.* Here, in contrast, 8 U.S.C. § 1182(f) clearly gives the President the authority to "suspend the entry … or impose on the entry of aliens any restrictions he may deem to be appropriate." Under this statute, the President clearly is empowered to impose restrictions such as the $100,000 fee on H-1B visas.

In short, in issuing the guidance and memoranda, the agencies carried out an order that the President issued under his statutory authority. Thus, the agencies' actions, too, were presidential actions unreviewable under the APA.

## II. Even if the Proclamation were subject to judicial scrutiny, it would clearly meet the statutory standard.

While Proclamation 10973 lacks citations to sources, every grim claim it makes is easily verifiable. Thus, even under the false premise that a proclamation made under 8 U.S.C. § 1182(f) is judicially reviewable, the facts conclusively support the findings made in support of Proclamation 10973.

The President found that "abuses of the H-1B program present a national security threat by discouraging Americans from pursuing careers in science and technology, risking American leadership in these fields." 90 Fed. Reg. at 46028.

The available data clearly supports such a finding. The majority of H-1B beneficiaries are in computer occupations. *Characteristics of H-1B Specialty Occupation Workers*, USCIS, Apr. 25, 2025, p. 9.[2] In fiscal year 2024, about 255,000 H-1B visas were approved for computer workers. *Id*. at 10. This figure has no basis in economic need.

The saturation of the computer job market by H-1B and other similar programs has had a devastating impact on recent graduates. Recent computer science graduates have an unemployment rate of 7.0% and recent computer engineering graduates are u/nemployed at a rate of 7.8%. Federal Reserve Bank of New York, *The Labor Market for Recent College Graduates*, Feb. 4, 2026 (based on data from 2024).[3] These unemployment rates are more than double that of accounting (2.6%) or civil engineering (2.3%) majors. *Id*. When the H-1B program is importing more than enough foreign workers to fill every new computer job in the country, the massive unemployment for Americans in that field is a natural consequence, and that job environment is likely to discourage Americans from pursuing study in that field. *E.g.*, Erica Blom *et al.*, *Investment over the Business*

[2] Available at: https://www.uscis.gov/sites/default/files/document/reports/ola_signed_h1b_characteristics_congressional_report_FY24.pdf (last visited Nov. 10, 2026).

[3] Available at: https://www.newyorkfed.org/research/college-labor-market#--:explore:outcomes-by-major (last visited Nov. 10, 2026); *see also* 90 Fed. Reg. at 46027.

*Cycle: Insights from College Major Choice*, IZA Discussion Paper No. 9167, July 2015 (explaining that, when unemployment rises, students tend to shift into fields that historically have better employment prospects). Right now, 25% of unemployed Americans have four-year college degrees, the highest percentage since tracking began. Matthew Boesler, *Americans With Four-Year Degrees Now Comprise a Record 25% of Unemployed Workers*, Bloomberg, Nov. 21, 2025.

Likewise, Proclamation 10973 quotes a study (without citation) that found H-1B workers are paid 36% less than Americans. 90 Fed. Reg. at 46027. Indeed, a study supports that assertion. Daniel Costa & Ron Hira, *H-1B visas and prevailing wage levels, Economic Policy Institute*, May 4, 2020. This is consistent with a plethora of other studies finding H-1B workers are paid substantially less than Americans. *E.g.*, Crisil, *Bulging staff cost, shrinking margins*, May 2019 (finding local workers cost 25–30% more than H-1B workers); Thomas Bourveau *et al., H-1B Visas and Wages in Accounting: Evidence from Big 4 Payroll and the Ethics of H-1B Visas*, Journal of Business Ethics (2024). Proclamation 10973 states that "[o]ne software company was approved for over 5,000 H-1B workers in FY 2025; around the same time, it announced a series of layoffs totaling more than 15,000 employees." 90 Fed. Reg. at 46027-28. Microsoft received 5,198 H-1B visas in fiscal year 2025. Maham Javaid & Adrián Blanco Ramos, *Where H-1B visa holders are from, who hires them and what they earn*, Washington Post, Sept. 24,

2025. Microsoft had laid off over 15,000 employees during that time period. Jim Edwards, *Microsoft lays off 9,000 in AI drive, bringing total job cuts to 15,000 this year*, Fortune, July 2, 2025. The proclamation also states that "[o]ne other IT firm was approved for nearly 1,700 H-1B workers in FY 2025; it announced it was laying off 2,400 American workers in Oregon in July." 90 Fed. Reg. 46028. Indeed, Intel announced it was laying off 2,400 Americans in Oregon. Allison Frost, *Mass Intel layoffs will hit Oregon economy hard*, Oregon Public Radio, July 24, 2025. Likewise, Intel received 1,698 H-1B visas in FY 2025. Economic Times, *Amazon leads H-1B visa approvals in early 2025*, Sept. 27, 2025.

The proclamation describes the direct displacement of Americans by H-1B workers, and how the Americans have had to train their foreign replacements. 90 Fed. Reg. at 46028. Replacements of Americans by H-1B workers on a massive scale have been extensively documented. *E.g.*, Reuters, *Lawmakers seek answers from major US firms over H-1B visa use amid layoffs*, Sept. 25, 2025 (Members of Congress questioned why Apple, Amazon, and JP Morgan were laying of thousands of Americans while hiring thousands of H-1B workers.); Julia Preston, *Laid-Off Americans, Required to Zip Lips on Way Out, Grow Bolder*, NY Times, June 11, 2016 (describing Americans replaced by H-1B workers at Abbott Labs and Eversource Energy).

The restriction on H-1B workers imposed by Proclamation 10973, moreover, is eminently reasonable. Rather than imposing a total ban on H-1B visas, as permitted under 8 U.S.C. § 1182(f), the Proclamation attempts to limit such visas only to workers who truly are highly skilled and thus will "supplement" the U.S. workforce. 90 Fed. Reg. at 46027. The obvious way to separate the wheat from the chaff flowing into the labor market is to impose a fee.

It is not as though the companies cannot afford it. Amazon currently is the largest user of H-1B visas. Harriet Torry *et al*. *Who Uses H-1B Visas the Most, in Charts*, Wall Street Journal, Sept. 30, 2025. Amazon's CEO was compensated $40.1 million in 2024. Amazon, Notice of 2025 Annual Meeting.[4] The disputed H-1B fee amounts to less than one fourth of one percent of Amazon's CEO compensation in that year.

The story is the same among the top U.S. employers of H-1B workers. In 2025, Microsoft's CEO was compensated $96.5 million. Jessica Coacci, *Microsoft CEO Satya Nadella's pay hits a record $96.5 million*, Fortune, Oct. 22, 2025. Apple's CEO compensation was $74.6 million in 2025. Apple, Inc., Proxy Statement Pursuant to Section 14(a), p. 61. And million-dollar salaries are not uncommon among senior technology workers in the United States. *E.g.*, Anna

[4] Available at: https://s2.q4cdn.com/299287126/files/doc_financials/2025/ar/Amazon-2025-Proxy-Statement.pdf (last visited Jan. 4, 2026).

Tong & Kenrick Cai, *OpenAI, Google and xAI battle for superstar AI talent, shelling out millions*, Reuters, May 21, 2025; Times of India, *Microsoft salary packages leaked: From entry-level to multi-million dollar paychecks,* Aug. 2, 2025 (top level engineers can earn $2.7 million a year). By industry compensation standards, the $100,000 fee is entirely reasonable to restrict H-1B visas to highly skilled workers that supplement—rather than displace—American workers.

## CONCLUSION

For the foregoing reasons, the judgement below should be reversed.

Dated: November 13, 2026

Respectfully submitted,

/s/ Christopher J. Hajec

Christopher J. Hajec
Matt A. Crapo
Federation for American Immigration Reform
25 Massachusetts Ave., N.W., Ste. 330
Washington, D.C. 20001
(202) 328-7004
chajec@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## CERTIFICATE OF COMPLIANCE

1. The foregoing brief complies with the type-volume limitation of FED. FED. R. APP. P. 29(a)(5) because this brief contains 2,449 words, including footnotes, but excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Christopher J. Hajec

**CERTIFICATE OF SERVICE**

I certify that on November 13, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. All parties were served electronically through the ACMS system.

/s/ Christopher J. Hajec